ERIC P. ISRAEL (State Bar No. 132426)
*eisrael@DanningGill.com*
DANNING, GILL, ISRAEL & KRASNOFF, LLP
1901 Avenue of the Stars, Suite 450
Los Angeles, California 90067-6006
Telephone: (310) 277-0077
Facsimile: (310) 277-5735

Attorneys for Jeffrey I. Golden, Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>JAMIE LYNN GALLIAN,<br><br>      Debtor. | Case No. 2:21-bk-11710-SC<br><br>Chapter 7<br><br>**CHAPTER 7 TRUSTEE'S NOTICE OF MOTION AND MOTION FOR ORDER COMPELLING DEBTOR AND ANY OTHER OCCUPANTS TO VACATE AND TURN OVER MANUFACTURED HOME AND AUTHORIZING ISSUANCE OF WRIT OF ASSISTANCE; MEMORANDUM OF POINTS OF AUTHORITIES, DECLARATION OF JEFFREY I. GOLDEN AND REQUEST FOR JUDICIAL NOTICE**<br><br>Date:        March 4, 2025<br>Time:       11:00 a.m.<br>Ctrm:      5C<br>Location:  411 W. 4TH STREET<br>             SANTA ANA, CA |

1   **TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY**

2   **JUDGE AND INTERESTED PARTIES:**

3          PLEASE TAKE NOTICE that on March 4, 2025, at 11:00 a.m., in Courtroom "5C" of the

4   United States Bankruptcy Court, for the Central District of California, located at 411 W. Fourth

5   Street, Santa Ana, California, Jeffrey I. Golden, the Chapter 7 trustee (the "Trustee") for the

6   bankruptcy estate (the "Estate") of Jamie Lynn Gallian (the "Debtor"), will and hereby does move

7   the Court (the "Motion") under 11 U.S.C. §§ 521 and 541, for an order directing the Debtor and any

8   other occupants to vacate and turnover to the Trustee the property described as a 2014 Skyline

9   Custom Villa manufactured home, decal no. LBM1081 (the "Property") currently located at 16222

10  Monterey Lane, Space #376, Huntington Beach, California 92649 (the "Space").

11         This Motion is based upon this Notice of Motion and Motion, the attached Memorandum of

12  Points and Authorities, the Declaration of Jeffrey I. Golden and Request for Judicial Notice; the sale

13  motion filed contemporaneously herewith; the papers and pleadings in the Debtor's bankruptcy case

14  and related adversary proceedings; and such other evidence that may be presented at the hearing.

15         Contemporaneously herewith, the Trustee is filing a motion to sell the Property (the "Sale

16  Motion"). The Trustee incorporates by reference all of the evidence and arguments in support of the

17  Sale Motion.

18         **PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-1(f),

19  each interested party opposing, joining in or responding to the Motion must, not less than **14 days**

20  before the date of the hearing, file with the Clerk of the Bankruptcy Court and serve upon the

21  Trustee's general counsel, Eric P. Israel, Esq., 1901 Avenue of the Stars, Suite 450, Los Angeles,

22  California 90067, and the United States Trustee, 411 W. 4th Street, Suite 7160, Santa Ana,

23  California, either: (i) a complete written statement of all reasons in opposition thereto or in support

24  or joinder thereof, declarations and copies of all photographs and documentary evidence on which

25  the responding party intends to rely, and any responding memorandum of points and authorities; or

26  (ii) a written statement that the Motion will not be opposed.

27  / / /

28  / / /

1      Pursuant to Local Bankruptcy Rule 9013-1(h), failure to timely file and serve papers may be

2  deemed by the Court to be consent to the granting of the Motion.

3

4  DATED:  January 3, 2025              DANNING, GILL, ISRAEL & KRASNOFF, LLP

5

6                                      By: _____

7                                          ERIC P. ISRAEL
                                           Attorneys for Jeffrey I. Golden, Chapter 7 Trustee
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

Jeffrey I. Golden, the Chapter 7 trustee (the "Trustee") for the bankruptcy estate (the "Estate") of Jamie Lynn Gallian ("Debtor"), seeks an order compelling the Debtor and any other occupants to turnover to the Trustee the 2014 Skyline Custom Villa manufactured home, decal no. LBM1081 (the "Property") currently located at 16222 Monterey Lane, Space #376, Huntington Beach, California 92649 (the "Space"). The Trustee is not confident that Debtor will timely vacate the Property, given the Debtor's efforts to obstruct the administration of the Property to date. Concurrently herewith, the Trustee is filing a motion to sell the Property. The Trustee requires an enforceable order granting possession to give assurances to the buyer that possession of the Property can be delivered upon the close of the sale.

**1.     Summary of Argument**

A Chapter 7 debtor has a duty to turn over possession of estate property to his or her trustee so that it may be liquidated for the benefit of creditors. The Trustee has marketed the Property and found a buyer at a sales price of $275,000.00. The sale, if approved, would be beneficial to the Estate and would allow for payments of administrative claims and distributions to unsecured creditors. The buyer, however, needs assurances that the Buyer will actually be able to take possession of the Property upon closing. In this case, the Debtor has repeatedly endeavored to obstruct Estate administration, at one point retaining her own agent to market and sell the Property, filing a second bankruptcy case, and recently threatening on December 13, 2024, to remove the Property from the Space as quickly as possible. To ensure that the sale of the Property closes smoothly and timely, the Trustee files this motion seeking an order of the Court for possession of the Property, which can be enforced by the United States Marshals Service ("Marshals") if necessary. Contemporaneously herewith, the Trustee is filing a motion to confirm the sale of the Property (the "Sale Motion"). Unless otherwise noted, references below are to the evidence attached to the Sale Motion.

## II.

### FACTUAL BACKGROUND

A. **Bankruptcy Background**

On July 9, 2021 (the "Petition Date"), Jamie Lynn Gallian (the "Debtor") filed a voluntary petition for relief under Chapter 7 of title 11 of the United States Code (the "Case"). Jeffrey I. Golden accepted appointment as the Trustee for the Debtor's estate (the "Estate") and continues to serve in that capacity.

Pursuant to an order entered on or about June 1, 2022, the Trustee retained the law firm of Danning, Gill, Israel, and Krasnoff, LLP ("Danning-Gill") as his general bankruptcy counsel. *Docket no. 108.* Effective as of February 1, 2025, the primary attorney at Danning-Gill who has been handling this file, Eric P. Israel, is leaving Danning-Gill and joining the firm of Levene, Neale, Bender, Yoo & Golubchik, L.L.P. The Trustee will be filing an application to employ the Levene Neale firm as his successor counsel and file an employment application thereon.

Pursuant to an order entered on or about September 5, 2024, the Trustee retained Coldwell Banker Realty ("Coldwell Banker") (agents William Friedman and Greg Bingham) as the Trustee's real estate broker to list, market and aid the Trustee in selling the Property described below (*docket no. 431*). A copy of the order employing Coldwell Banker is attached to the Sale Motion as Exhibit "2".

B. **The Debtor's Schedules**

The Debtor has amended her schedules at least 13 times to date.[1] In her original schedules, she valued the Property at $235,000 and disclosed that title to the Property was vested in J-Sandcastle, LLC on the Petition Date, of which she was its sole member and its managing member. *Docket no. 1.* The Debtor's schedules further disclosed that the Property was subject to a lien in favor of J-Pad, LLC, and that she was its managing member. *Id.* A copy of pertinent pages from those schedules are attached to the Sale Motion as Exhibit "3". The Debtor later claimed a homestead exemption in the Property in the amount of $600,000. *Docket no. 72, p. 20.*

---

[1] *See docket nos. 15, 16, 17, 22, 37, 38, 39, 42, 72, 75, 94, 444, 468 and 519.*

1  As noted below, the Trustee commenced an adversary proceeding and recovered title to the

2  Property and avoided and preserved all of the consensual liens.

3  C.  **The Manufactured Home at Issue**

4  1.  The Property

5  On the Petition Date, the registered title owner of the manufactured home located at 16222

6  Monterey Lane, Space #376, Huntington Beach, California 92649 (the "Property"), was vested in J-

7  Sandcastle Co, LLC ("J-Sandcastle"). *Docket no. 468 (*Exhibit "3" to the Sale Motion*).* The Debtor was

8  not on title to the Property on the Petition Date.

9  2.  Liens Against the Property

10  The Property is subject to a consensual lien on the Property in favor of J-Pad, LLC ("J-Pad") in

11  the amount of $225,000, plus interest, and other voluntary liens and transfers in favor of the Debtor's

12  family members, ex-husband, and a former roommate as discussed below. *Docket no. 468.* As noted

13  below, the Trustee commenced an adversary proceeding and recovered title to the Property and

14  avoided and preserved all consensual liens thereon.

15  The following two judgment liens were also recorded against the Debtor (collectively the

16  "Abstracts of Judgment"):

17  a.  An abstract of judgment recorded on or after December 18, 2021, in favor of Janine

18  Jasso, Jennifer Paulin, Lori Burrett, Lee Gragnano, Lindy Beck, and Ted Phillips (collectively the

19  "Jasso Parties") in the sum of "at least $64,049.66 (not including additional interest, fees and other

20  costs)". See proof of claim no. 4-1 (Exhibit "9" to the Sale Motion); and

21  b.  A series of abstracts of judgment recorded on or about May 3, 2019, May 16, 2019,

22  and November 18, 2019, in favor of The Huntington Beach Gables Homeowners Association

23  ("Gables") in the sum of "at least $510,742.55 (not including additional interest, fees and other

24  costs)". See proof of claim no. 1-1 (Exhibit "10" to the Sale Motion).

25  As discussed in the Sale Motion, abstracts of judgment do not reach a manufactured home,

26  which is personal property – not real property. Moreover, title was not vested in the Debtor at the

27  time, and the avoided lien is senior to those Abstracts of Judgments.

28

1785058.3 27046

3.     The First Objection to the Debtor's Homestead Exemption, Appeal and Remand

On or about May 12, 2022, Houser Bros. Co., dba Rancho Del Rey Mobile Home Estates, the homeowners association for the manufactured home park that includes the Space ("Houser Bros."), filed its Motion Objecting to Debtor's Claimed Homestead Exemption (the "Exemption Motion") (*docket no. 95*).  The hearing on the Exemption Motion was held on June 2, 2022, and continued to July 21, 2022.  At the continued hearing, the Court granted the Exemption Motion and disallowed any claim of exemption by the Debtor in the Property.

On or about July 26, 2022, the Debtor filed her Motion for Reconsideration from the Court's July 21, 2022, ruling (the "Motion for Reconsideration") (*docket no. 157*).  The order granting the Exemption Motion was thereafter entered on or about August 5, 2022 (*docket no. 177*).  The hearing on the Motion for Reconsideration was held on September 22, 2022, and the Court took the matter under submission.

On or about December 19, 2022, the Court entered its order granting the Debtor's Motion for Reconsideration, finding that the Debtor was entitled to a homestead exemption in the Property (even though she was not on title) in the amount of $600,000 (the "Order Granting the Motion for Reconsideration") (*docket no. 274*).

On or about December 29, 2022, Houser Bros. appealed the Order Granting the Motion for Reconsideration to the District Court (*docket no. 280*).

On or about November 1, 2023, the District Court entered an order that reversed and remanded the Order Granting the Motion for Reconsideration on the grounds that the Court did not make findings regarding the Debtor's interest in the Property including whether "Gallian ever acquired (and retained) an equitable interest in the Property" (the "Reversal and Remand Order") (*docket no. 387*).

On or about May 15, 2024, the Court entered a further order after remand (the "Remand Order") (*docket no. 393*).  The Remand Order again found "that Debtor held a sufficient equitable interest in the Property to claim an automatic homestead exemption under Cal. Civ. Proc. Code § 704.720(a)."

Houser Bros. did not appeal the Remand Order, which is now final.

4.    <u>The Objection to the Debtor's Latest Exemption Claim</u>

On or about December 3, 2024, the Debtor amended her claim of exemption yet again. *Docket no. 519.* The Second Exemption claimed an exemption in the ground lease for the "pad" (the "Ground Lease"). A copy of that amendment is attached to the Sale Motion as Exhibit "4".

Houser Bros. timely objected to that amended exemption claim. *Docket no. 529.* The Trustee joined in that objection (*docket no. 533*), as did Gables (*docket no. 531*). The hearing on that motion is set for February 4, 2025, at 11:00 a.m.

The Ground Lease was never assumed, and hence was deemed rejected long ago. 11 U.S.C. § 356(d)(1). In any event, the Trustee is not proposing via the Sale Motion to sell or assume and assign the Ground Lease. Houser has agreed to issue a new ground lease to a new qualified buyer – but not the Debtor.

D.    <u>**Trustee's Avoidance and Recovery of Transfers of Title and Liens on the Property**</u>

On or about June 30, 2023, the Trustee commenced an adversary proceeding, adv. No. 8:23-ap-01064-SC, by filing a *Complaint: (1) to Avoid and Recover Fraudulent Transfers; (2) to Avoid and Recover Postpetition Transfers; (3) for Declaratory Relief; (4) for Breach of Contract; (5) for Money Had and Received; and (6) Unjust Enrichment* ("Complaint") against Ronald J. Pierpont, J-Pad LLC, J-Sandcastle Co., LLC, Steven D. Gallian, Brian J. Gallian, Justin Barclay, Robert J. McLelland, and E. J. Gallian (collectively the "Defendants").

1.    <u>**Stipulated Judgments**</u>

Pursuant to stipulations with defendants Steven D. Gallian, Brian J. Gallian, Justin Barclay and E. J. Gallian (collectively the "Family Defendants"), a stipulated judgment was entered against the Family Defendants on or about October 3, 2023 (*adv. docket no. 47*). The judgment against the Family Defendants avoided the liens on the Property in favor of the Family Defendants (the "Stipulated Family Defendants Judgment"). The judgment also preserved those liens for the benefit of the Debtor's estate pursuant to 11 U.S.C. § 551. A copy of the Stipulated Family Defendants Judgment is attached to the Sale Motion as Exhibit "5".

Pursuant to a stipulation with defendant Robert J. McLelland ("Mr. McLelland") (*adv. docket no. 52*), a stipulated judgment was entered against Mr. McLelland on or about March 29, 2024 (*adv.*

1    *docket no.* 66) (the "McLelland Stipulated Judgment"). The judgment against Mr. McLelland also

2    avoided his lien on the Property. The judgment also preserved his lien for the benefit of the Debtor's

3    estate pursuant to 11 U.S.C. § 551. A copy of the McClelland Stipulated Judgment is attached to the

4    Sale Motion as Exhibit "6".

5         2.    **Default Judgments**

6         Pursuant to motions for default judgment filed by the Trustee with respect to defendants, J-

7    Pad, J-Sandcastle, and Ronald J. Pierpont (collectively the "Defaulting Defendants"), default

8    judgments were entered against the Defaulting Defendants on or about May 10, 2024 (*adv. docket*

9    *nos.* 79, 81 and 83) (collectively the "Defaulting Defendants Judgments"). Copies of the Defaulting

10   Defendants Judgments are attached to the Sale Motion collectively as Exhibit "7".

11        The default judgment against J-Sandcastle avoided and preserved the Debtor's transfers of

12   title of the Property to J-Sandcastle and recovered legal title to and the beneficial interest in the

13   Property for the Debtor's bankruptcy estate in the name of the Trustee. The Debtor's schedules

14   disclosed that the Debtor was the sole member of J-Sandcastle.

15        The default judgment against defendant J-Pad avoided J-Pad's lien on the Property in the

16   amount of $225,000 and other liens on the Property in favor of J-Pad. The judgment also preserved

17   those liens for the benefit of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 551. The

18   Debtor's schedules disclosed that the Debtor was the sole member of J-Pad.

19        The default judgment against defendant Ronald J. Pierpont determined that Mr. Pierpont does

20   not have any interest in the Property. It also avoided his liens on the Property and preserved those

21   liens for the benefit of the Debtor's estate pursuant to 11 U.S.C. § 551.

22        As a result of the above, title to the Property has been restored to the Estate, and the Property is

23   property of the Estate. In addition, the consensual lien in the original principal sum of $225,000 in favor

24   of J-Pad on the Property, and the other consensual liens and interests on the Property in favor of the

25   Family Defendants, Mr. Pierpont and Mr. McLelland, have been avoided and preserved for the

26   benefit of the Debtor's estate in the Trustee's name.

27        Although the Debtor has been allowed a homestead exemption in the Property, such

28   exemption is only payable from any equity following consensual liens, which liens include the

1    avoided and preserved J-Pad lien.  *See* Cal. Code Civ. P. § 703.010.  Exemptions may be claimed

2    only against involuntary liens, such as judgments, attachments and execution liens, and then only if

3    the procedures of section 522(f) are followed.  *Id.*  Thus, the consensual liens on the Property come

4    ahead of any allowed amount of the Debtor's homestead exemption.  *See In re Roach*, 2019 WL

5    408628, at *3-5 (B.A.P. 9th Cir. 2019)[2]; *see also In re Bunn-Rodemann*, 491 B.R. 132, 134-35

6    (Bankr. E.D. Cal. 2013).  To date, the Debtor has not succeeded on a 522(f) motion, but those

7    involuntary liens are junior to the avoided consensual liens in any event.

8         The Trustee contends that notwithstanding the Debtor's allowed homestead exemption, that

9    he is in a position to sell the Property for the benefit of the Estate and creditors.  Specifically, the

10   Trustee avoided and preserved the transfer of title to J-Sandcastle, the consensual J-Pad lien in the

11   amount of $225,000 plus interest and other liens.  The payoff on the J-Pad avoided lien is now

12   approximately $301,000.  This amount and the other avoided liens are senior to the Debtor's

13   homestead exemption.  As such, any distribution from the sales proceeds must be paid to the Trustee

14   first in connection with the consensual liens, and prior to any amount that the Debtor may be entitled

15   to in connection with her homestead exemption.

16        For example, the avoided and preserved consensual J-Pad lien of $225,000.00, plus interest,

17   which amount with interest the Trustee calculates to be not less than $301,011.14[3], as of January 9,

18   2025, at the contract interest rate of 5.5% (daily interest continues to accrue at $33.90 per day) must

19   be paid before any other junior liens and the Debtor's homestead exemption.  Because most if not all

20   of the sales proceeds will be exhausted by the consensual liens that the Debtor recorded against the

21   Property, including the J-Pad lien, absent significant overbidding, it is anticipated that there will be

22   no proceeds available to pay to the Debtor on account of her exemption.

23

24

25

———————————————————

26

27   [2] A copy of *Roach* is attached to the Sale Motion as Exhibit "12".

     [3] As of January 9, 2025, at the contract interest rate of 5.5% (daily interest continues to accrue at
28   $33.90) per day.

1    E.    **Marketing Efforts**

2        An order approving the Trustee's employment of Coldwell Banker to sell the Property and

3    approving the listing agreement was entered on or about September 5, 2024. *Docket no. 431*

4    (Exhibit "2" to the Sale Motion). The listing price was $320,000. With the aid of the broker, the

5    Trustee has marketed the Property for sale, and the Buyer's offer is the best and only offer that the

6    Trustee has received to date. The Buyer has conducted all due diligence that it needs to close the

7    sale. The only remaining requirement to close the sale is Court approval, subject to qualified

8    overbids made at the sale hearing.

9    F.    **Denial of the Debtor's Discharge and Appeal**

10        On or about October 18, 2021, Houser Bros. filed a complaint under 11 U.S.C.§ 727 to deny

11    the Debtor's discharge, adversary no. 8:22-ap-01097-SC. *Adv. docket no. 1.* Pursuant to an order

12    entered on or about May 23, 2023, the Court denied the Debtor's discharge (the "Discharge

13    Judgment"). *Adv. docket no. 81.*

14        The Debtor appealed that ruling to the United States District Court, which affirmed the

15    Discharge Judgment. *Adv. docket no. 131.* No further appeal was taken therefrom.

16    G.    **Insurance Placed on the Property**

17        The Trustee was unable to confirm that the Property was insured, and as a result obtained

18    insurance from Trustee Insurance Services ("TIS"). As of this time, TIS is owed $1,691.80 for

19    insurance premiums, plus $409.20 per month thereafter (collectively the "Insurance Advances").

20    The Trustee requests authority to pay TIS the Insurance Advances from the sale proceeds.

21    H.    **The Trustee's Marketing of the Property, and the Debtor's Efforts to Obstruct the Sale**

22        Shortly after entry of the order employing the Broker, the Property was listed for sale at

23    $320,000. The Trustee has received one offer for the Property, the offer at bar in the Sale Motion

24    for $275,000.00. The Trustee continues to market the Property for overbids otherwise.

25        Before the Trustee was able to list the Property for sale, on or about August 27, 2024, the

26    Debtor filed a Motion to Avoid Lien under 11 U.S.C. § 522(f), which the Court denied by order

27    entered on or about October 22, 2024 (*docket nos. 422, 474*). That motion sought to collaterally

28    challenge the Trustee's final judgments avoiding various transfers by the Debtor.

1    On or about September 9, 2024, the Debtor filed another voluntary petition for relief – this

2    one under Chapter 13 of the Bankruptcy Code, which was assigned case no. 8:24-11267-SC (the

3    "Chapter 13 Case"). The Chapter 13 Case was dismissed on or about October 21, 2024. *Chapter 13*

4    *Docket no. 38.*

5    On or about September 11, 2024, the Debtor filed a motion to convert this Case to Chapter

6    13. *Docket no. 438.* Pursuant to an order entered on or about October 29, 2024, the Court denied

7    the Debtor's motion to convert. *Docket no. 491.*

8    The Debtor further retained real estate agent Joseph Arroyo to market and sell the Property,

9    which was property of the Estate. The Court accordingly entered an Order to Show Cause Why

10    Debtor and Joseph Arroyo Should Not Be Found in Contempt of Court on September 12, 2024

11    (*docket no. 440*). After the Debtor withdrew the listing and agreed on the record to comply with her

12    duties under the Bankruptcy Code to cooperate with the Trustee's efforts to list, market, and sell the

13    Property, the Court entered an Order on Order to Show Cause Why Debtor and Joseph Arroyo

14    Should Not Be Found in Contempt of Court (*docket no. 495*).

15    On or about December 13, 2024, the Trustee was copied on the following two emails in

16    which the Debtor advised:

17    "Gentlemen, I am making arrangements to remove the 2014 Skyline Manufactured Home

18    from the Rancho Del Rey Park and will inform you where it will be stored.." A copy of this email is

19    attached to the Golden Declaration appended hereto as Exhibit "1".

20    "Please accept this as Notice the home will be removed from the park as quickly as possible

21    to avoid accruing any further accrual of rent." A copy of this email is attached to the Golden

22    Declaration appended hereto as Exhibit "2".

23    On or about December 17, 2024, the Trustee was copied on an email in which the Debtor

24    advised: "In keeping with the spirit of the holidays, I respectfully request any Home Inspections

25    and Termite Inspections be continued after January 2, 2025." A copy of this email is attached to the

26    Golden Declaration appended hereto as Exhibit "3".

27    On or about January 1, 2025, the Trustee was copied on an email in which the Debtor

28    advised: "I came home sick with the flu from work. Fever with severe headache and body aches

1    and bronchitis.  I will be in bed resting due to the severe pain and migraine headaches.  Please

2    inform your broker of the circumstances."  A copy of this email is attached to the Golden

3    Declaration appended hereto as Exhibit "4".

4          In sum, the Debtor has generally impeded the Trustee's attempts to administer the Property.

5    ### III.

6    ### LEGAL ARGUMENT

7          "Except as provided in subsection (c) or (d) of this section, an entity… shall deliver to the

8    trustee, and account for, such property or the value of such property, unless such property is of

9    inconsequential value or benefit to the estate."  11 U.S.C. § 542(a).  Moreover, a debtor has a duty to

10   cooperate with the Trustee and turn over all estate property.  11 U.S.C. § 521(a)(3)-(4).

11       **A.**    **The Property is Property of the Estate.**

12         Section 541(a) of the Bankruptcy Code provides that upon the filing of a bankruptcy case, an

13   estate is created.  11 U.S.C. § 541(a).  The estate is "comprised of all the following property,

14   wherever located and by whomever held: (1) . . . all legal or equitable interests of the debtor in

15   property as of the commencement of the case. . . . (3) Any interest in property that the trustee

16   recovers under section . . . 550 . . . ."  The bankruptcy court has exclusive jurisdiction over property

17   of the estate.  *See* 28 U.S.C. § 1334(e); *Kismet Acquisition, LLC v. Icenhower (In re Icenhower)*, 757

18   F.3d 1044, 1050 (9th Cir. 2014) (court has "exclusive *in rem* jurisdiction" over estate property).

19         As discussed above, the Trustee avoided and recovered title to the Property from J-

20   Sandcastle, and further avoided and recovered the consensual liens against the Property.  The

21   Property is accordingly property of the Estate.

22       **B.**    **The Court has Personal Jurisdiction over the Debtor.**

23         "[T]he district court shall have original and exclusive jurisdiction of all cases under title 11."

24   28 U.S.C. § 1334(a).  A debtor consents to personal jurisdiction of the bankruptcy court by filing a

25   bankruptcy petition.  *Sasson v. Sokoloff (In re Sasson)*, 424 F.3d 864, 870 (9th Cir. 2005) ("The

26   debtor invoked bankruptcy subject matter and *in personam* jurisdiction by filing a voluntary petition

27   in bankruptcy."); *see, e.g., In re Malek*, 591 B.R. 420, 426 (Bankr. N.D. Cal. 2018) ("[Debtor]

28   consented to the equitable jurisdiction of the bankruptcy court by voluntarily filing a bankruptcy

1    petition."); *In re Kasl*, 2009 Bankr. LEXIS 2351 at *10-11 (Bankr. C.D. Cal. January 13, 2009)[4]

2    ("where the debtor voluntarily files a petition, the debtor submits to the personal jurisdiction of the

3    court sitting in the district in which he filed."); *In re Hunt*, 2014 U.S. Dist. LEXIS 189464 at *34

4    (C.D. Cal. July 25, 2014)[5] ("It is axiomatic that a bankruptcy court has personal jurisdiction over a

5    debtor who files a voluntary bankruptcy petition.") (citing *Securities and Exchange Comm'n v. Ross*,

6    504 F.3d 1130, 1149 (9th Cir. 2007)).

7       **C.**      **Property of the Estate Must be Turned over to the Trustee.**

8       Property of the estate must be accounted for and turned over to the trustee. 11 U.S.C.

9    § 542(a). "Bankruptcy Code § 542(a) grants a bankruptcy trustee the power to recover property of

10    the debtor's estate or such property's value." *Shapiro v. Henson*, 739 F.3d 1198, 1199 (9th Cir.

11    2014). Present possession of an interest which constitutes property of the estate is not a prerequisite

12    for the trustee seeking turnover of such property. *Id.* at 1204; *see, e.g., APJL Consulting, LLC v.*

13    *Treasures, Inc. (In re Treasures, Inc.)*, 2015 Bankr. LEXIS 662 at *59 (B.A.P. 9th Cir. 2015)[6]. A

14    Chapter 7 debtor has a statutory duty to "surrender to the trustee all property of the estate and any

15    recorded information, including books, documents, records, and papers, relating to property of the

16    estate." 11 U.S.C. § 521(a)(4); *see Mwangi v. Wells Fargo Bank, N.A. (In re Mwangi)*, 764 F.3d

17    1168, 1174 (9th Cir. 2014) ("...the debtor has a duty to surrender to the trustee all estate property.");

18    *see also Starky v. Birdsell (In re Starky)*, 522 B.R. 220, 227 (B.A.P. 9th Cir. 2014); *see also, Mwangi*

19    *v. Wells Fargo Bank N.A. (In re Mwangi)*, 432 B.R. 812, 818, 822 (B.A.P. 9th Cir. 2010) (estate

20    property must be turned over to trustee; "the failure to return property of the estate with knowledge

21    of the bankruptcy is a violation of both the automatic stay and of the turnover requirements of the

22    Bankruptcy Code.") (*quoting Abrams v. Sw. Leasing & Rental, Inc. (In re Abrams)*, 127 B.R. 239,

23    242-43 (B.A.P. 9th Cir. 1991)).

24

25

---

26

27 [4] A copy of *Kasl* is attached hereto as Exhibit "5".

[5] A copy of *Hunt* is attached hereto as Exhibit "6".

28 [6] A copy of *APL Consulting* is attached hereto as Exhibit "7".

1    The Trustee requests an order of the Court providing a date certain (March 11, 2025) for the

2    Debtor and any occupants to be compelled to vacate the Property, which is enforceable by

3    application of the Trustee if the Debtor refuses to comply.

4    **D.    Procedures for Enforcement of Turnover Order.**

5    Bankruptcy courts have the power to authorize the issuance of a writ of execution or

6    assistance authorizing and directing the Marshals to compel the surrender of real property.  Fed. R.

7    Civ. P. 70 (made applicable to adversary proceedings by Fed. R. Bankr. P. 7070); *In re Kerlo*, 311

8    B.R. 256, 261 (Bankr. C.D. Cal. 2004) ("'a writ of assistance to deliver . . . possession [of real

9    property] . . . was agreeable to the usages and principals of law' and 'clearly lies under the express

10   terms of Fed. R. Civ. P. 70.'") (citing *Hamilton v. McDonald*, 503 F.2d 1138, 1148 (9th Cir. 1974)).

11   Indeed, the Court may issue any order that is necessary and appropriate to carry out the provisions of

12   the Bankruptcy Code.  11 U.S.C. § 105(a).  Section 105 also authorizes the Court to grant a trustee's

13   request for issuance of a writ of assistance.  Specifically, orders for possession of property may be

14   enforced through writs and orders under Section 105(a).  *See Kerlo*, 311 B.R. at 262.

15   As set forth above, good cause exists for the Court to provide the Trustee with the means to

16   enforce any turnover order under Fed. R. Bankr. P. 7070 and authorizing all efforts of the Trustee

17   and the Marshals to enforce the resulting turnover order should enforcement be necessary.  The

18   Trustee further requests that the Court authorize the Clerk of the Court to issue a writ of assistance

19   directing the Marshals to enforce any resulting turnover order, at Trustee's discretion.  Otherwise,

20   the Estate may suffer irreparable harm, especially if the Debtor or any occupants delays or frustrates

21   the closing of a sale of the Property.

**IV.**

**CONCLUSION**

24   The Trustee respectfully requests that the Court enter an order:

25   1.    Granting this Motion;

26   2.    Directing the Debtor and all occupants of the Property to vacate the Property by

27   March 11, 2025 (the "Turnover Deadline");

28

3.    Authorizing the United States Marshals Service to effectuate an eviction of all occupants and turn over possession of the Property to the Trustee or his agents should the Debtor and all occupants fail to vacate the Property by the Turnover Deadline;

4.    Authorizing Trustee and his agents to re-key and secure the Property upon turnover;

5.    Barring and prohibiting the Debtor from returning to the Property;

6.    Entitling the Trustee to enforce such order by issuance of a writ of assistance to the United States Marshals Service pursuant to Local Bankruptcy Rule 7064-1(e), which states as follows:

> Upon execution and entry of this Order, the United States Marshals Service [and any other executing officer authorized by the court] (collectively, the "U.S. Marshal") is immediately directed to assist Trustee to enforce the underlying order awarding possession. Trustee and his authorized agent(s) will act as substitute custodian of any and all items of personal property seized pursuant to this Order and the U.S. Marshal shall have no liability arising from any acts, incidents, or occurrences in connection with the seizure of the personal property located at the subject real property arising in the ordinary authorized scope of duties of the U.S. Marshal (which acts do not include acts arising from negligent or intentional tortious conduct), including any third party claims and the U.S. Marshal shall be discharged of his or her duties and responsibilities for safekeeping of the seized goods. The U.S. Marshal accomplishing such eviction or seizure shall use whatever reasonable force necessary to break open and enter the subject real property regardless of whether the premises or location is locked or unlocked, occupied or unoccupied and to inspect the contents of any room, closet, cabinet, vehicle, container, desk or documents. Anyone interfering with the execution of this Order is subject to arrest by law enforcement officials.

7.    For any such other and further relief as the Court deems just and proper.

DATED: January 3, 2025

DANNING, GILL, ISRAEL & KRASNOFF, LLP

By: _____
ERIC P. ISRAEL
Attorneys for Jeffrey I. Golden, Chapter 7 Trustee

1785058.3  27046

16

# DECLARATION OF

# JEFFREY I. GOLDEN

## DECLARATION OF JEFFREY I. GOLDEN

I, Jeffrey I. Golden, declare as follows:

1.     I am the duly appointed and acting Chapter 7 trustee of the estate of Jamie Lynn Gallian (the "Debtor").

2.     I have personal knowledge of the facts in this declaration, or upon information and belief, and as to such matters I could testify competently thereto.

3.     I make this declaration in support of my motion for a court order compelling the turnover of the 2014 Skyline Custom Villa manufactured home, decal no. LBM 1081 (the "Property") currently located at 16222 Monterey Lane, Space #376, Huntington Beach, California 92649 (the "Space"), which is currently in possession of Debtor (the "Motion"). I believe it is the best exercise of my business judgment to have the Debtor removed from the Property.

4.     Shortly after retaining the Broker, I listed the Property for sale at $330,000. I have received one offer for the Property, consisting after negotiations is for $275,000.00 for which I seek approval via a concurrently filed sale motion (the "Sale Motion"). I continue to market the Property for overbid otherwise.

5.     I incorporate by reference all testimony in my declaration in support of the Sale Motion for this declaration as well.

6.     I am informed that any purchaser of the Property, including the proposed buyer in the Sale Motion, will require that I deliver possession to the Property in connection with closing escrow. To maximize the value of the Property and incentivize overbids, I require an enforceable order for turnover of the Property to ensure that I can deliver possession of the Property and consummate a sale.

7.     I believe that the Debtor has sought to obstruct my administration of the Property by, *inter alia*, hiring her own agent to market the Property, moving to avoid my lien against the Property, filing a second bankruptcy case, and seeking to convert this case.

8.     Also on or about December 13, 2024, I was copied on the following two emails in which the Debtor advised:

"Gentlemen, I am making arrangements to remove the 2014 Skyline Manufactured Home

1    from the Rancho Del Rey Park and will inform you where it will be stored." A true and correct

2    copy of this email is attached hereto, marked as Exhibit "1" and incorporated herein by this

3    reference.

4         "Please accept this as Notice the home will be removed from the park as quickly as possible

5    to avoid accruing any further accrual of rent." A true and correct copy of this email is attached

6    hereto, marked as Exhibit "2" and incorporated herein by this reference.

7         9.    On or about December 17, 2024, I was copied on an email in which the Debtor

8    advised: "In keeping with the spirit of the holidays, I respectfully request any Home Inspections and

9    Termite Inspections be continued after January 2, 2025." A true and correct copy of this email is

10   attached hereto, marked as Exhibit "3" and incorporated herein by this reference.

11        10.   On or about January 1, 2025, I was copied on an email in which the Debtor advised:

12   "I came home sick with the flu from work. Fever with severe headache and body aches and

13   bronchitis. I will be in bed resting due to the severe pain and migraine headaches. Please inform

14   your broker of the circumstances. ." A copy of this email is attached as Exhibit "4".

15        11.   I further request that any turnover order be enforceable by writ of assistance by the

16   United States Marshals Service.

17

18        I declare under penalty of perjury under the laws of the United States of America, that the

19   foregoing is true and correct.

20        Executed on January 3, 2025, at Los Angeles, California,

21

22

23                   JEFFREY I. GOLDEN

24

25

26

27

28

# REQUEST FOR JUDICIAL NOTICE

1

## **REQUEST FOR JUDICIAL NOTICE**

2          Jeffrey I . Golden, solely in his capacity as Chapter 7 trustee ("Trustee") of the bankruptcy

3     estate (the "Estate") of Jamie Lynn Gallian (the "Debtor"), requests pursuant to Rule 201 of the

4     Federal Rules of Evidence, that this Court take judicial notice of the following:

5          1.  Copies of the following unpublished opinions are attached hereto:

6               A.  A copy of *In re Kasl*, 2009 Bankr. LEXIS 2351 at *10-11 (Bankr. C.D. Cal.

7     January 13, 2009) is attached hereto as Exhibit "5".

8               B.  A copy of *In re Hunt*, 2014 U.S. Dist. LEXIS 189464 at *34 (C.D. Cal. July 25,

9     2014) is attached hereto as Exhibit "6".

10              C.  A copy of *APJL Consulting, LLC v. Treasures, Inc. (In re Treasures, Inc.)*, 2015

11    Bankr. LEXIS 662 at *59 (B.A.P. 9th Cir. 2015) is attached hereto as Exhibit "7".

12

13    DATED: January 3| 2025              DANNING, GILL, ISRAEL & KRASNOFF, LLP

14

15                                       By
16
                                            ERIC P. ISRAEL
17                                          Attorneys for Jeffrey I. Golden, Chapter 7 Trustee

18

19

20

21

22

23

24

25

26

27

28

1785058.3  27046

19

# EXHIBIT 1

**Gloria Ramos**

| | |
|---|---|
| **From:** | Jamie Gallian <jamiegallian@gmail.com> |
| **Sent:** | Friday, December 13, 2024 12:31 PM |
| **To:** | Eric Israel; Jeff Golden; Lori Werner |
| **Subject:** | Fwd: Minute Order December 12, 2024 30-2023-01316057 |
| **Attachments:** | 12.12.24 Minute Order.pdf |

Gentlemen,

I am making arrangements to remove the 2014 Skyline Manufactured Home from the Rancho Del Rey Park and will inform you where it will be stored.

You should have no problem with showing the home to potential purchasers.


Sincerely,


Jamie Gallian
714-321-3449
jamiegallian@gmail.com




---------- Forwarded message ---------
From: **Jamie Gallian** <jamiegallian@gmail.com>
Date: Fri, Dec 13, 2024 at 12:21 PM
Subject: Minute Order December 12, 2024 30-2023-01316057
To: Vivienne Alston <valston@aadlawyers.com>, Jeff Golden <jgolden@go2.law>, Eric Israel
<EPI@danninggill.com>
Cc: Jamie Gallian <jamiegallian@gmail.com>


Ms Alston,

In light of the Court's 12.12.24 Minute Order, I will tender to your client, $31,384.00.

Please accept this as Notice the home will be removed from the park as quickly as possible to avoid accruing any further accrual of rent.

Sincerely,

1

EXHIBIT 1

20

Jamie Gallian
714-321-3449
jamiegallian@gmail.com

# EXHIBIT 2

**Eric Israel**

| | |
|---|---|
| **From:** | Jamie Gallian <jamiegallian@gmail.com> |
| **Sent:** | Friday, December 13, 2024 12:22 PM |
| **To:** | Vivienne Alston; Jeff Golden; Eric Israel |
| **Cc:** | Jamie Gallian |
| **Subject:** | Minute Order December 12, 2024 30-2023-01316057 |
| **Attachments:** | 12.12.24 Minute Order.pdf |

Ms Alston,

In light of the Court's 12.12.24 Minute Order, I will tender to your client, $31,384.00.

Please accept this as Notice the home will be removed from the park as quickly as possible to avoid accruing any further accrual of rent.

Sincerely,


Jamie Gallian
714-321-3449
jamiegallian@gmail.com

EXHIBIT 2

# EXHIBIT 3

**Gloria Ramos**

| | |
|---|---|
| **From:** | Jamie Gallian <jamiegallian@gmail.com> |
| **Sent:** | Tuesday, December 17, 2024 1:13 PM |
| **To:** | Jeff Golden; Eric Israel; Lori Werner; Bingham, Gregory |
| **Subject:** | Request to Continue Inspections after January 1, 2025 |

Mr. Golden, Mr. Israel,

In keeping with the spirit of the holidays, I respectfully request any Home Inspections and Termite Inspections be continued after January 2, 2025.

I am available on January 2 or January 3, for your Broker to schedule Termite Inspection and Home Inspection,

I just finished working almost 90 hours and the small amount of time home, to prepare for Christmas is precious to me.

I appreciate your cooperation and understanding.

Sincerely,


Jamie Gallian
714-321-3449
jamiegallian@gmail.com

EXHIBIT 3

# EXHIBIT 4

## Gloria Ramos

| | |
|---|---|
| **From:** | Jamie Gallian <jamiegallian@gmail.com> |
| **Sent:** | Wednesday, January 1, 2025 3:44 PM |
| **To:** | Jeff Golden |
| **Cc:** | Lori Werner; Eric Israel |
| **Subject:** | Re: Questions regarding Inspections |

Mr. Golden,

I came home sick with the flu from work. Fever with severe headache and body aches and bronchitis.
I will be in bed resting due to the severe pain and migraine headaches.

Please inform your broker of the circumstances.

Jamie Gallian
Sent from my iPhone

> On Dec 27, 2024, at 5:42 AM, Jeff Golden <jgolden@go2.law> wrote:
>
> Thank you for confirming that you will be providing access on January 2 2025 at 11 am.
>
>
> Sent from my iPhone
>
>> On Dec 26, 2024, at 11:23 PM, Jamie Gallian <jamiegallian@gmail.com> wrote:
>>
>> Mr. Golden,
>> I have no information from you or your attorneys you are in "Escrow" to sell my personal property manufactured
home LBM 1081.
>>
>> I will cooperate with the termite inspection your broker has requested scheduled on January 2, 2025, unless the
Bankruptcy Court issues an Order otherwise.
>>
>> Sincerely,
>>
>> Jamie Gallian
>> Sent from my iPhone
>>
>>>> On Dec 26, 2024, at 6:36 PM, Eric Israel <EPI@danninggill.com> wrote:
>>>
>>> Ms. Gallian:  As you know, the Trustee is in escrow to sell the property.  After the buyer finishes inspections and due
diligence, the Trustee will file a motion to sell the property.  At that time, overbidders who qualify may bid per the
procedures set forth in the sale motion, and as authorized by the Court.
>>>
>>> The buyer is doing due diligence and has requested a termite and other inspections, which are standard.  The
Trustee needs access for two hours for the buyer's inspection.  If you do not confirm in writing by close of business
tomorrow --- December 27, 2024, that you will cooperate and afford the buyer's inspectors access on January 2, 2025 at
11:00 a.m., and not move the property per my prior emails, the Trustee will be left with no choice but to ask the Court
for immediate turnover and to evict you.  Again, we hope that will not be necessary.

1

EXHIBIT 4

24

>>>
>>> -----Original Message-----
>>> From: Jamie Gallian <jamiegallian@gmail.com>
>>> Sent: Thursday, December 26, 2024 5:07 PM
>>> To: Eric Israel <EPI@DanningGill.com>; Jeff Golden <jgolden@go2.law>; Lori Werner <lwerner@go2.law>
>>> Cc: Jamie Gallian <jamiegallian@gmail.com>
>>> Subject: Questions regarding Inspections
>>>
>>> Mr. Israel,
>>>
>>> I have a question regarding a Coldwell Broker requested Termite Inspection.
>>>
>>> Why would a Termite Inspection require an appearance by a potential purchaser?  Doesn't a motion to sell the home need to be approved by the Court.
>>>
>>> It appears to me that my home has only been viewed by two clients of Galaxy Homes formerly known as Five Star.
>>>
>>> It appears that the Newport  Beach real estate Broker Coldwell Banker is above marketing and bringing prospective purchasers to a personal property  manufactured home. I suspect the broker has a client list a mile long but refrained from advertising or even investing monies in photographs of the property.
>>>
>>> The listing agreement signed by the Trustee and Coldwell states "AS IS"
>>> The agents are not selling real property.
>>>
>>> Please kindly address the items above.
>>> I promised the court to cooperate however this seems to be one-sided, and I question what has the Broker proactively done to earn a 6% real estate commission on personal property. HCD fee to transfer title is less than $100.
>>>
>>> Sincerely,
>>>
>>> Jamie Gallian
>>> Sent from my iPhone
>>>

# EXHIBIT 5

### *In re Kasl*

United States Bankruptcy Court for the Central District of California

January 13, 2009, Decided; March 20, 2009, Filed, Entered

Case No: SV-05-15311MT, Chapter: 13

**Reporter**

2009 Bankr. LEXIS 2351 *

In re: Vladimir Kasl, Vera Kasl, Debtor(s).

**Counsel:** **[\*1]** For Vladimir Kasl, Debtor: Kevin T Simon, Simon & Resnik, LLP, Sherman Oaks, CA; Matthew D Resnik, Simon Resnik LLP, Beverly Hills, CA.

For Vera Kasl, Joint Debtor: Kevin T Simon, Simon & Resnik, LLP, Sherman Oaks, CA; Matthew D Resnik, Simon Resnik LLP, Beverly Hills, CA.

Trustee: Elizabeth (SV) Rojas, Sherman Oaks, CA.

**Judges:** Maureen Tighe.

**Opinion by:** Maureen Tighe

## Opinion

**MEMORANDUM OF LAW FINDING CREDITOR OBJECTS & POSTERS, GMBH & CO. IN VIOLATION OF THE AUTOMATIC STAY**

### I. Introduction

This Court determined that Respondents Objects & Posters, GMBH & Co. ("O&P") and Vladimir Mueller ("Mueller") (the "Respondents" or the "Creditors") were unsecured creditors in the bankruptcy case of debtors Vladimir Kasl and Vera Kasl (the "Debtors"). Debtors brought this Motion for Intentional Violation of the Automatic Stay Against Objects & Posters GMBH & Co. & Vladimir Mueller Jointly & Severally [hereinafter the "Motion"] upon learning that Respondents had commenced collections proceedings in the Czech Republic. This Motion considers whether Creditor O&P is subject to sanctions for its attempts to persuade a Czech Republic court to execute and enforce a California judgment on Debtors' real property located at Dolni Lukavice **[\*2]** 46, county of Pilsen-South, Czech Republic (the "Property").

### II. Chronology of Events

Debtors commenced their bankruptcy case in this Court by filing a voluntary petition under Chapter 7 of the Bankruptcy Code [1] on August 3, 2005. The automatic stay went into effect on this date with the filing of the initial petition, continued when the case was converted from Chapter 7 to 13, and will continue to be in effect as to the bankruptcy estate until the Court discharges Debtors' remaining debts, if any, upon full performance of their duties

---

[1] Unless otherwise indicated, all chapter, section, and rule references are to the Bankruptcy Code, *11 U.S.C. §§ 101 - 1530*, the *Federal Rules of Bankruptcy Procedure 1001 - 9037*, and the Local Bankruptcy Rules of the United States Bankruptcy Court, Central District of California 1001-1 - 9075-1.

EXHIBIT 5                                    26

and obligations under the plan they filed pursuant to Chapter 13. On Schedule F of their initial petition, Debtors listed O&P, of which Mueller is the owner, as an unsecured non-priority creditor with a claim of $ 60,585.39 or a "pending" lawsuit. O&P is a German company in the business of printing and selling poster art. On October 12, 2006, the Court granted Debtors' motion to convert the case from a Chapter 7 to Chapter 13 proceeding. In accordance with *Fed. R. Bankr. P. 3015(b)*, Debtors submitted a plan under Chapter 13 of the Bankruptcy Code (the "Plan"), fifteen days after the conversion of the case. The Plan provided that Debtors would pay $ 563.00 [*3] a month for a period of 60 months, or 25% of the allowed claims of the general unsecured creditors. [2] Pursuant to the Plan, O&P, a general unsecured creditor, will be paid $ 21,554.00, or 25% of its claim for $ 86,216.00, as filed on November 13, 2006. O&P filed its Objection to the Confirmation of Chapter 13 Plan (the "Objection") and Proof of Claim (the "Claim") on November 13, 2006. The Claim stated that O&P held a secured claim in the amount of $ 86,216.00 as of November 13, 2006, for a judgment entered in O&P's favor in the Superior Court of the State of California, for the County of Los Angeles. O&P asserted in the Objection that the judgment was entered in *Objects & Posters GMBH & Co. v. Kasl*, Case No. LC053748 and that the judgment was secured by real property in the Czech Republic, where it was duly recorded and perfected.

Debtors objected to [*4] O&P's Claim, arguing that the evidence supporting O&P's Claim was (1) inadmissible on grounds of hearsay and lacking in foundation, authentication, personal knowledge and completeness; (2) that the Debtors' valuation of the Property was legal, admissible, and accurate; and (3) that O&P's debt was unsecured. Numerous continuances were given to allow O&P to submit further evidence in support of its claim. O&P was represented by counsel in this Court who fully briefed and argued the issue. On September 11, 2007, the Court heard and orally granted Debtors' Motion Objecting to Claim of Objects & Posters GMBH & Co., decreed O&P's Proof of Claim unsecured, and determined the value of the real property located at Dolni Lukavice 46, County of Pilsen-South, Czech Republic to be $ 50,466.54. The Court entered the order on September 19, 2007. At the same hearing, the Court also orally confirmed Debtors' amended Chapter 13 Plan, and the order was entered on September 24, 2007. Pursuant to the confirmed Plan, Debtors have been making their payments and are current.

On or about October 2008, Debtors learned that Respondents have been trying to persuade the District Court of Pilser-South, Czech Republic [*5] (the "CZR District Court"), to order the sale of Debtors' real property in the Czech Republic in order to pay its claim. In response, Debtors' attorney notified O&P's counsel of this development and gave a deadline by which time O&P was to stop its collection efforts. Debtors received no response from either O&P or opposing counsel, and thus Debtors filed and properly served this Motion on O&P, Mueller, and counsel, Mark Salzman, on November 7, 2008, requesting punitive damages and attorneys' fees in the amount of $ 10,000.00. Pursuant to LBR 9013-1(f), a response or opposition to this Motion should have been filed and properly served not later than December 2, 2008, or 14 days prior to the December 16, 2008, hearing date. Neither O&P nor Mueller submitted responses.

Debtors allege that O&P requests the CZR District Court to order Debtors to sell the Property and deliver the proceeds of such sale to O&P as judgment creditor. In the Motion, Debtors and their attorney declare and submit translated documents from the CZR District Court as exhibits alleging that O&P, with and through its owner, Mueller, intentionally misrepresented sections of the Bankruptcy Code and orders this Court issued [*6] in attempts to collect on its California Superior Court judgment in the Czech Republic. Specifically, Debtors file as part of Exhibit D a letter from O&P to the CZR District Court, dated January 23, 2008. In the letter, O&P refers to correspondence the CZR District Court sent to the Superior Court of California, Los Angeles, and the United States Bankruptcy Court as early as July 6, 2006, yet acknowledges that neither court received the correspondence. The letter also indicates O&P's belief that "Czech courts proceed in proceedings with an international element according to Czech legal rules and not according to those of the foreign state." Mot. at Ex. D. [3]

---

[2] First Am. Chapter 13 Plan, Section I(A).

[3] "I am of the opinion that in accordance with the provisions of § 48 of law no. 97/1963 Coll. regarding international private and procedural law, Czech courts proceed in proceedings with an international element according to Czech legal rules and not according to those of the foreign state." Mot. at Ex. C., Letter dated January 23, 2007, P5.

2009 Bankr. LEXIS 2351, *6

In a subsequent letter from O&P to the CZR District Court dated June 2, 2008, O&P characterized documents submitted by Debtor Vera Kasl as "forged documents," and stated there is "no law in California **[*7]** which would forbid a Czech court from carrying out execution against the property of an American citizen in accordance with a legally valid and enforceable judgment of a bankruptcy court." The June 2, 2008 letter also reiterates a statement O&P made to the CZR District Court on May 14, 2008 [4]: "As far as the decision of the bankruptcy court is concerned, the basic amount of $ 85,216.00 was awarded to us, rather than $ 62,950.00." *Id.* The only finding regarding O&P's Claim that this Court made, however, was an implicit finding that O&P's Claim was an unsecured claim for $ 86,216.00. Order on Debtors' Objection to Claim of Objects & Posters GmbH & Co. (entered September 19, 2007).

The Court continued the hearing on this Motion until April 14, 2009, and issued an interim order (the "Order") on January 5, 2009, because there was no opposition or response to Debtors' counsel's requests to stop collection efforts in the Czech Republic. The interim order states, "It is hereby ordered, and adjudged and decreed that:

1. No individual, creditor or entity **[*8]** take any action that will affect the property located at Dolni Lukavice 46, County of Pilsen South in the Czech Republic, (the "Dolni Lukavice property"), including but not limited to selling and/or executing any judgments on the property, until further order of this United States Bankruptcy Court.

2. The automatic stay provided by Title *11, United States Code, section 362(a)* is in effect and applicable to Dolni Lukavice property.

3. The hearing is continued to January 13, 2009 at 12:00 p.m.

4. A copy of this order be mailed by Air Mail to the District Court for South Plzen by the debtors to each address known to them as courts or judges potentially involved in legal activity related to the Dolni Lukavice property."

## III. Applicable Law

### A. Extraterritorial Application of the Bankruptcy Code

"Congress has unquestioned authority to enforce its laws beyond the territorial boundaries of the United States ... Whether Congress has exercised such authority in a particular case is a matter of statutory construction." *Hong Kong & Shanghai Banking Corp. v. Simon (In re Simon), 153 F.3d 991, 996 (9th Cir. 1998)*, cert. denied, 525 U.S. 1141, 119 S. Ct. 1032, 143 L. Ed. 2d 41 (1999)[hereinafter *Simon*](citing *E.E.O.C. v. Arabian-American Oil Co., 499 U.S. 244, 248, 111 S. Ct. 1227, 113 L. Ed. 2d 274 (1991)*; **[*9]** *Stegeman v. United States, 425 F.2d 984, 986 (9th Cir. 1970)(en banc)*). The presumption is that Congress means for its legislation "to apply only within the territorial jurisdiction of the United States" absent contrary intent. *Id.* (quoting *Foley Bros., Inc. v. Filardo, 336 U.S. 281, 285, 69 S. Ct. 575, 93 L. Ed. 680 (1949)*). Where Congressional intent is indeterminable, the presumption is not applied if restricting application of the legislation to the territorial jurisdiction of the United States would "result in adverse effects within the United States," or if the "regulated conduct is 'intended to, and results in, substantial effects within the United States.'" *Id.* (quoting *Environmental Defense Fund, Inc. v. Massey, 986 F.2d 528, 531, 300 U.S. App. D.C. 65 (D.C. Cir. 1993)* and *Laker Airways, Ltd. v. Sabena Belgian World Airlines, 731 F.2d 909, 925, 235 U.S. App. D.C. 207 (D.C. Cir. 1982))*. The express language of the Bankruptcy Code rebuts the presumption that Congress intended to restrict jurisdiction of the bankruptcy court to the territorial jurisdiction of the United States. [5]

---

[4] The May 14, 2008 letter states that the judgment debt is $ 86,226.00, but the June 2, 2008 letter uses $ 85,216 as the amount of the award.

[5] Additionally, Congress granted extraterritorial jurisdiction to the bankruptcy court through the doctrine of *in rem* jurisdiction. *In rem* jurisdiction grants a court jurisdiction over a *res* or thing situated in the state or jurisdictional boundaries. The creation of the estate at the commencement of a case simultaneously creates the fiction that the property that comprises the estate is legally

2009 Bankr. LEXIS 2351, *9

The commencement of a case under §§ 301, 302, or 303 of the Bankruptcy Code creates an estate. 11 U.S.C. § 541(a). All legal or equitable interests of the debtor in property [*10] as of the commencement of the bankruptcy case comprise the estate, *wherever located and by whomever held. Id.*, (emphasis added). With this express language, Congress "intended extraterritorial application of the Bankruptcy Code as it applies to property of the estate." Simon, 153 F.3d at 996; see also 28 U.S.C. § 1334(e).

## B. Personal Jurisdiction

Congress has given the Bankruptcy Court authority to exercise jurisdiction over the extraterritorial interests of the bankruptcy estate, but the Bankruptcy Court must also have personal jurisdiction over the parties to the action. In a bankruptcy case where the debtor voluntarily files a [*11] petition, the debtor submits to personal jurisdiction of the court sitting in the district in which he filed. Similarly, a creditor who files a claim in a bankruptcy case commenced under the Bankruptcy Code pursuant to 11 U.S.C. § 501 submits to the general jurisdiction of the bankruptcy court presiding over the bankruptcy case and subjects itself to that court's equitable power. See Samuel L. Bufford, et al., *International Insolvency* 15 (Federal Judicial Center 2001)[hereinafter *Bufford*]; Langenkamp v. Culp, 498 U.S. 42, 44, 111 S. Ct. 330, 112 L. Ed. 2d 343 (1990). This applies to both domestic and foreign creditors who file claims. By filing a proof of claim, a creditor grants the bankruptcy court power to enforce its orders against the creditor with respect to assets of the debtor or estate both within and outside of the territorial jurisdiction of the United States. When a creditor files its claims, it "assumes certain risks" and forfeits certain legal claims. Simon, 153 F.3d at 997. One type of claim a creditor who submits to jurisdiction of the bankruptcy court forfeits is the right to "claim the court lacks power to enjoin … post-bankruptcy collection proceedings against the debtor." *Id.* Furthermore, since bankruptcy [*12] converts legal claims into an equitable claim to a pro rata share of the estate, a creditor who files a claim assumes the risk that it will not be able to collect the full amount of its claim. *Id.* (quoting Katchen v. Landy, 382 U.S. 323, 336, 86 S. Ct. 467, 15 L. Ed. 2d 391 (1966)).

## C. The Automatic Stay

### 1. Duration of the Automatic Stay

Commencement of a bankruptcy case invokes the automatic stay under 11 U.S.C. § 362(a), which protects the debtor and the property of the estate. Among other actions, the stay operates to prohibit "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case." 11 U.S.C. § 362(a)(6). Where the debtor did not have a single or joint case pending within the previous year, the automatic stay "continues until such property is no longer property of the estate" and continues until the case is closed, dismissed, or a discharge is granted or denied. 11 U.S.C. § 362(c). In a Chapter 13 case, the debtor may file a plan with the petition, or within 15 days of converting a case to Chapter 13. Fed. R. Bankr. P. 3015. After the court confirms the plan pursuant to the requirements of 11 U.S.C. § 1325, the provisions of that plan are binding on the debtor [*13] and each creditor, regardless of whether or not the plan provides for the claim of a creditor. 11 U.S.C. § 1327(a). Furthermore, except as otherwise provided in the plan or order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor. 11 U.S.C. § 1327(b). Once the debtor completes making payments pursuant to the confirmed plan, the court shall grant the debtor a discharge of all remaining debts or under applicable bankruptcy law. 11 U.S.C. § 1328. If the court dismisses a debtor's debts, it will issue a discharge injunction "which permanently prohibits all creditors … from taking or continuing any activity to collect a debt from the debtor or the debtor's assets." *Bufford*, at 16. Until such time, however, the provisions of the automatic stay under 11 U.S.C. § 362(c) remain in effect. Taken together, the protection of the automatic stay under 11 U.S.C. § 362 applies to all legal and equitable interests of the bankruptcy estate. These interests include a debtor's foreign pre-petition assets automatically turned over to the bankruptcy estate when the case commences.

---

located within the jurisdictional boundaries of the district in which the court sits regardless of the actual location. See Simon, 153 F.3d at 996 (citations omitted).

## 2. Violation of the Automatic Stay

_Section 362(k)(1) of the Bankruptcy Code_ **[*14]** allows "an individual injured by any willful violation of a stay ... [to] recover actual damages, including cost and attorneys' fees, and in appropriate circumstances, ... recover[y of] punitive damages." Where the violator acts on the good faith belief the stay has terminated, a court shall limit recovery to actual damages. _11 U.S.C. § 362(k)(2)._ Violation of the automatic stay is actionable if it is willful. _In re Montgomery, 2008 Bankr. LEXIS 2211 (Bankr. D. Mont. Aug. 21, 2008)._ The test for willfulness requires that (1) the violator know that a stay is in effect and (2) that the actions which violate the stay are intentional. _See Morris v. Peralta, 317 B.R. 381, 388 (B.A.P. 9th Cir. 2004); In re White, 2007 Bankr. LEXIS 2354, 14 (Bankr. D. Ariz. July 9, 2007)_(where the court characterized notice of the debtor's bankruptcy filing to constitute knowledge that a stay is in effect). Moreover, the offending party's good faith belief that it had a right to the property is irrelevant in determining "willful" or whether to award compensation. _Montgomery, at 16-17_ (quoting _In re INSLAW, Inc., 83 B.R. 89, 165 (Bankr. D.D.C. 1998))._ Thus, "any deliberate act taken in violation of a stay, which **[*15]** the violator knows to be in existence justifies an award of actual damages. An additional finding of maliciousness or bad faith on the part of the offending creditor warrants the further imposition of punitive damages pursuant to [_11 U.S.C. § 362(k)_]." _Crysen/Montenay Energy Co. v. Esselen Associates, Inc., (In re Crysen/Monetenay Energy Co.), 902 F.2d 1098, 1104 (2nd Cir. 1990)_[hereinafter _Crysen_]. More to the point, the Ninth Circuit has held that "a creditor who attempts collection of pre-petition debt after it knows of the debtor's bankruptcy is subject to sanctions for willful violation of the automatic stay." _In re Del Mission Ltd., 98 F.3d 1147, 1151 (9th Cir. 1996)._

## IV. Analysis

Debtors' foreign real property assets in the Czech Republic became property of the estate on August 3, 2005, as soon as Debtors filed their petition for bankruptcy. _Simon, at 996; see also In re Artimm, S.r.l.,_ 278 B.R. 832, 840 (Bankr. C.D. Cal 2002); _In re Lykes Bros. S.S. Co., Inc., 191 B.R. 935, 936 (Bankr. M.D. Fla. 1995)._ Likewise, the protections of the automatic stay under _11 U.S.C. § 362_ went into effect on August 3, 2005, and continued upon conversion of the case from Chapter 7 to Chapter 13. **[*16]** The automatic stay applied to all assets of the estate, including the Property. Although Debtors' Plan has been confirmed and Debtors are current in their payments to the Trustee pursuant to that Plan, the Court has yet to discharge Debtors' debts. Until the discharge is entered pursuant to _11 U.S.C. § 524,_ the automatic stay is still in effect. _11 U.S.C. §§ 362(c)_ and _1328._

This Court has power to enforce the automatic stay with respect to the Property and issue sanctions for violation thereof because there is no evidence of concurrent or prior main or ancillary insolvency proceedings outside the United States [6] involving Debtors, and Respondents failed to file either an objection to the instant Motion challenging the Court's jurisdiction over the Property or a motion for relief from the automatic stay. In enforcing the provisions of the automatic stay, the Court enjoins O&P from continuing to pursue enforcement of its judgment against Debtors outside this Court. O&P filed its Claim for $ 86,216.00 with this Court on November 13, 2006. By filing its claim, O&P voluntarily participated in Debtors' domestic bankruptcy case and submitted to this Court's jurisdiction. _See Langenkamp, 498 U.S. at 44._ **[*17]** Respondents may choose to begin collection proceedings in the Czech Republic, but in doing so after participating in Debtors' domestic case, Respondents assumed the risk of incurring bankruptcy court sanctions in the United States, just as O&P assumed certain risks by filing its Claim against Debtors in this Court. _See id. at 44-45; Simon, 153 F.3d at 997._ When O&P submitted to this Court's

---

[6] The doctrine of international comity does not require this Court to vacate the January 5, 2009 Order. International comity proposes that a "statute 'ought never to be construed to violate the law of nations, if any other possible construction remains.'" _See Simon, 153 F.3d at 998_ (quoting _Murray v. The Charming Betsy, 6 U.S. 64, 2 L. Ed. 208 (1804))._ Essentially, comity is "the recognition ... one nationallows **[*18]** within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." _Id.,_ (quoting _Hilton v. Guyot, 159 U.S. 113, 16 S. Ct. 139, 40 L. Ed. 95 (1895))._ In this case, as in other matters of "international comity in transnational insolvency proceedings," the philosophy of "deference to the country where the primary insolvency proceeding is located" controls the Bankruptcy Code and this Court's reading of the Code. _Id._

jurisdiction, O&P voluntarily assumed the risk that Debtors' estate would not be large enough to satisfy fully O&P's Claim. Upon reviewing O&P's Claim and Objection to the Plan, this Court found that O&P's Claim was *not* secured by Debtors' Property in the Czech Republic. Thus, O&P is an unsecured creditor and must accept that it is unlikely to collect on its judgment against Debtors in the sum of $ 86,216.00.

O&P never sought relief from the automatic stay in this Court. After voluntarily participating in Debtors' bankruptcy case, O&P, presumably unsatisfied with the results of the proceedings, instead sought relief from the CZR District Court. Such act was a willful violation of the automatic stay. O&P had notice of Debtors' bankruptcy case and therefore knew or should have known that the automatic stay was in effect. By seeking relief as a judgment creditor in the CZR District Court, O&P acted with intent. Clearly, O&P's actions meet the willful violation test. The Court will impose sanctions and the main issue remaining is  [*19] the appropriate amount. At the very least, Debtors should recover actual damages, namely, the costs associated with bringing the instant Motion, including attorneys' fees, and the costs incurred in defending the CZR District Court proceedings. The Court may even impose punitive damages since O&P's collection attempts were not based on a good faith belief that the automatic stay was not in effect or did not apply as to O&P. *See* Crysen, 902 F.2d at 1104. In light of O&P's willful violation in the absence of good faith, Debtors' request for punitive damages and attorneys' fees in the amount of $ 10,000.00 is reasonable.

It is important to note that the Court's injunctive powers do not restrain the CZR District Court, but enjoin creditor O&P from participating in proceedings in the CZR District Court to enforce a judgment entered against Debtors. [7] If the Court could not enjoin such proceedings or issue sanctions against O&P, the result would be akin to allowing foreign creditors or creditors with interests outside the territorial boundaries of the bankruptcy court to disregard its orders. Such result would have substantial effects within the United States, namely, domestic bankruptcy proceedings  [*20] would prove ineffective in protecting debtors and estates with foreign contacts. The bankruptcy courts would be powerless to "control and marshal the assets of the debtor." Simon, 153 F.3d at 996 (quoting Underwood, 98 F.3d at 961). This type of effect within the United States would also operate to rebut the presumption that extraterritorial effect of a statute does not apply. Id. at 997.

## V. Conclusion

Debtors commenced this case in this Court, and O&P submitted to the general jurisdiction of this Court by participating in Debtors' bankruptcy proceedings. The Court therefore grants Debtors' Motion for Intentional Violation of the Automatic Stay, enjoins O&P from seeking relief in the District Court of Plzen-South, and awards $ 10,000.00 for actual and punitive damages and attorneys' fees to Debtors.

<u>NOTE TO USERS OF THIS FORM</u>:

**1)** Attach this form to the last page of a proposed Order or Judgment. Do not file as a separate document.

**2)** The title of the judgment or order and all service information must be filled in by the party lodging the order.

**3) Category I.** below: The United States trustee and case trustee (if any) will always be in this category.

**4)Category II.** below:  [*21] List ONLY addresses for debtor (and attorney), movant (or attorney) and person/entity (or attorney) who filed an opposition to the requested relief. <u>DO NOT</u> list an address if person/entity is listed in category I.

---

[7] This Court's *in rem* jurisdiction over the bankruptcy estate serves as "sufficient basis to restrain another court's proceedings," including "foreign proceedings." Simon, 153 F.3d at 996 (citations omitted). In fact, the Seventh Circuit expressly held in Underwood v. Hilliard (In re Rimsat, Ltd.), 98 F.3d 956, 961 (7th Cir. 1996), that "the bankruptcy court's *in rem* jurisdiction over estate property allows an international proceeding to be enjoined pursuant to the automated stay," lest the international proceeding dilute the efficacy of the domestic bankruptcy proceedings. Simon, 153 F.3d at 996. However, such basis does not arise where O&P participated in the U.S. bankruptcy proceeding and thus submitted to this Court's jurisdiction.

2009 Bankr. LEXIS 2351, *21

## NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*) <u>Memorandum of Law</u> was entered on the date indicated as AEntered@ on the first page of this judgment or order and will be served in the manner indicated below:

**I. SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** - Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of <u>March 11, 2009</u>, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

. Matthew D Resnik matt@resniklaw.com

. Elizabeth (SV) Rojas cacb_ecf@ch13wla.com

. Kevin T Simon kevin@ktsimonlaw.com

. Gilbert B Weisman notices@becket-lee.com

[]Service information continued on attached page

**II. SERVED BY THE COURT VIA U.S. MAIL**:  **[*22]** A copy of this notice and a true copy of this judgment or order was sent by U.S. Mail to the following person(s) and/or entity(ies) at the address(es) indicated below:

Portfolio Recovery Associates, LLC.

PO BOX 41067

Norfolk, VA 23541


**Vladimir & Vera Kasl**

6215 Mary Ellen Avenue

Van Nuys, CA 91401

XService information continued on attached page

**III. TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an AEntered@ stamp, the party lodging the judgment or order will serve a complete copy bearing an AEntered@ stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s) and/or email address(es) indicated below:

[]Service information continued on attached page

**ADDITIONAL SERVICE INFORMATION** (if needed):

Category I (Served by the Court via Notice of Electronic Filing ("NEF").

Category II (Served by Court via U.S. mail).

**Objects and Posters GMBH & Co.**
Mainzlarer Street 6

32

2009 Bankr. LEXIS 2351, *22

35460 Staufenberg 1 (Hessen)
Germany

**Vladimir Mueller**
6528 Firmament Avenue
Van Nuys, CA 91406

**Vladimir Mueller**

**V Dymaku 177**

**250 90  [*23] Jirmy Czech Republic E**

**Vladimir Mueller**

**Mainslarer Strasse 6**

**35460 Staufenberg**

**Germany**
Category III (To be served by the lodging party).

---

**End of Document**

# EXHIBIT 6

## *In re Hunt*

United States District Court for the Central District of California

July 25, 2014, Decided; July 25, 2014, Filed

CASE NO. CV 12-08439 MMM; CASE NO. CV 14-00440 MMM

**Reporter**

2014 U.S. Dist. LEXIS 189464 *

IN RE: PELI POPOVICH HUNT, DEBTOR.PELI POPOVICH HUNT, Appellant, vs. ELISSA D. MILLER, Chapter 7 Trustee, et al., Appellees.PELI POPOVICH HUNT, Trustee, Appellant, vs. ELISSA D. MILLER, Chapter 7 Trustee, et al., Appellees.

**Prior History:**  [*1] BANKRUPTCY NO. BK 11-58222 ER.

**Counsel:** For Peli Popovich Hunt, Appellant (2:12cv8439): Franklin P Jeffries, Jeffries P Franklin Law Offices, Los Angeles, CA USA.

For Elissa D. Miller, Chapter 7 Trustee, Appellee (2:12cv8439): Daniel A Lev, Sulmeyer Kupetz APC, Los Angeles, CA USA.

For David M. Goodrich, Appellee (2:12cv8439): David Gould, Gould and Gould LLP, Calabasas, CA USA.

For Daniel A. Capen, Creditor doctor, Timothy J. Hunter, Creditor doctor, Adrew R. Jaminski, Creditor doctor, Howard J. Marans, Creditor doctor, Mary Aziz, Creditor doctor, Khiem D. Doa, Creditor doctor, Robert A. Rafael, Creditor doctor, Appellees (2:12cv8439): James R Selth, Weintraub & Selth APC, Los Angeles, CA USA; Paul R Pearlson, Cameron Pearlson & Gale, Long Beach, CA USA.

For 2007 Restated Robert And Peli Hunt Living Trust, Appellant (2:14cv440): Franklin P Jeffries, LEAD ATTORNEY, Jeffries P Franklin Law Offices, Los Angeles, CA USA; Kelly Leon Pexton, LEAD ATTORNEY, Pexton Law APC, Redlands, CA USA.

For Elissa D. Miller, Chapter 7 Trustee, Appellee (2:14cv440): Daniel A Lev, LEAD ATTORNEY, Sulmeyer Kupetz APC, Los Angeles, CA USA.

**Judges:** MARGARET M. MORROW, UNITED STATES DISTRICT JUDGE.

**Opinion by:** MARGARET M. MORROW

## Opinion

ORDER AFFIRMING DECISIONS OF THE [*2] BANKRUPTCY COURT

Pending before the court are appeals of two orders of the bankruptcy court. The first approved the sale of a commercial office building located at 3661-3663 Torrance Boulevard, Torrance, California 90503 ("the Torrance property") and overruled objections appellant filed in her personal capacity to the claim of Daniel Capen, Timothy Hunt, Andrew Jarminski, Howard Marans, Amir Azizi, Maryam Azizi, Khiem Dao, and Robert Rafael (collectively the "Creditor Doctors"). The second is a nearly identical appeal of the sale order filed by Hunt in her capacity as Trustee for the 2007 Restated Robert and Peli Hunt Living Trust (the "Trust").[1] Appellee Elissa Miller, Hunt's

---

[1] Notice of Appeal, Case No. CV 12-08439, Docket No. 2 (Oct. 2, 2012); Notice of Appeal, Case No. CV 14-00440, Docket No. 2 (Jan. 21, 2014).

EXHIBIT 6                    34

2014 U.S. Dist. LEXIS 189464, *2

Chapter 7 trustee, opposes both appeals of the sale order.[2] The Creditor Doctors oppose the appeal of the order overruling Hunt's objection to their claim.[3]

Pursuant to [*3] *Rule 78 of the Federal Rules of Civil Procedure* and *Local Rule 7-15*, the court finds this matter appropriate for decision without oral argument. The hearing calendared for July 28, 2014 is therefore vacated and the matter is taken off calendar.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Creditor Doctors' Bankruptcy Claim

The Creditor Doctors are former employees of Robert W. Hunt, M.D., a Medical Corporation, dba Intercommunity Medical Group ("RWH"). In 2008, the Creditor Doctors filed suit in Los Angeles Superior Court against RWH, Hunt in her individual capacity, and Hunt in her capacity as trustee of the Trust, alleging breach of contract and violations of the California Labor Code; the lawsuit sought to hold Hunt liable as an alter ego of RWH.[4] RWH and Hunt cross-complained against the Creditor Doctors for breach of contract, intentional interference with contractual advantage, intentional interference with prospective economic advantage, negligent interference with prospective economic advantage, conversion, and intentional infliction of emotional distress.[5] The case was tried to a jury, which returned a verdict in favor of the Creditor Doctors against Hunt and RWH on the Creditor Doctors' claims for unpaid wages, and on Hunt's and RWH's cross-claims. [*4] During a second phase of the trial, the court found for the Creditor Doctors and against Hunt and RWH on the Creditor Doctors' waiting time penalties claims, and on Hunt's alter ego liability individually and in her capacity as trustee.[6] A $3,509,617.23 judgment was entered on October 14, 2011.[7]

On November 23, 2011, Hunt filed a voluntary Chapter 11 bankruptcy petition.[8] On May 4, 2012, the Creditor Doctors filed a proof of claim for $3,537,513.38 (the "claim"), which reflected the $3,509,617.23 judgment in their favor, plus $27,996.15 in post-judgment interest.[9] On July 9, 2012, Hunt filed an objection to the claim,[10] together with a supporting declaration.[11] On August 17, 2012, the Creditor Doctors opposed Hunt's objection,[12] and [*5] asserted evidentiary objections to her declaration.[13] On September 5, 2012, the bankruptcy court issued a tentative

---

[2] Appellee's Reply Brief, Case No. CV 12-08439, Docket No. 51 (May 13, 2014); Appellee's Reply Brief, Case No. CV 14-00440, Docket No. 34 (May 14, 2014).

[3] Appellee's Reply Brief, Case No. CV 12-08439, Docket No. 49 (May 12, 2014).

[4] Appellants' Supplemental Excerpt of Record ("ASER"), Case No. CV 12-08439, Docket No. 50 (May 12, 2014) at 14.

[5] ASER at 14-15, 17-34.

[6] ASER at 37-57. The trial was bifurcated, with most matters tried to a jury in an initial phase; whether RWH was Hunt's alter ego, and whether the Creditor Doctors were entitled to waiting time penalties were tried to the court in a second phase. (*Id.* at 49.)

[7] Appellant's Excerpts of Record ("12-08439 AER"), Case No. CV 12-08439, Docket No. 30-2 (Mar. 27, 2014) at 48-113; see also *id.* at 116.

[8] *Id.* at 6.

[9] *Id.* at 25, 116.

[10] *Id.* at 35-40.

[11] *Id.* at 117-147.

[12] ASER at 3-59.

2014 U.S. Dist. LEXIS 189464, *5

order, sustaining many of the Creditor Doctors' evidentiary objections to Hunt's evidence and overruling her objection.[14] It issued a final order overruling the objection on September 24, 2012.[15]

## B. The Torrance Property and the Trust

The Hunts created the Trust, which was a revocable living trust, on May 8, 2006.[16] They amended the Trust on September 17, 2007.[17] The 2007 amendment identified the Hunts as settlors and trustees of the Trust.[18] The restated trust agreement provided that upon the death of Robert Hunt, Peli Hunt, as trustee, was to distribute the residue of Robert Hunt's estate, which included the Torrance property "and the identifiable proceeds of the sale of such real property," to a "Survivor's Trust" and a "Credit Bypass Trust."[19] The Credit Bypass Trust was to consist of "a pecuniary amount equal to the maximum sum which can be allocated to a trust which does not qualify for the federal estate tax marital deduction."[20] The Survivor's Trust was to receive the balance of the residue, including any community and separate property and accrued income not distributed [*6] to the Credit Bypass Trust.[21] Following her husband's death, Hunt had the power to amend and/or revoke the Survivor's Trust; she could not amend the Credit Bypass Trust, which became irrevocable.[22]

As the successor trustee of the Trust,[23] however, Hunt retained the power to sell all trust property, real and personal, without first obtaining a court order;[24] and to pay to or apply for her benefit "such sums out of the income and principal of the Survivor's Trust as [she] . . . consider[ed] necessary or appropriate for [her] proper health, support and maintenance in [ ] her accustomed manner of living."[25] If the assets of the Survivor's Trust and other resources had been exhausted, moreover, she also had authority to "pay to or apply for [her] benefit . . . as much of the income and principal of the Credit Bypass Trust as [she], in [her] discretion, consider[ed] appropriate for [ ] her accustomed manner of living."[26] There was an exception to this provision, however, which authorized Hunt, as successor [*7] trustee, to make distributions from the Credit Bypass Trust even if the assets of the Survivor's Trust

---

[13] AER at 151-164.

[14] *Id.* at 25-34.

[15] ASER at 60-61.

[16] Notice of Opposition and Request for a Hearing by the Trust ("Trust Opposition"), Case No. BK 11-58222, Docket No. 135 (June 1, 2012), at 1.

[17] *Id.*

[18] *Id.*, Exh. 2 (The Trust, ¶ 1).

[19] *Id.*, ¶ 4.4.

[20] *Id.*, ¶ 4.4(a).

[21] *Id.*, ¶ 4.4(b).

[22] *Id.*, ¶ 23.3.

[23] *Id.*, ¶ 9.

[24] *Id.*, ¶ 7.4.

[25] *Id.*, ¶ 4.6.

[26] *Id.*, ¶ 6.1.

and other resources had not been exhausted, so long as she "consider[ed] it reasonable to do so under the circumstances."[27]

In November 2007, Hunt filed an *ex parte* petition in Los Angeles Superior Court, seeking a declaration under *California Probate Code § 850(a)(3)(B)* that the Trust owned stock in RWH; record legal title to the stock was held by Robert Hunt in his individual capacity.[28] The probate court granted the petition on December 4, 2007, holding that "all issued and outstanding shares of Robert W. Hunt, M.D., a Medical Corporation (the "Shares") . . . are assets of [the Trust], and Peli Popovich Hunt, as the current trustee of the Trust, and any successor trustees, are vested with full beneficial and legal title to the shares."[29]

## C. Hunt Institutes Chapter 11 Bankruptcy Proceedings and the Court Appoints a Trustee

On November 23, 2011, Hunt filed a bankruptcy petition because the Creditor Doctors were attempting to enforce their state court judgment against the Torrance property.[30] Hunt's bankruptcy schedules identified the Torrance property as her property, held in fee simple, with an estimated value of $1,300,000.[31]

On February 9, 2012, the Creditor Doctors filed a motion to convert Hunt's case to Chapter 7, dismiss the Chapter 11 case, or alternatively, to appoint a Chapter 11 trustee.[32] The bankruptcy court granted the motion on March 1, 2012, and approved the appointment of a trustee.[33] The court found that Hunt "ha[d] failed to timely file documents and information required under the [Bankruptcy] [*9] [C]ode and reasonably requested by the [U.S. Trustee]."[34] The court also found that Hunt

"ha[d] [ ] attempted to conceal assets of the estate and preferential transfers from creditors and the [U.S. Trustee]. Specifically, [Hunt] is the record holder of certain property located in Texas. [Hunt] failed to identify these properties in her schedules and initially disclaimed any interest in any properties not listed in the schedules during the *§ 341(a)* meeting. When confronted with the deeds of trust for the properties, [Hunt] conceded that she is the record owner."[35]

The court also found that

"during the *§ 341(a)* meeting, [Hunt] attested under oath that she did not make any transfers within one year of the meeting; however, [Hunt's] own operating reports and testimony demonstrate that [Hunt] transferred real and personal property within a year of the petition date and post-petition. Specifically, [Hunt] divested the estate of approximately $8,000 of estate funds in December 2011 alone in the form of Christmas gifts (which

---

[27] *Id.*

[28] Ex Parte Petition for Order Establishing Title to Trust Property, Case No. BK 11-58222, Docket No. 179 (July 25, 2012). *Section 850(a)(3)(B)* permits a trustee of a trust to petition the probate court for a finding that the trust owns property held in another party's name. *Cal. Prob. Code § 850(a)(3)(B)* ("The following persons may file a petition requesting that the [probate] court make an order under this [*8] part: . . . The trustee or any interested person in . . . the following case[ ]: Where the trustee has a claim to real or personal property, title to or possession of which is held by another").

[29] AER at 262-263 (Order Granting Ex Parte Petition for Order Establishing Title to Trust Property).

[30] Case No. BK 11-58222, Docket No. 116 (May 11, 2012) at 2 (Amended Disclosure Statement).

[31] Summary of Schedules, Case No. BK 11-58222, Docket No. 25 (Jan. 5, 2012).

[32] Case No. BK 11-58222, Docket No. 54 (Feb. 9, 2012) (Motion of Creditor-Doctors to Convert, Dismiss, or Appoint a Trustee).

[33] Case No. BK 11-58222, Docket No. 83 (Mar. 1, 2012) (Order Granting Motion to Appoint Chapter 11 Trustee).

[34] *Id.*

[35] *Id.*

2014 U.S. Dist. LEXIS 189464, *8

appear to be cash disbursements) ranging from $500 to $1000 per individual and rent payments for [Hunt's] sister. Such misuse of estate funds is a clear violation of [Hunt's] fiduciary duty to creditors [*10] of the estate as debtor-in-possession. [Hunt's] assurances that further transfers will not occur are unpersuasive in light of [Hunt's] prior efforts to conceal these transfers and demonstrated willingness to perjure herself to do so."[36]

On March 8, 2012, Elissa Miller was appointed as trustee.[37] On April 5, 2012, Miller moved to convert Hunt's case to a Chapter 7 proceeding pursuant to *11 U.S.C. §§ 706(a)* or *1112(a)*.[38] On May 17, 2012, the Creditor Doctors joined Miller's motion, arguing that conversion was necessary under *§ 1112(b)* because Hunt had continued to misuse estate assets despite Miller's appointment as Chapter 11 trustee by amending her schedules to remove the estate's largest asset - the Torrance property — and by submitting a plan that omitted their approved claims.[39] On July 11, 2012, the bankruptcy court converted the case to Chapter 7.[40]


## D. The Sale of the Torrance Property

On May 17, 2012, Miller filed an application seeking authority to employ William Stimming, a real estate broker at Coldwell Banker, to sell the Torrance property.[41] Hunt opposed the motion, arguing that the Torrance property belonged to the Trust, not to her, and was therefore not property of the estate.[42] Hunt filed a separate opposition in her capacity as trustee of the Trust, which advanced the same argument.[43]

In a one-paragraph order, the court approved Miller's application to employ Stimming and held that the property belonged to the estate. It stated:

"Based on the Notice of Application and Application, the declarations in support thereof, the oppositions thereto, the documents and pleadings on file herein, all judicially noticeable facts, the arguments and representations of counsel, and after finding that notice of the hearing on the Application was proper, and after further finding that [the Torrance property] is property of the estate pursuant to *11 U.S.C. § 541(a)*, and after further finding that the employment of Coldwell Banker is in the best interests of the estate, and for good cause . . . , it is hereby ordered, adjudged and decreed as follows: [ ] the Application is granted."[44]

---

[36] *Id.*

[37] Case No. BK 11-58222, Docket No. 86 (Mar. 5, 2012) (Order Directing the Appointment of a Chapter 11 Trustee); Case No. BK 11-58222, Docket No. 88 [*11]  (Mar. 8, 2012) 103 (Notice of Appointment of Chapter 11 Trustee).

[38] Case No. BK 11-58222, Docket No. 165 (July 11, 2012);(Order Granting Motion to Convert Case); Case No. BK 11-58222, Docket No. 96 (Apr. 5, 2012) (Notice of Chapter 11 Trustee's Motion to Convert Case).

[39] Order Granting Motion to Convert Case; Case No. BK 11-58222, Docket No. 124 (May 17, 2012) (Joinder of Creditor-Doctors in Motion to Convert Case).

[40] Order Granting Motion to Convert Case.

[41] Chapter 11 Trustee's Application for Authority to Employ Real Estate Broker, Case No. BK 11-58222, Docket No. 122 (May 17, 2012).

[42] Debtor's Opposition and Request for a Hearing on Chapter 11 Trustee's Application, Case No. BK 11-58222, Docket No. 134 (June 1, 2012).

[43] Notice of Opposition and Request for Hearing, [*12]  Case No. BK 11-58222, Docket No. 135 (June 1, 2012).

[44] Order Granting Chapter 11 Trustee's Application for Authority to Employ Real Estate Broker, Case No. BK 11-58222, Docket No. 169 (July 17, 2012).

On August 2, 2012, Miller filed a motion for an order, *inter alia*, authorizing a sale of the Torrance Property for $3,000,000 to Soon K. Rim, or to the highest bidder at auction.[45] Hunt opposed the motion on August 17, 2012, arguing, [*13] *inter alia*, that the Torrance Property was not property of the bankruptcy estate.[46] Hunt also asserted that the property's value exceeded $3,000,000, and disputed the property's valuation on the grounds that Coldwell Banker had not provided an appraisal of the property, and that Miller had failed to consider the value accruing from the property's "air space" and the income generated by its parking structure.[47] Hunt attached to her opposition listings for purportedly comparable properties with values ranging from $3.02 million to $383.7 million.[48] On September 5, 2012, the bankruptcy court held a hearing at which it issued a tentative ruling authorizing the sale of the Torrance Property.[49] During the hearing, Kelly Pexton, counsel for the Trust, attempted to introduce in evidence copies of title records that purportedly showed the Torrance property was owned by the Trust.[50] Bankruptcy Judge Ernest Robles declined to consider the document, because it had not been offered as evidence prior to the hearing and had not been authenticated.[51]

On September 11, 2012, Hunt filed a motion for a stay of the September 5 sale order pending appeal.[52] The bankruptcy court denied Hunt's request, stating that Hunt had

> "not demonstrated a likelihood of success on the merits. In granting the Trustee's application for authority to employ a real estate broker and to sell the Property, the Court considered and denied Debtor's argument that the Property was not property of the estate pursuant to *11 U.S.C. § 541(a)*. Debtor provided no credible evidence in support of the argument, and Debtor's case was converted from a Chapter 11 to a Chapter 7 based in part on the Debtor's bad faith attempts to conceal assets of the estate."[53]

On September 14, 2012, the bankruptcy court issued a final order authorizing the sale of the bankruptcy estate's interest in the Torrance Property to the highest bidder at auction.[54] Specifically, it approved a sale of the property to Blue Sky Capital Partner, LP ("Blue Sky") for $4,050,000 and deemed Blue Sky a good faith purchaser under *11 U.S.C. § 363(m)*.[55]

## E. Bankruptcy Judge Robles Declines to Recuse Himself

In an apparent reference to Judge Robles' refusal to consider the purported title documents at the September 5 hearing despite the fact that no party objected, Hunt argued in her motion to stay that "[t]he ('thinkers pose') if, that is a form of objection is a new form of objection, which was not recorded on the forthcoming transcript to be

---

[45] AER 265-329.

[46] *Id.* 335-364.

[47] *Id.*

[48] *Id.* at 355-363.

[49] Order Authorizing Sale of Real Property, Case No. BK 11-58222, Docket No. 239 (Sept. 5, 2012).

[50] Transcript Regardign Hearing Held 09/05/12, Case No. [*14] BK 11-58222, Docket No. 285 (Oct. 3, 2012) at 6:11-23.

[51] *Id.* at 6:24-7:18. Pexton said he had not filed the exhibit earlier because he had been retained only the previous day. (*Id.* at 7:5-7.)

[52] Notice of Non-Emergency [*15] Motion and Non-Emergency Motion for Stay of September 5, 2012 Orders Pending Appeal, Case No. BK 11-58222, Docket No. 249 (Sept. 11, 2012).

[53] Order Denying Emergency Motion for Stay Pending Appeal, Case No. BK 11-58222, Docket No. 252 (Sept. 12, 2012), at 2.

[54] AER at 18-24.

[55] *Id.*

2014 U.S. Dist. LEXIS 189464, *15

ordered, and 'recusal motion,' if, necessary as Judge Ernest M Robles may U.S.C. _§ 455 (a)_ _sua sponte_ recuse, himself."[56] Judge Robles construed this statement as a request that he recuse himself, and scheduled a hearing on the matter for November 14, 2012.[57] Hunt filed a brief on November 1, 2012 arguing that the bankruptcy court had made erroneous evidentiary rulings, had rejected evidence without soliciting objections, had not cited precedent supporting its decisions, had refused to grant continuances, had not ensured she was served court filings, and had [*16] accepted misinformation from litigants, requiring that she file five separate appeals and evidencing the court's bias and prejudice against her.[58] The bankruptcy court observed that Hunt's arguments, while difficult to follow, might concern its refusal to admit the purported deed of trust in evidence at the September 5 hearing.[59] The court denied Hunt's recusal motion on the grounds that it failed clearly to identify the basis for recusal, and failed to identify any extrajudicial source of bias.[60]

### F. Hunt Appeals the Bankruptcy Court's Orders

On September 12, 2012, Hunt, in her personal capacity, appealed the bankruptcy court's orders overruling her objection [*17] to the Creditor Doctors' claim, and authorizing the sale of the Torrance Property to the district court.[61] Hunt filed a second appeal on October 9, 2012, in her capacity as trustee of the Trust.[62] Unlike her first appeal, Hunt appealed the sale order only, and elected to have the appeal heard by the Bankruptcy Appellate Panel of the Ninth Circuit ("BAP").[63] On November 16, 2012, the court dismissed Hunt's first appeal for lack of prosecution.[64] On November 29, 2012, Hunt filed a motion to vacate the dismissal of her appeal,[65] which the court granted on December 23, 2013.[66] On January 21, 2014, with Hunt's first appeal reinstated, the BAP transferred Hunt's second appeal to this court under Ninth Circuit BAP Rule 8001(e)-1(a).[67]

### II. DISCUSSION

---

[56] Notice of Non-Emergency Motion and Non-Emergency Motion for Stay of September 5, 2012 Orders Pending Appeal, Case No. BK 11-58222, Docket No. 249 (Sept. 11, 2012) at 6.

[57] Amended Order Setting Peli Popovich Hunt's Request for Sua Sponte Recusal for Hearing, Case No. BK 11-58222, Docket No. 298 (Sept. 11, 2012).

[58] Supplemental Brief on Sua Sponte Recusal, Case No. BK 11-58222, Docket No. 324 (Nov. 1, 2012).

[59] Hearing Re Order Setting Peli Popovich Hunt's Request for Sua Sponte Recusal, Case No. BK 11-58222, Docket No. 332 (Nov. 14, 2012) at 5.

[60] _Id._

[61] Notice of Appeal, Case No. CV 12-08439; Notice of Election to Transfer, Docket no. 3 (Oct. 2, 2012); Notice of Referral of Appeal, Docket No. 4 (Oct. 2, 2012).

[62] Notice of Appeal, Case No. CV 14-00440, Docket No. 2 (Jan. 21, 2014); see also Docket No. 2-1 (Jan. 21, 2014).

[63] Notice of Referral of Appeal, Case No. CV 14-00440, Docket No. 3 (January 21, 2014).

[64] Order of Dismissal for Lack of Prosecution, Case No. CV 12-08439, Docket No. 9 (Oct. 16, 2012).

[65] Motion to Vacate Dismissal of Appeal, Docket No. 10 (Nov. 29, [*18] 2012).

[66] Order Granting Motion to Vacate Dismissal of Appeal, Docket No. 23 (Dec. 23, 2013).

[67] Order Transferring Appeal to the United States District Court, Docket No. 4 (Jan. 21, 2014). Rule 8001(e)-1(a) provides: "The Panel may transfer an appeal to the district court to further the interests of justice, such as when a timely statement of election has filed in a related appeal, or for any other reason the Panel deems appropriate." The BAP determined that transfer would be in the interest of justice due to the pendency of Hunt's appeal of the same order that was pending before the court. (_Id._ at 3.)

## A. Jurisdiction

The district court has jurisdiction to hear appeals from "final judgments, orders, and decrees; [and] with leave of the court, from other interlocutory orders and decrees" of the bankruptcy court. *28 U.S.C. § 158(a)(1)*, *(3)*. The Ninth Circuit has "developed a 'pragmatic' approach to deciding whether orders in bankruptcy cases are final, 'recognizing that certain proceedings in a bankruptcy case are so distinct and conclusive either to the rights of individual parties or the ultimate outcome of the case that final decisions as to them should be appealable as of right.'" *In re City of Desert Hot Springs, 339 F.3d 782, 788 (9th Cir. 2003)* (citing *In re Mason, 709 F.2d 1313, 1317 (9th Cir. 1983)*). This "flexible finality" approach [*19] to appellate jurisdiction under *§ 158(a)* "focuses upon whether the order affects substantive rights and finally determines a discrete issue." *In re Belli, 268 B.R. 851, 854 (9th Cir. BAP 2001)*. The parties have not challenged the court's jurisdiction to hear this appeal, but the court "ha[s] an independent duty to examine [such] issues." *In re McCarthy, Nos. CC-07-1083-MoPaD, CC-07-1263-MoPaD, SV 05-18622-GM, 2008 Bankr. LEXIS 4688, 2008 WL 8448338, *10 (9th Cir. BAP Feb. 19, 2008)*.

Applying the flexible finality approach, courts often find orders authorizing the sale of property of the bankruptcy estate and overruling an objection to a claim final and appealable. See *In re Prestige Ltd. Partnership-Concord, 234 F.3d 1108, 1113 (9th Cir. 2000)* ("The district court's order disposed of all the issues in the case by overruling Prestige's objections to East Bay's claim and was thus sufficiently conclusive to be appealable"); *In re Green, Nos. CC-11-1374-MkHHa, ND 09-11614-RR, 2012 Bankr. LEXIS 4884, 2012 WL 4857552, *5-6 (9th Cir. BAP Oct. 15, 2012)* (concluding that an order overruling an objection to a claim was final and appealable); *In re PW, LLC, 391 B.R. 25 (9th Cir. BAP 2008)* (a sale order was final and appealable). Thus, the sale order and order overruling Hunt's objection to the Creditor Doctors' claim are appealable.

Local Rule 8001-2 states that "[a] notice of appeal must designate the judgment, order, or part thereof from which the appeal is taken and attach a copy of the judgment or order, if available." C.D. CAL. BANKR. L.R. 8001-2. Hunt's [*20] appeal in her capacity as trustee of the Trust attaches an *ex parte* application for an extension of time to appeal the September 14, 2012 sale order.[68] She also asserts as one ground for her appeal that the BAP improperly denied her request for leave to file an untimely appeal.[69]

A denial of a motion for an extension of time to appeal is a final, appealable order that is itself appealable. See *In re Cahn, 188 B.R. 627, 628, 633 (9th Cir. BAP 1995)* (concluding that the BAP had jurisdiction to hear a party's appeal of the bankruptcy court's denial of its motion to extend the time for filing a notice of appeal). The bankruptcy court did not rule on Hunt's application for an extension of time, however;[70] in fact, it appears the application was never [*21] filed prior to October 9, 2012, when Hunt filed the document as her "appeal" to the BAP of the sale order.[71] The court therefore construes Hunt's appeal in her capacity as trustee as an appeal of a decision on the *ex parte* application that was never rendered and dismisses it for lack of jurisdiction. See *28 U.S.C. § 158(a)(1)*, *(3)*

---

[68] The text on the caption page that references an application for an extension of time to appeal is crossed out, so that the caption states it is an appeal of the sale order, rather than an application for an extension of to file such an appeal. The only pleading attached, however, is the application for an extension of time. No order from the bankruptcy court approving the sale is attached.

[69] Appellant's Opening Brief ("Hunt Opening Trustee Brief"), Case No. CV 14-00440, Docket No. 30 (Apr. 24, 2014) at 12.

[70] Order Transferring Appeal to the United States District Court, Case No. CV 14-00440, Docket No. 24-2 (Jan. 21, 2014) at 2.

[71] The document appears twice on the bankruptcy court's docket, once on October 9, 2012 as an appeal to the BAP, and again on October 10, 2012 as a notice of appeal. (Notice of Appeal to BAP Court, Case No. BK 11-58222, Docket No. 287 (Oct. 9, 2012); Notice of Appeal September 14, 2012, Case No. BK 11-58222, Docket No. 292 (Oct. 10, 2012).) Also on October 9, 2012, Hunt filed an application for an order setting a hearing on shortened notice on her *ex parte* application. (Application for Order Setting Hearing on Shortened Notice, Case No. BK 11-58222, Docket [*22] No. 290 (Oct. 9, 2012).) The bankruptcy court denied Hunt's application on the next day, stating that the motion could be brought on regular notice. (Order Re: Denying Application for Order Setting Hearing on Shortened Notice, Case No. BK 11-58222, Docket No. 292 (Oct. 10, 2012).)

2014 U.S. Dist. LEXIS 189464, *22

(stating that the district court has jurisdiction to hear appeals from "final judgments, orders, and decrees; [and] with leave of the court, from other interlocutory orders and decrees" of the bankruptcy court).

## B. Whether Hunt's Appeal in her Capacity as Trustee is Timely

As noted, Hunt filed an appeal in her individual capacity on September 18, 2012. She purported to file a notice of appeal in her capacity as trustee of the Trust twenty-one days later, on October 9, 2012. A notice of appeal must be filed within fourteen days of the date of entry of the order from which the appeal is taken. _Fed.R.Bank.Proc._ _8002(a)_. Thus, the September 18 appeal was timely filed. Once a notice of appeal is timely filed by a party, "any other party may file a notice of appeal within 14 days of the date on which the first notice of appeal was filed[.]" _Fed.R.Bank.Proc. 8002(a)_. Hunt, therefore, was required to file her appeal in her capacity as trustee of the Trust no later than October 2, 2012. Because the appeal was not filed until October 9, it was untimely.

The failure to file a timely appeal under _Rule 8002(a)_ deprives the court of jurisdiction to hear the appeal. _In re_ _Wiersma, 483 F.3d 933, 938 (9th Cir. 2007)_ ("Generally, a party to [*23] a bankruptcy action must file a notice of appeal within ten days after entry of the order being appealed. The timely appeal requirement is jurisdictional"). See _In re D'Alfonso, 539 Fed. Appx. 729, 729 (9th Cir. Aug. 21, 2013)_ (Unpub. Disp.) ("The BAP properly dismissed the appeal because Beristain filed her notice of appeal more than fourteen days after entry of the bankruptcy court's order denying her motion for a new trial or to alter or amend a judgment," citing _Wiersma_). Hunt argues that she was unable to file a timely appeal because she was not served the September 14 order approving the sale of the Torrance property.[72] She states that she was able to file the first appeal in her personal capacity only because the bankruptcy court denied her motion for stay, but that the Trust was not a party to the stay motion.[73] The court finds this argument unavailing, as Hunt, by her own admission, had notice of the bankruptcy court's September 14 order, which she timely appealed in her individual capacity. More fundamentally, Hunt's argument does not overcome the jurisdictional bar to her appeal. See _Key Bar Invs. v. Cahn (In re Cahn), 188 B.R. 627, 632 (9th Cir. BAP 1995)_ ("It is well-settled that failure to receive notice of entry of judgment or order is not an excuse for an untimely appeal because it is the party's affirmative [*24] duty to monitor the dockets"). Accordingly, the court dismisses Hunt's appeal in her capacity as trustee of the Trust on this basis as well.

## C. Standard of Review

When reviewing a bankruptcy court decision, a district court functions as an appellate court and applies the standard of review generally applied in the federal courts of appeal. _In re Webb, 954 F.2d 1102, 1103-04 (5th Cir._ _1992)_. The district court must accept the bankruptcy court's findings of fact unless they are clearly erroneous. A finding is clearly erroneous "'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" _In re Banks, 263 F.3d 862,_ _869 (9th Cir. 2001)_ (quoting _Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S. Ct. 1504, 84 L. Ed. 2d 518_ _(1985))_. Stated differently, "[a] court's factual determination is clearly erroneous if it is illogical, implausible, or without support in the record." _Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir.2010)_ (citing _United_ _States v. Hinkson, 585 F.3d 1247, 1261-62 & n. 21 (9th Cir.2009)_ (en banc)).

The district court reviews the bankruptcy court's conclusions of law _de novo_. _Laws v. Sony Music Entertainment,_ _Inc., 448 F.3d 1134, 1137 (9th Cir. 2006)_; _In re Cohen, 300 F.3d 1097, 1101 (9th Cir. 2002)_. "De novo review is independent, with no deference given to the trial court's conclusion." _Allen v. U.S. Bank, N.A. (In re Allen), 472 B.R._ _559, 564 (9th Cir. BAP 2012)_.

---

[72] Notice of Appeal, Case No. CV 14-00440, Docket No. 2 (Jan. 21, 2014) at 9-10.

[73] _Id._ at 11.

"Under the abuse of discretion standard of review, we first determine de novo whether the bankruptcy court identified [*25] the correct legal rule to apply to the relief requested. If the bankruptcy court identified the correct legal rule, we then determine under the clearly erroneous standard whether its factual findings and its application of the facts to the relevant law were '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'" *In re Khan, Nos. CC-11-1542-HPaD, 11-36527, 2012 Bankr. LEXIS 2574, 2012 WL 2043074, *4 (9th Cir. BAP June 6, 2012)* (citing *United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009)* (en banc)).

"Whether property is included in a bankruptcy estate is a question of law, subject to *de novo* review." *In re Cogliano, 355 B.R. 792, 800 (9th Cir. BAP 2006)* (citing *In re Kim, 257 B.R. 680, 684 (9th Cir. BAP 2000)*, aff'd, *35 Fed. Appx. 592 (9th Cir. 2002)*. An order authorizing a sale of property of the bankruptcy estate other than in the ordinary course of business under *11 U.S.C. § 363* is reviewed for abuse of discretion. *In re Clark, 266 B.R. 163, 168 (9th Cir. BAP 2001)*.

Where the bankruptcy court's decision whether to overrule an objection to a claim is based on an issue of law, the appellate court reviews the order *de novo*. Where the decision is based on factual issues, the review is for clear error. A bankruptcy court's decision can also rest on legal and factual issues, which the appellate court reviews separately under the respective standards. *In re Rader, 488 B.R. 406, 409 (9th Cir. BAP 2013)*. See *In re Godfrey, Nos. CC-07-1413-BMdK, LA 05-18335-TD, 2008 Bankr. LEXIS 4735, 2008 WL 8444813, *1 (9th Cir. BAP Mar. 21, 2008)* ("The bankruptcy court's ruling was [*26] based on its interpretation of California law and, implicitly, the Bankruptcy Code. We review issues of statutory construction de novo"). Evidentiary rulings are reviewed for abuse of discretion and support reversal only where prejudicial. *In re Mbunda, 484 B.R. 344, 351 (9th Cir. 2012)* ("[W]e review a bankruptcy court's evidentiary rulings for abuse of discretion, and then only reverse if any error would have been prejudicial to the appellant"); see *id. at 355* ("Generally speaking, we ignore harmless error. Specifically with respect to erroneous evidentiary rulings, such rulings do not constitute reversible error unless it is more likely than not that the rulings changed the outcome of the lawsuit" (internal citations omitted)); cf. *Harper v. City of Los Angeles, 533 F.3d 1010, 1030 (9th Cir. 2008)* ("We afford broad discretion to a district court's evidentiary rulings. To reverse such a ruling, we must find that the district court abused its discretion and that the error was prejudicial. A reviewing court should find prejudice only if it concludes that, more probably than not, the lower court's error tainted the verdict"). Finally, an order denying a motion to recuse is reviewed for abuse of discretion. *In re Goodwin, 194 B.R. 214, 220 (9th Cir. BAP 1996)*.

The court cannot reverse for errors that do not affect the substantial rights of the parties. It may, [*27] moreover, affirm for any reason supported by the record. *Fed.R.Bankr.Proc. 9005*; *In re Maximus Computers, Inc., 278 B.R. 189, 195 (9th Cir. BAP 2002)*.

## D. Arguments Raised for the First Time on Appeal

The court generally does not decide issues raised for the first time on appeal; such arguments are deemed to have been waived. *In re Kelly, 499 B.R. 844, 857 (S.D. Cal. 2013)* (holding that a district court reviewing a bankruptcy court's order would not consider arguments raised for the first time on appeal, and stating that "[b]ecause the Kellys failed to raise their consideration argument in the proceeding below, it is waived"); *In re Khoe, 255 B.R. 585-86 (E.D. Cal. 2000)* ("[A]s a general rule, an appellate court will not consider arguments that are raised for the first time on appeal").

"The Ninth Circuit recognizes three exceptions to the general rule that the court will not consider an issue raised for the first time on appeal: 'in the "exceptional" case in which review is necessary to prevent a miscarriage of justice or to preserve the integrity of the judicial process, when a new issue arises while appeal is pending because of a change in the law, or when the issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed.' The court 'will only excuse a failure to comply [*28] with this rule when necessary to avoid a manifest injustice.'" *Greger v. Barnhart, 464 F.3d 968, 973 (9th Cir. 2006)* (citing *Bolker v. C.I.R., 760 F.2d 1039, 1042 (9th Cir. 1985)*, and *Meanel v. Apfel, 172 F.3d 1111,*

2014 U.S. Dist. LEXIS 189464, *28

*1115 (9th Cir. 1999))* see also *In re Khoe, 255 B.R. at 585-86* ("A court may review an issue raised for the first time on appeal only to prevent a miscarriage of justice or when a change in the law raises a new issue while an appeal is pending, or when the issue is purely one of law"). "The decision to consider an issue not raised below is discretionary, and such an issue should not be decided if it would prejudice the other party." *In re Khoe, 255 B.R. at 586.*

Hunt argues for the first time on appeal that the bankruptcy court did not have jurisdiction to determine the ownership of the Torrance property because the probate court previously exercised jurisdiction over the property.[74] Although Hunt did not raise this argument below, whether a court has subject matter jurisdiction is not an affirmative defense that can be waived, and the court has a continuing obligation to consider its jurisdiction. See *Guzman-Andrade v. Gonzales, 407 F.3d 1073, 1077 (9th Cir. 2005)* ("The parties' agreement [ ] cannot create subject matter jurisdiction nor waive its absence. We are obliged independently to assess whether we have jurisdiction to review [a matter]"); *City of South Pasadena v. Mineta, 284 F.3d 1154, 1157 (9th Cir. 2002)* ("[O]bjections to subject-matter jurisdiction [ ] may be raised at any time, even on appeal"); **[*29]** *Reis v. D'Braunstein, No. SA CV 08-0754-AG (ANx), 2008 U.S. Dist. LEXIS 79498, 2008 WL 4326717, *1 (C.D. Cal. Sept. 22, 2008)* ("Because it affects the court's very power to adjudicate, delay in raising lack of subject matter jurisdiction does not waive the ground. The objection can be raised initially at trial, or even on appeal"). The court therefore addresses this argument.

It has long been held that under the exclusive jurisdiction doctrine, "[i]n proceedings *in rem* or *quasi in rem*, the court first assuming custody of the property at issue has exclusive jurisdiction to proceed." *40235 Washington Street Corp. v. Lusardi, 976 F.2d 587, 589 (9th Cir. 1992)*; see *Donovan v. City of Dallas, 377 U.S. 408, 412, 84 S. Ct. 1579, 12 L. Ed. 2d 409 (1964)* ("Early in the history of our country a general rule was established that state and federal courts would not interfere with or try to restrain each other's proceedings. . . . An exception has been made in cases where a court has custody of property, that is, proceedings in rem or quasi in rem. In such cases, this Court has said that the state or federal court having custody **[*30]** of such property has exclusive jurisdiction to proceed," citing *Princess Lida v. Thompson, 305 U.S. 456, 465-68, 59 S. Ct. 275, 83 L. Ed. 285 (1939)*); *Chapman v. Deutsche Bank National Trust Co., 651 F.3d 1039, 1043 (9th Cir. 2011)* ("The prior exclusive jurisdiction doctrine holds that 'when one court is exercising *in rem* jurisdiction over a *res*, a second court will not assume *in rem* jurisdiction over the same res,'" quoting *Marshall v. Marshall, 547 U.S. 293, 311, 126 S. Ct. 1735, 164 L. Ed. 2d 480 (2006)*); *Federal Home Loan Mortgage Corp. v. Ha, 145 F.3d 1337, 1998 U.S. App. LEXIS 11643, 1998 WL 340118, *1 (9th Cir. June 1, 1998)* (Unpub. Disp.) ("Although the existence of a case in one forum does not generally defeat jurisdiction in another, there is a firmly-rooted exception to this rule: in cases concerning real property, whichever forum assumes control over the property first has exclusive jurisdiction to proceed"). This is because in rem and quasi in rem actions require the court to have "possession" or "control of the property which is the subject of the litigation." *Princess Lida, 305 U.S. at 466.* The jurisdiction of the second court to deal with the same res must therefore "yield to that" of the first court. *Id.*

Even assuming both the probate and the bankruptcy actions are *in rem* (a question the court need not resolve), Hunt's argument that the federal court lacks jurisdiction over the property fails because there is no evidence in the record that there are any proceedings currently pending before the probate court, and because the probate court's decision did not involve **[*31]** the Torrance property. The prior exclusive jurisdiction doctrine applies only when "a state court has previously exercised jurisdiction over that same property and retains that jurisdiction in a separate, concurrent proceeding." *Sexton v. NDEX West, LLC, 713 F.3d 533, 537 (9th Cir. 2013)*; see *id.* (holding that "[b]ecause the state court did not retain jurisdiction over the Sextons' property [at the time the federal court obtained jurisdiction over it], the doctrine of prior exclusive jurisdiction is inapplicable"); *United States v. One 1977 Mercedes Benz, 450 SEL, VIN 11603302064538, 708 F.2d 444, 450 n. 5 (9th Cir. 1983)* (holding that "[w]hen [a state court action is] dismissed, the [state] courts ha[ve] no further practical reason for retaining jurisdiction over [property]. Any federal seizure [of that property], therefore, does not impose upon any legal or practical interests the courts of the state . . . could have"); *Rice v. Citibank, NA, No. C13-5371 BHS, 2013 U.S. Dist. LEXIS 87692, 2013 WL 3187026,*

---

[74] Appellant's Opening Brief ("Hunt Opening Brief"), Case No. CV 12-08439, Docket No.46 at 7-8. Hunt filed a nearly identical brief in her capacity as Trustee in Case No. CV 14-00440. For simplicity, the court's citations refer only to the brief filed in Case No. CV 12-08439, except where the brief in Case No. CV 14-00440 differs materially.

2014 U.S. Dist. LEXIS 189464, *31

*4 (W.D. Wash. June 20, 2013) (noting that where state court jurisdiction had ended before the federal court obtained jurisdiction over property, "the doctrine of prior exclusive jurisdiction [was] inapplicable").

The probate court issued an order on Hunt's *ex parte* petition on December 4, 2007, almost three years before Hunt sought bankruptcy protection, and more than four years [*32] before the bankruptcy court determined that the Torrance property belonged to Hunt in her individual capacity and was property of her estate. The only documents related to these proceedings in the record are Hunt's petition and the probate court's order granting that petition. As neither document indicates that there are ongoing proceedings before the probate court, it appears the probate court's jurisdiction over any res has long since terminated. Moreover, as the court noted in its order affirming one of the bankruptcy court's prior orders in Hunt's case,[75] the probate court decided only that the Trust was the owner of the shares in Robert Hunt's professional corporation. It did not decide anything concerning, and thus could not have exercised control over, the Torrance property.[76] For these reasons, the bankruptcy court was not barred by the doctrine of prior exclusive jurisdiction from determining ownership of the Torrance property. The doctrine is simply inapplicable here.[77]

Hunt raises another jurisdictional argument for the first time on appeal, arguing that the bankruptcy court failed to make a finding that it acquired personal jurisdiction from the state court.[78] While a court must have personal jurisdiction over a litigant to issue enforceable orders, there is no requirement that a court make explicit findings concerning this fact. There is no indication that Hunt — in either her individual capacity or her capacity as trustee of the Trust — raised lack of personal jurisdiction as a defense to either of the motions from which she now appeals. There was thus no reason for the bankruptcy court to have explicitly considered and decided the issue. Accordingly, it did not [*34] err in failing to do so. This jurisdictional challenge to the orders therefore provides no basis for overturning them.

Moreover, to the extent Hunt's argument implies that the bankruptcy court could not exercise personal jurisdiction over her, she is clearly incorrect. It is axiomatic that a bankruptcy court has personal jurisdiction over a debtor who files a voluntary bankruptcy petition. Personal jurisdiction, "simply stated, is the power to enter judgment against a person." *S.E.C. v. Ross, 504 F.3d 1130, 1138 (9th Cir. 2007)*. "[A] party has consented to personal jurisdiction when the party took some kind of affirmative act — accepting a forum selection clause, submitting a claim, *filing an action* — that fairly invited the court to resolve the dispute between the parties." *Id. at 1149* (emphasis added); *Romero v. Citibank USA, National Association, 551 F.Supp.2d 1010, 1014 (E.D. Cal. 2008)* ("This court has personal jurisdiction over Plaintiff by Plaintiff's appearance and commencing the initial action"); see also *Stroud Productions and Enterprises, Inc. v. Castle Rock Entertainment, Inc. No. 09-cv-03796 JSW (NC), 2014 U.S. Dist. LEXIS 45706, 2014 WL 1306050, *8 (N.D. Cal. Mar. 31, 2014)* ("[T]he Court has personal jurisdiction over plaintiffs. . . . Here, plaintiffs initiated this action for copyright infringement and unfair competition in the Southern District of New York, and moved to transfer [*35] venue to this Court. . . . Plaintiffs further moved for reconsideration of the Court's orders leading to the entry of default, and opposed the pending default judgment motion without raising an objection based on personal jurisdiction").

Hunt raises a related argument in her capacity as trustee of the Trust, asserting in her reply brief that the Creditor Doctors have not satisfied their burden of showing that the state court could exercise personal jurisdiction over Hunt.[79] The argument fails because Hunt failed to argue lack of personal jurisdiction as an affirmative defense in

---

[75] Order Affirming Decision of the Bankruptcy Court, Case No. CV 13-02705, Docket No. 15 (Sept. 24, 2013), at 8 n. 34.

[76] There is no evidence in the record that the corporation owned the Torrance property.

[77] Hunt also argues [*33] that the probate court retained exclusive jurisdiction to dissolve or disburse trust assets. None of the bankruptcy court orders challenged in these appeals effected a dissolution of the trust. While the court did authorize a sale of the Torrance property, it did so not in the guise of ordering a disbursement of trust assets, but because it determined that because of the powers Hunt retained under the terms of the Trust, the Torrance property was in fact property of her bankruptcy estate.

[78] Hunt Opening Brief at 5, 15.

[79] Reply ("Hunt Trustee Reply"), Case No. CV 14-00440, Docket No. 36 (July 1, 2014) at 10-13.

her answer to the state court complaint.[80] As a result, she waived this defense. _Roy v. Superior Court of County of San Bernardino, 127 Cal.App.4th 337, 341, 25 Cal. Rptr. 3d 488 (2005)_ ("[I]t has long been the rule in California that a party waives any objection to the court's exercise of personal jurisdiction when the party makes a general appearance in the action. An answer, of course, is such an appearance").

## E. Whether the Bankruptcy Court Abused its Discretion in Denying Hunt's Recusal Motion

The disqualification of [*36] bankruptcy judges is governed by _28 U.S.C. § 455_. See _In re Goodwin, 194 B.R. at 221_. Under _28 U.S.C. § 455(a)_, "[a]ny . . . judge . . . shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The substantive standard under this statute is "[w]hether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." _Pesnell v. Arsenault, 543 F.3d 1038, 1043 (9th Cir. 2008)_ (citing _United States v. Hernandez, 109 F.3d 1450, 1453 (9th Cir. 1997))_.

"The test for disqualification under _section 455(a)_ is an objective one"; courts consider whether disqualification is required from the perspective of a reasonable person. _United States v. Nelson, 718 F.2d 315, 321 (9th Cir. 1983)_. "The 'reasonable person' in this context means a 'well-informed, thoughtful observer,' as opposed to a 'hypersensitive or unduly suspicious person.'" _Clemens v. United States District Court for the Central District of California, 428 F.3d 1175, 1178 (9th Cir. 2005)_ (quoting _In re Mason, 916 F.2d 384, 385 (7th Cir. 1990))_. If a reasonable person would question the judge's impartiality, "the judge must recuse himself; but there is as much an obligation for a judge not to recuse himself when there is no occasion for him to do so as there is for him to do so when there is." _United States v. West Productions, Ltd., No. 95 Civ. 1424(CSH), 2003 WL 328307, *1 (S.D.N.Y. Feb. 13, 2003)_.

The bias or prejudice that must be shown to merit recusal is not merely a favorable or unfavorable disposition toward a party, but rather a "favorable or unfavorable disposition or opinion that is somehow **[*37]** _wrongful or inappropriate_, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess." _Liteky v. United States, 510 U.S. 540, 550, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994)_ (emphasis original). For this reason, "the alleged bias and prejudice . . . must stem from an extrajudicial source." _Id. at 544_. See _United States v. Johnson, 610 F.3d 1138, 1147 (9th Cir. 2010)_ ("We have described the extrajudicial source factor as involving 'something other than rulings, opinions formed or statements made by the judge during the course of trial,'" quoting _United States v. Holland, 519 F.3d 909, 914 (9th Cir. 2008))_. "[O]pinions formed by the judge on the basis of facts introduced or evidence presented during the course of the proceedings are not grounds for disqualification unless there is evidence of such deep-seated favoritism or antagonism that fair judgment would be impossible." _Liteky, 510 U.S. at 555_; see also _United States v. Studley, 783 F.2d 934, 939 (9th Cir. 1986)_.

In her motion, Hunt argued that Judge Robles had exhibited bias by making purportedly erroneous evidentiary rulings, refusing to admit evidence despite the lack of any objection by the opposing party, failing to cite precedent supporting his decisions, refusing to grant continuances, failing to ensure that court filings were served on Hunt, and accepting misinformation from litigants. All of these things, Hunt maintained, demonstrated his bias and prejudice against her. As is evident, **[*38]** Hunt cited only rulings and alleged legal errors as evidence of bias, not prejudice flowing from an extrajudicial source. See _Liteky, 510 U.S. at 555_ ("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion"); _id._ ("In and of themselves . . . [judicial rulings] cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required . . . when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal"); _Clemens v. U.S. District Court for the Central District of California, 428 F.3d 1175, 1178-79 (9th Cir. 2005)_ (noting that the fact that a judge issued adverse rulings against a party in the proceeding is not ordinarily sufficient to require recusal); _Leslie v. Grupo ICA, 198 F.3d 1152, 1160 (9th Cir. 1999)_ ("Leslie's allegations stem entirely from the district judge's adverse rulings. That is not an adequate basis for

---

[80] See _Capen v. Hunt_, BC 397187, Answer of Peli Popovich Hunt to Unverified Second Amended Complaint) (May 6, 2009).

recusal"); *Hasbrouck v. Texaco, Inc., 842 F.2d 1034, 1046 (9th Cir. 1987)* ("Texaco supports its allegations of bias merely by pointing to alleged errors at trial. . . . Even if these rulings were erroneous, and we do not suggest that they were, they could not justify a finding of judicial bias [that would support recusal under *§ 455*]"); *Studley, 783 F.2d at 939* (a judge's prior rulings adverse to a tax-protestor defendant were not a sufficient cause for recusal); *Hagans v. Andrus, 651 F.2d 622, 628 (9th Cir. 1981)* ("It is not a ground **[*39]** for disqualification that the judge has ruled against the moving party or that he may have committed an error of law," citing *United States v. Conforte, 624 F.2d 869 (9th Cir. 1980)*).

Hunt identified no extrajudicial source of bias, nor any interest that precluded Judge Robles from handling the case. Her assertions, which were unclear and unsupported, did not merit his disqualification. See *Palmieri v. United States, 286 F.Supp. 520, 523-24 (S.D.N.Y. 1968)* ("Petitioner has failed to meet the statutory requirement of setting forth facts and reasons for his belief that bias or prejudice exists and, instead, has presented mere conclusions"). Accordingly, Judge Robles did not abuse his discretion in denying Hunt's motion for recusal.[81]

## F. Whether the Court Should Reverse the Bankruptcy Court's Order Approving the Sale of the Torrance Property

Although difficult to discern, Hunt appears to advance three arguments concerning the bankruptcy court's order approving the sale of the Torrance property: (1) the property was property of the Trust, and not of the estate; (2) the trust transfer deed is a contract over which the bankruptcy court, as an Article I court, lacked jurisdiction; and (3) the property was sold for below fair market value. The court addresses these arguments in turn.

### 1. Whether the Torrance Property Was Property of the Estate

Several of Hunt's arguments rest on the assertion that the Torrance property was **[*41]** not property of the bankruptcy estate. She argues that she lacked authority as trustee of the Trust to assign the property to the bankruptcy,[82] that the trust's procedures for transferring property out of the trust were not followed,[83] and that Miller failed to serve her with a turnover order prior to confiscating trust assets.[84] As he court noted in its order affirming one of the bankruptcy court's prior orders in Hunt's case, the Torrance property was property of the bankruptcy estate.[85] Nonetheless, because Hunt continues to raise the issue, the court addresses her argument once again.[86]

---

[81] The fact that Judge Robles decided the recusal motion was not error. Federal judges may rule on motions seeking to recuse them. See *Microsoft Corp. v. United States, 530 U.S. 1301, 1301-02, 121 S. Ct. 25, 147 L. Ed. 2d 1048 (2000)* (Statement of Rehnquist, C.J.) (discussing the fact that his son represented Microsoft in another matter, and declining to recuse himself because no "well-informed individual would conclude that an appearance of impropriety exists"); *Miles v. Ryan, 697 F.3d 1090, 1090 (9th Cir. 2012)* ("Appellant's motion to recuse Judge Graber was, in its format, directed to all three judges on the three-judge panel in this case. Under this Circuit's procedures, however, each judge may decide for himself or herself **[*40]** whether recusal is appropriate"); *Perry v. Schwarzenegger, 630 F.3d 909, 912 (9th Cir. 2011)* ("Proponents' contention that I should recuse myself due to my wife's opinions is based upon an outmoded conception of the relationship between spouses"); *In re Williams, BAP No. CC-04-1605-MaMoPa, 2006 Bankr. LEXIS 4856, 2006 WL 6817587, *6 (9th Cir. BAP Mar. 10, 2006)* (Unpub. Disp.) (bankruptcy judge did not err in ruling on a motion to recuse him because then applicable Central District General Order 224 applied only to district court judges). Accordingly, Judge Robles acted within his authority and discretion in deciding Hunt's recusal motion.

[82] Hunt Opening Brief at 5.

[83] *Id.* at 6, 8.

[84] *Id.* at 6.

[85] Order Affirming Decisions of the Bankruptcy Court, Case No. CV 12-06600, Docket No. 59 (Jan. 31, 2014) at 33-37.

Under *11 U.S.C. §363*, a trustee is authorized to sell "property of the estate." Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." *11 U.S.C. § 541(a)*. "A bankruptcy court may not allow the sale of property as 'property of the estate,' without first determining whether the debtor in fact owned the property." *In re Rodeo Canon Development Corp., 362 F.3d 603, 608-09 (9th Cir. 2004)*, opinion withdrawn on other grounds, *126 Fed. Appx. 353 (9th Cir. Mar. 8, 2005)* (Unpub. Disp.); see *In re Silver Beach, LLC, No. NV-09-1049, 2009 Bankr. LEXIS 4587, 2009 WL 7809002, *7 (9th Cir. BAP Nov. 3, 2009)* (Unpub. Disp.) ("Before the bankruptcy court may authorize a sale under authority of *section 363(b)(1)*, the court must determine whether the estate actually has an interest in the property to be sold"); *In re Cogliano, 355 B.R. 792, 804 (9th Cir. BAP 2006)* ("*Rule 7001(2)* requires an adversary proceeding 'to determine the validity, priority, or extent of a lien or other interest in property'"); *In re Popp, 323 B.R. 260, 266 (9th Cir. BAP 2005)* ("*Section 363(b)* . . . requires that the estate demonstrate that the property it proposes to sell is 'property of the estate'"); *In re Clark, 266 B.R. 163, 172 (9th Cir. BAP 2001)* (holding that "[t]he threshold question [—] is [the property] still property of the estate [—] must . . . be decided" before it can be sold free and clear under *§ 363(f)*); see also *In re Robertson, 203 F.3d 855, 863 (5th Cir. 2000)* ("Because the separate [*44] property home of [a non-debtor] was not included or owned in indivision with the property of the Debtor's bankruptcy estate, the Trustee lacked authority to sell her home . . . as property of the estate in which there is an interest of 'an entity other than the estate' under *section 363(f). . .*"); *In re Coburn, 250 B.R. 401, 403 (Bankr. M.D. Fla. 1999)* (finding it necessary to determine whether an asset was property of the estate in order to decide whether the trustee was entitled to sell it under *§ 363(f)*).

Hunt argues that the Torrance property is not her individual property because, as trustee, she never transferred title to herself in her individual capacity.[87] This statement is contradicted by her own filings in this case. As noted, Hunt's January 5, 2012 schedules listed the Torrance property as her individual property. The schedules were filed under penalty of perjury. *Fed.R.Bankr.Proc. 1008* ("All petitions, lists, schedules, statements and amendments thereto shall be verified"); *In re Bohrer, 266 B.R. 200, 201 (Bankr. N.D. Cal. 2001)* ("Statements in bankruptcy schedules are executed under penalty of perjury and when offered against a debtor are eligible for treatment as judicial admissions," citing *In the Matter of Gervich, 570 F.2d 247, 253 (8th Cir. 1978)*); *id.* ("A debtor may not adopt a cavalier attitude toward [ ] the accuracy of his schedules by arguing that they are not precise and [*45] correct," citing *In re Duplante, 215 B.R. 444, 447 n. 8 (9th Cir. BAP 1997)*). As the court noted in its order on Hunt's prior appeal, because Hunt's schedules were executed under penalty of perjury, the statements they contain can be treated as judicial admissions. *In re Rolland, 317 B.R. 402, 421 (Bankr. C.D. Cal. 2004)* ("Statements in bankruptcy schedules are executed under penalty of perjury and, when offered against a debtor, are eligible for treatment as judicial admissions"). "Judicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Id. at 421-22* (quoting *Am.*

---

[86] Hunt argues that the court can reconsider its decisions in Case Nos. CV 12-06600 (see *id.*) and CV 13-02705, in which the court found over Hunt's objections, respectively, that the Torrance property and another property in Glendale were property of the estate (see Order Affirming Decision of the Bankruptcy Court, Case No. CV 13-02705, Docket No. 15 (Sept. 24, 2013) at 8-12) either as an en banc panel or a merits panel reconsidering its prior decision. (Hunt Opening [*42] Brief at 23.) Although a district court functions as an appellate court when reviewing decisions of the bankruptcy court, en banc review is not available to a party in a district court. *Hanneman v. Nevada Attorney General, No. 3:05-cv-0284-ECR-VPC, 2010 U.S. Dist. LEXIS 55775, 2010 WL 1904826, *1 (D. Nev. May 10, 2010)* ("[T]here is no en banc review available for a district court decision"). See also *Cuesta v. Bertrand No. 04-C-645, 2006 U.S. Dist. LEXIS 36212, 2006 WL 1598409, *1 (E.D. Wis. June 1, 2006)* ("En banc review is not available to a party in a district court bur rather is limited to Courts of Appeals. See *28 U.S.C. § 46*; *Fed.R.App.P. 35*. Therefore, Cuesta's motion may be best regarded as a 'Motion to Reconsider Reconsideration'"); *Ryburn v. Ramos, No. 09-cv-1176, 2010 U.S. Dist. LEXIS 132417, 2010 WL 5344961, *1 (C.D. Ill. Dec. 15, 2010)* ("Petitioner filed a Motion for Rehearing en banc under *Federal Rule 60(b)*. En banc review is not available to a party in a district court, but rather is limited to courts of Appeals. Accordingly, the Court will treat this Motion as a motion for relief from judgment," internal citation and quotation omitted). The appropriate procedure to seek reconsideration of a district court decision reviewing a bankruptcy court order, moreover, is by filing a motion for rehearing under *Rule 8015 of the Federal Rules of Bankruptcy Procedure*. See *Fed.R.Bankr.Proc. 8015*. Hunt sought reconsideration of both orders discussed in this footnote, and the motions the court denied. (Order Denying Motion to Vacate Mandate; Recall Mandate and Petition for [*43] Rehearing, Case No. 13-02705, Docket No. 21 (Apr. 8, 2014); Order Denying Motion for Rehearing and to Recall Mandate, Case No. 12-06600, Docket No. 66 (Apr. 28, 2014).)

[87] Hunt Opening Brief at 6, 12.

2014 U.S. Dist. LEXIS 189464, *43

*Title Ins. Co. v. Lacelaw Corp., 861 F.2d 224, 226 (9th Cir. 1988))*. "Judicial admissions are conclusively binding on the party who made them. Even when schedules are amended, [moreover,] the old schedules are subject to consideration by the court as evidentiary admissions." *Id. at 422* (internal citations omitted). See *In re Rollings, 451 Fed. Appx. 340, 348 (5th Cir. Oct. 12, 2011)* (Unpub. Disp.) ("'Admissions made in superseded pleadings are as a general rule considered to lose their binding force, and to have value only as evidentiary admissions,'" quoting *White v. ARCO/Polymers, Inc., 720 F.2d 1391, 1396 n. 5 (5th Cir. 1983))*.

Hunt argues that the statement that she owned the Torrance property in her individual capacity was the product of "unreasonable legal advice" by her prior attorney and that it should be disregarded [*46] for that reason.[88] The court disagrees. Hunt signed the schedule under penalty of perjury and had an independent duty to verify its accuracy. See *In re Rolland, 317 B.R. at 422* (rejecting debtors' argument that they should not be held responsible for alleged mistakes in their schedules because they relied on counsel). Additionally, it was only once her bankruptcy case was at risk of being converted to a Chapter 7 proceeding, leaving the property open for sale, that Hunt began to contest her ownership of it.

Even were the court to look past Hunt's admission and consider the evidence she proffered to the bankruptcy court to show that the property was held by her in her capacity as trustee of the Trust rather than in her individual capacity,[89] the court would still conclude that the interest is the property of Hunt's bankruptcy estate. This is true whether Hunt distributed the Torrance property to the Survivor's Trust or to the Credit Bypass Trust on her husband's death.[90]

Assuming she transferred the property to the Survivor's Trust, the property would be property of the estate because Hunt retains the power to revoke the trust. Under California law, "[i]f the settlor retains the power to revoke the trust in whole or in part, the trust property is subject to the claims of creditors of the settlor to the extent of the power of revocation during the lifetime of the settlor." *Cal. Prob. Code § 18200*; *In re Brooks-Hamilton, 348 B.R. 512, 519 (Bankr. N.D. Cal. 2006)* ("Under California law, when the settlor of a trust retains the power to revoke a trust, the trust res remains the settlor's property subject to his creditor's claims"); *see also In re Irwin, 338 B.R. 839, 854-53 (E.D. Cal. 2006)* (holding that property transferred to a revocable trust was property of the settlor's bankruptcy estate). Because Hunt is a settlor of the Trust, which directs her to distribute [*48] the Torrance Property to the Survivor's Trust[91] and because she retains the power to revoke that trust,[92] any assets in the Survivor's Trust are the property of her individual bankruptcy estate.

If, on the other hand, Hunt transferred the Torrance property to the Credit Bypass Trust despite the requirement that she distribute the property [*49] to the Survivor's Trust, the property would still be property of the estate because she retains power under that trust to pay to or apply for her benefit as much of the income and principal of the

---

[88] *Id.* at 5, 13, 18; Reply ("Hunt Miller Reply"), Case No. CV 12-08439, Docket No. 53 (May 28, 2014) at 3.

[89] As the court noted in a prior order, it is unclear whether Hunt owns the Torrance property in her individual capacity or as trustee of the Trust because the two grant [*47] deeds she and her late husband executed, dated the same day, conflict with one another. One transfers the property to Hunt and her husband as community property, while the other transfers it to them as trustees of the Trust. (Order Affirming Decisions of the Bankruptcy Court, Case No. CV 12-00600, Docket No. 59 (Jan. 31, 2014) at 5.)

[90] There is no information in the record regarding the trust to which the Torrance property was transferred.

[91] See Notice of Opposition and Request for a Hearing by the Trust ("Trust Opposition"), Case No. BK 11-58222, Docket No. 135 (June 1, 2012), Exh. 9 (Trust, ¶ 4.1(c)(2) ("The TRUSTEE shall distribute the residue of the Trust as provided in Paragraph 4.4 below, including but not limited to: . . . Real property improved with a medical building commonly known as 3661 Torrance Boulevard, Torrance, California (APN 7524-015-054) and the adjacent unimproved lot (APN 7524-015-075), and the identifiable proceeds of the sale of such property"); *id.*, ¶ 4.4(b) ("The Survivor's Trust shall consist of the residue of the Trust Estate . . . .").

[92] See *id.*, ¶ 23.3 ("On the Death of the Deceased Spouse, the Surviving Spouse shall have the power to amend, revoke, or terminate the Survivor's Trust in whole or in part; but the Credit Bypass Trust may not be amended or terminated")).

Credit Bypass Trust as she, in her discretion, considers appropriate and because that trust does not have a valid spendthrift clause. "[W]hile assets transferred to a trust do not ordinarily become property of the bankruptcy estate of the trust's trustee, powers that a debtor who is trustee of a trust may exercise for his or her own benefit become property of the estate." *In re Cutter, 398 B.R. 6, 19 (9th Cir. BAP 2008)* (citing *Askanase v. LivingWell, Inc., 45 F.3d 103, 106 (5th Cir. 1995)).* "Moreover, to the extent a debtor holds a beneficial interest in a trust, that beneficial interest becomes property of the estate, unless it is protected by a valid spendthrift provision." *Id.* (citing *11 U.S.C. § 541(a)(1)* and *(c)(2)).*

In *Cutter*, a Chapter 7 debtor created an irrevocable trust and named himself trustee. *Id. at 12*. The trust provided that the trustee could make distributions at his "sole discretion . . . in an amount to provide for the health, the education, or the support and maintenance in the customary manner of living of the trustor. . . ." *Id.* The court affirmed the bankruptcy court's conclusion that the debtor had an equitable interest [*50] in the trust assets, and thus that those assets were property of the bankruptcy estate. *Id. at 19*; see also *id. at 12* (noting the bankruptcy court's conclusion that, even though the trust "did not specifically identify [the debtor] as a primary beneficiary," he was in fact a primary beneficiary because he had the ability to invade the trust property for emergencies related to his health, education, support and/or maintenance). It also affirmed the bankruptcy court's conclusion that the trust property was property of the bankruptcy estate because the "[d]ebtor had access to potentially all of the Trust's assets and income in order to maintain his standard of living. Debtor possessed the power to 'invade' the corpus of the Trust for emergencies relating to his health, education, support and/or maintenance. Debtor possessed the right, at his sole discretion, to make distributions in order to provide for his health, education, or support and maintenance in [his] customary standard of living'" *Id. at 20* (internal citations omitted).

Like the debtor in *Cutter*, Hunt has the power to "pay to or apply for [her] benefit . . . as much of the income and principal of the Credit Bypass Trust as [she], in [her] discretion [as trustee], [*51] considers appropriate for [ ] her care, support, health and education and to maintain [ ] her accustomed manner of living."[93] While the trust instrument states that she cannot make principal or income distributions from the Credit Bypass Trust to herself unless the assets of the Survivor's Trust and other resources have been exhausted, it qualifies this prohibition by stating that even if assets of the Survivor's Trust and other resources remain, she may distribute the principal and income of the Credit Bypass Trust to herself if she "considers it reasonable to do so under the circumstances." Because Hunt, as settlor and trustee of the trust, has the power in her sole discretion to distribute the assets of the Credit Bypass Trust to herself, her interest in the Torrance property is property of the bankruptcy estate even if it was held in that trust. Accordingly, the bankruptcy court did not err when it held that the Torrance property was property of Hunt's personal bankruptcy estate.[94]

## 2. Whether the Bankruptcy Court Lacked Jurisdiction

Hunt next argues that the bankruptcy court lacked subject matter jurisdiction to issue an order authorizing a sale of the property by the trustee, apparently on the basis that a trust transfer deed is a contract, and that bankruptcy courts lack jurisdiction over contracts.[95] The Bankruptcy Code expressly provides for the sale of property of the estate by the trustee, however. *11 U.S.C. § 363(b)(1)* ("The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate"). The bankruptcy court's approval of such a sale is constitutional because the sale itself is authorized by statute, and its approval therefore constitutes

---

[93] *Id.*, Exh. 9 (Trust, ¶ 6.1).

[94] Hunt also argues that the bankruptcy court erred in denying her motion for stay pending appeal of the order authorizing sale of the property. (Hunt Opening Brief at 5-6.) The court [*52] finds Hunt's argument unavailing. The bankruptcy declined to grant Hunt's request for temporary stay pending appeal because it concluded that, *inter alia*, Hunt was unlikely to prevail on the merits of her claim that the property was not property of the estate. (AER at 242.) Because the court has now determined on several occasions that this conclusion was correct, the court affirms the bankruptcy court's denial of Hunt's motion for stay on this basis.

[95] Hunt Opening Brief at 14-15; Hunt Miller Reply at 10-15.

2014 U.S. Dist. LEXIS 189464, *52

the adjudication of a public right. [*53] See, e.g., *Pusser's (2001) Ltd. v. HMX, LLC, No. 11 C 4659, 2012 U.S. Dist. LEXIS 43199, 2012 WL 1068756, *6 (N.D. Ill. Mar. 28, 2012)* ("[T]he bankruptcy court was correct that it possessed subject matter jurisdiction to enter the Sale Order. The entry of orders approving the sale of the property of a debtor's estate outside the usual course of business is a 'core proceeding' within a bankruptcy court's subject matter jurisdiction, . . . Bankruptcy courts have the ability to enter final determinations on § 363 sales because such sales are a product of the Bankruptcy Code, and therefore are adjudications of 'public rights' that Congress can delegate to an Article I court without violating Article III," citing *Stern v. Marshall, 564 U.S. 462, 131 S. Ct. 2594, 2613, 180 L. Ed. 2d 475 (2011)* (describing cases that fit within the "public rights exception" as those "in which the claim at issue derives from a federal regulatory scheme")); see also *In re Motors Liquidation Co., 428 B.R. 43, 56-57 (S.D.N.Y.2010)* ("It is well-settled that bankruptcy courts have core jurisdiction to approve *section 363* sales. . .").

To the extent Hunt argues that the bankruptcy court lacked authority to determine the ownership of the property — i.e., whether the property the trustee sought to sell was in fact property of the estate — she misstates the law. A bankruptcy court may "enter appropriate orders and judgments, subject [*54] to review under" *28 U.S.C. § 158* in core matters. *28 U.S.C. § 157(b)(1)*. In contrast, the bankruptcy court's power over non-core proceedings, or those "related to" a bankruptcy case, is limited, absent the parties' consent, to issuing proposed findings of fact and conclusions of law that are subject to *de novo* review by the district court. *28 U.S.C. §§ 157(c)(1)*, *(2)*; *In re Stokes, No. MT-13-1097-TaPaJu, 2013 Bankr. LEXIS 4654, 2013 WL 5313412, *7 (9th Cir. BAP Sept. 23, 2013)* ("[A] core proceeding refers to matters that the bankruptcy court may hear and determine, as opposed to non-core matters, where, absent consent, the bankruptcy court may hear but not finally adjudicate").

Whether property is property of the estate is a core matter within the bankruptcy court's jurisdiction. *In re Stokes, 2013 Bankr. LEXIS 4654, 2013 WL 5313412 at *8* ("Indeed, '[p]roceedings to determine the nature and extent of property of the estate are fundamental to the administration of a bankruptcy case,' and, thus, are 'core' proceedings," quoting *Watson v. Kincaid (In re Kincaid), 96 B.R. 1014, 1017 (9th Cir. BAP 1989)*, rev'd on other grounds, *917 F.2d 1162 (9th Cir. 1990)*); *Olivie Development Grp. LLC v. Ki Chang Park, No. C11-1691Z, 2012 U.S. Dist. LEXIS 60299, 2012 WL 1536207, *3 & n. 2 (W.D. Wash. Apr. 30, 2012)* (collecting cases). See also *Olivie Development Grp. LLC, 2012 U.S. Dist. LEXIS 60299, 2012 WL 1536207 at *4* ("A bankruptcy court's finding regarding the parties' interests in property is necessarily a function of determining what constitutes property of the estate. Here, the Bankruptcy Court's Order makes a factual finding about the parties' interest in the security [*55] deposit so that the court could determine the issue of whether that deposit was part of the bankruptcy estate. This necessary finding does not convert the core issue of whether something is property of the estate into a non-core proceeding"). Accordingly, the court finds that the bankruptcy court acted within its authority in issuing an order authorizing the sale of Hunt's interest in the Torrance property.

**3. Whether the Sale Price Was Fair Market Value**

Hunt also challenges the sale on the grounds that it was sold below fair market value.[96] She asserts that a property's value must be determined at the time a petition is filed, and that she provided data on the value of comparable properties that Miller failed to consider.[97]

An appeal of an order authorizing the sale of assets of the bankruptcy estate to a good faith purchaser is moot in the absence of a stay. *In re Fearing, 143 Fed. Appx. 744, 745 (9th Cir. July 18, 2005)* (Unpub. Disp.) ("[W]hen, in the absence of a stay of the order of sale, a sale to a 'good faith purchaser' has been concluded — an appellate court cannot undo the sale. Because the court cannot provide meaningful relief to the appellant under those circumstances, any appeal of the order of sale thereby becomes moot," [*56] quoting *Dunlavey v. Ariz. Title Ins. & Trust Co. (In re Charlton), 708 F.2d 1449, 1454 (9th Cir. 1983)* (in turn quoting *Taylor v. Lake (In re Cada Invs., Inc.), 664 F.2d 1158, 1160 (9th Cir.1981)*); *11 U.S.C. § 363(m)* ("The reversal or modification on appeal of an

---

[96] Hunt Opening Brief at 9.

[97] *Id. at 20*.

2014 U.S. Dist. LEXIS 189464, *56

authorization under *subsection (b)* or *(c)* of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal"). "There are two exceptions to this rule: "(1) where real property is sold subject to a statutory right of redemption, and (2) where state law otherwise would permit the transaction to be set aside." *Id.* (quoting *Ewell v. Diebert (In re Ewell), 958 F.2d 276, 280 (9th Cir. 1992)).* Neither exception applies in this case.

The Ninth Circuit has defined a good faith purchaser as "one who buys 'in good faith' and 'for value.'" *Id. at 746* (quoting *In re Ewell, 958 F.2d at 281*). Lack of good faith is shown by "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Id.* (quoting *In re Ewell, 958 F.2d at 281*). A bankruptcy court's finding of good faith is reviewed for clear error. *In re Thorpe Insulation Co., 392 Fed. Appx. 549, 550 (9th Cir. Aug. 13, 2010)* (Unpub. Disp.).

Here, as noted, Hunt did not obtain a stay of the sale. Consequently, the court's review is limited to determining whether the **[*57]** bankruptcy court's finding that the buyer was a good faith purchaser was clearly erroneous. In her motion for an order authorizing the sale, Miller proffered a declaration stating that the proposed buyer had no relation to the debtor or trustee and was not a creditor of the estate, and that the sale was negotiated at arms length.[98]

In its September 5 order approving Miller's motion for an order authorizing the sale, the bankruptcy court found the sale was proposed in good faith and was the result of an arms-length transaction. The court cited Miller's declaration that the proposed sale was the result of an arms-length transaction, and that the $3,000,000 purchase offer exceeded Hunt's valuation by $1,000,000.[99] Hunt does not argue that Blue Sky was not a good faith purchaser, and she adduces no evidence that would support such a conclusion. She states that she provided "comps" for properties similar in value to the Torrance property, but provides no explanation and adduces no evidence that the listings — which range in value from $3.02 million **[*58]** to $383.7 million[100] — are actually comparable to the Torrance property.[101] Accordingly, the court concludes the bankruptcy court did not commit clear error in approving the sale. The court, therefore, dismisses Hunt's appeal of the sale order as moot.[102] See *In re Thorpe Insulation Co., 392 Fed. Appx. at 550-51* ("In support of its motion for approval of the settlement agreement, Thorpe submitted a declaration prepared and executed by its president Robert W. Fults, in which Fults attested that the agreement 'was negotiated at arms-length and in good faith.' . . . The court went on to find that Thorpe and General Insurance had negotiated 'extensively, at arm's-length, [and] in good faith.' On the basis of those and many other factors (including, as the district court pointed out, the bankruptcy court's own observations), the bankruptcy court approved the agreement. . . . As the record stands, therefore, Thorpe made a prima facie showing of good

---

[98] Motion for Order Authorizing Sale of Real Property, Case No. BK 11-58222, Docket No. 196 (Aug. 2, 2012) at 26 (Declaration of Elissa D. Miller, ¶ 9).

[99] Case No. BK 11-58222, Docket No. 239 (Sept. 5, 2012) (Order Authorizing Sale of Real Property) 4. In fact, Hunt initially scheduled the property at $1.3 million; thus, the $3,000,000 offer was more than twice this amount, and the final $4,050,000 sale price more than three times.

[100] AER at 357, 360.

[101] The wide range of values suggests the properties proffered by Hunt are not even comparable to each other.

[102] Hunt also argues that the failure to serve the September 14, 2012 sale order on her in her capacity as trustee of the Trust, or on her counsel, violated her due process rights and requires vacation of the order. (Hunt Opening Brief at 10-11.) "The standard for what amounts to constitutionally adequate notice . . . is fairly low; it[ ] [is] 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objection.'" *Espinosa v. United Student Aid Funds, Inc., 553 F.3d 1193, 1202 (9th Cir. 2008)* (citing *Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 70 S. Ct. 652, 94 L. Ed. 865 (1950)).* As noted, Hunt, in her personal capacity, was on notice of the sale order because she timely appealed it just days later. Accordingly, the court finds that Hunt had adequate notice of the sale order. Moreover, as noted, Hunt's appeals of the **[*60]** sale order in both her individual capacity and her capacity as trustee of the Trust are moot.

faith, and that showing went without rebuttal. Motor Vehicle and Central National proffered no evidence that would support a finding of bad faith or cast doubt on the integrity of the negotiations. The bankruptcy court's finding of good faith was, accordingly, supported by sufficient evidence, and the district **[\*59]** court did not err in upholding it").

Even if Hunt's appeal were not moot, the court would deny it because the bankruptcy court's order was substantively correct. As noted, the Torrance property was property of the bankruptcy estate, the bankruptcy court had jurisdiction to approve a sale, and the bankruptcy court's finding that the sale was in good faith and at arms length was not clearly erroneous.

Although Hunt does not dispute the point, the court also finds that the order approving the sale was not an abuse of discretion under *11 U.S.C. § 363(b)*. *11 U.S.C. § 363(b)(1)* provides in relevant part: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate[.]" Sales pursuant to § 363(b) must be supported by a valid business justification. *240 N. Brand Partners, Ltd. v. Colony GFP Partners, 200 B.R. 653, 659 (9th Cir. BAP 1996)* (citing *In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983)*). The sale must also be in good faith. "'Good faith' encompasses fair value, and further speaks to the integrity of the transaction. Typical 'bad faith' or misconduct, would include collusion between the seller and buyer, or any attempt to take unfair advantage of other potential purchasers." *240 N. Brand Partners, 200 B.R. at 659* (quoting *In re Wilde Horse Enterprises, Inc., 136 B.R. 830, 842 (Bankr. C.D. Cal. 1991)*).

At the September 5, 2012 **[\*61]** hearing, the bankruptcy court held that the "the sale is supported by a valid business justification and has been proposed in good faith," in that it would "yield a distribution for creditors."[103] Hunt does not challenge or address this finding in any way. Accordingly, she has abandoned any challenge to the findings that were necessary to support the sale under § 363(b)(1). Even if the appeal were not moot, therefore, it would fail on the merits.[104] This conclusion provides an alternative basis on which to find against Hunt on her appeal in her capacity as trustee of the Trust.

### G. Whether the Court Should Overturn the Bankruptcy Court's Order Overruling Hunt's Objection to the Creditor Doctors' Claim

"A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." *In re HWY Squared, Inc., 208 Fed. Appx. 581, 582 (9th Cir. Nov. 30, 2006)* (Unpub. Disp.) (quoting *Fed.R.Bankr.Proc. 3001(f)*). "The filing of an objection to a proof of claim 'creates a dispute which is a contested matter' within the meaning of *Bankruptcy Rule 9014* and must be resolved after notice and opportunity for hearing upon a motion for relief." *Lundell v. Anchor Const. Specialists, Inc., 223 F.3d 1035, 1039 (9th Cir. 2000)*. "Upon objection, the proof of claim provides 'some evidence as to its validity and amount' and is 'strong enough to carry over a mere formal objection without more.'" *Id.* (quoting *Wright v. Holm (In re Holm), 931 F.2d 620, 623 (9th Cir. 1991)* (quoting 3 L. King, *Collier on Bankruptcy § 502.02* at 502-22 (15th ed. 1991)); see also *Ashford v. Consolidated Pioneer Mort. (In re Consol. Pioneer Mort.), 178 B.R. 222, 226 (9th Cir. BAP 1995)*, aff'd, *91 F.3d 151, 1996 WL 393533 (9th Cir. July 15, 1996)* (Unpub. Disp.)). "To defeat the claim, the objector must come forward with sufficient evidence and 'show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves.'" *Lundell, 223 F.3d at 1039* (quoting *In re Holm, 931 F.2d at 623*).

---

[103] Order Authorizing Sale of Real Property, Case No. BK 11-58222, Docket No. 239 (Sept. 5, 2012) at 4-5.

[104] Hunt challenges the sale order on the basis that the bankruptcy court denied a request for a hearing on an environmental impact study purportedly requested by Blue Sky. (Hunt Opening Brief at 10.) Hunt identifies nothing in the record supporting her contention that the request was denied, however. Nor does she explain how such a denial negatively impacted the sale or the bankruptcy court process approving the sale. The court thus finds the argument unavailing, particularly given its determination that Hunt's appeal is moot, and **[\*62]** that the sale was conducted in good faith.

2014 U.S. Dist. LEXIS 189464, *62

"'If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the [*63] validity of the claim by a preponderance of the evidence.'" *Id.* (quoting *In re Consol. Pioneer Mort., 178 B.R. at 226* (in turn quoting *In re Allegheny Int'l, Inc., 954 F.2d 167, 173-74 (3d Cir. 1992))*. "The ultimate burden of persuasion remains at all times upon the claimant." *Id.* (citing *In re Holm, 931 F.2d at 623*).

The only reference in Hunt's opening brief to the Creditor Doctors' claim is her assertion that a finding of successor liability was inappropriate because she is not a physician, and therefore could not have qualified as a shareholder under RWH's bylaws.[105] Hunt likely intends to object to the state court's finding of alter ego liability rather than successor liability, as the state court judgment found her liable only on the former theory.[106] Hunt raised a similar argument in the bankruptcy court; in her reply in support of her objection to the claim, Hunt argued that the corporate articles and bylaws for RWH precluded her from authorizing medical treatment after October 26, 2007, because she was not a licensed physician who owned stock.[107] Hunt's argument that she was not a shareholder, however, is contradicted by her sworn declaration filed in support of her objection to the Creditor Doctors' claim. There, Hunt states, under penalty of perjury: "I am the President, sole director, and sole shareholder of Robert [*64] W. Hunt, M.D., A Medical Corporation, as well as the above captioned debtor."[108]

Because Hunt's only argument as to why the bankruptcy court should have sustained her objection is contradicted by her own admissible sworn statement, she has failed to carry her burden of proffering "sufficient evidence and show[ing] facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves." *Lundell, 223 F.3d at 1039*. Accordingly, the court finds that the bankruptcy court did not err in overruling Hunt's objection to the Creditor Doctors' claim.

## III. CONCLUSION

For the reasons stated, the court affirms the decisions [*66] of the bankruptcy court.

DATED: July 25, 2014

/s/ Margaret M. Morrow

---

[105] Hunt Opening Brief at 11; Hunt Miller Reply at 9. In her reply brief, Hunt raises new arguments that (1) the court should have held an evidentiary hearing providing her the opportunity to introduce live testimony, (2) hearsay objections to her declaration should not have been sustained, and (3) her declaration demonstrates that she was not the alter ego of RWH. (Hunt Miller Reply at 10, 13, 17.) As noted, courts generally do not consider arguments raised for the first time in a reply brief, because it deprives the nonmoving party of an opportunity to respond. *United States v. Romm, 455 F.3d 990, 997 (9th Cir. 2006)* ("Finally, and for the first time in his reply brief, Romm argues the search of his laptop was too intrusive on his *First Amendment* interests to qualify as a 'routine' border search. We decline to consider this issue here because 'arguments not raised by a party in its opening brief are deemed waived,'" quoting *Smith v. Marsh, 194 F.3d 1045, 1052 (9th Cir. 1999)*); *Cedano-Viera v. Ashcroft, 324 F.3d 1062, 1066 n. 5 (9th Cir. 2003)* "[W]e decline to consider new issues raised for the first time in a reply brief"); *Bazuaye v. INS, 79 F.3d 118, 120 (9th Cir. 1996)* ("Issues raised for the first time in a reply brief are waived"); *State of Nev. v. Watkins, 914 F.2d 1545, 1560 (9th Cir. 1990)* ("[P]arties cannot raise a new issue for the first time in their reply briefs" (citations omitted)); *Ass'n of Irritated Residents v. C & R Vanderham Dairy, 435 F.Supp.2d 1078, 1089 (E.D. Cal. 2006)* ("It is innapropriate [*65] to consider arguments raised for the first time in a reply brief"; *United States ex rel. Giles v. Sardie, 191 F.Supp.2d 1117, 1127 (C.D. Cal. 2000)* ("It is improper for a moving party to introduce new facts or different legal arguments in the reply brief than those presented in the moving papers"). Because Hunt raised these arguments for the first time in her reply brief, and because she provides no explanation for her failure to include them in her opening brief — which would have afforded appellees an opportunity to respond — the court declines to consider the arguments.

[106] Case No. BK 11-58222, Docket No. 216 (Aug. 17, 2012) at 39.

[107] AER at 178.

[108] *Id.* at 117, ¶ 1. This statement was one of the only statements deemed admissible by the bankruptcy court. (*Id.* at 33.)

MARGARET M. MORROW

UNITED STATES DISTRICT JUDGE

---

**End of Document**

# EXHIBIT 7

### *APJL Consulting, LLC v. Treasures, Inc. (In re Treasures, Inc.)*

United States Bankruptcy Appellate Panel for the Ninth Circuit

January 22, 2015, Argued and Submitted at Pasadena, California; March 3, 2015, Filed

BAP No. SC-13-1304-JuKiKu, BAP No. SC-13-1464-JuKiKu (related)

**Reporter**
2015 Bankr. LEXIS 662 *

In re: TREASURES, INC., Debtor. APJL CONSULTING, LLC, Appellant, v. TREASURES, INC.; LEONARD J. ACKERMAN, Chapter 7 Trustee, Appellees.

**Notice:** THIS DISPOSITION IS NOT APPROPRIATE FOR PUBLICATION. ALTHOUGH IT MAY BE CITED FOR WHATEVER PERSUASIVE VALUE IT MAY HAVE (SEE *FED. R. APP. P. 32.1*), IT HAS NO PRECEDENTIAL VALUE. SEE 9TH CIR. BAP RULE 8013-1.

**Prior History:** [*1] Appeal from the United States Bankruptcy Court for the Southern District of California. Bk. No. 12-06689-MM7. Honorable Margaret M. Mann, Bankruptcy Judge, Presiding.

*In re Treasures, Inc., 2013 Bankr. LEXIS 3885 (Bankr. S.D. Cal., Sept. 10, 2013)*

**Counsel:** Jeremy W. Faith of Margulies Faith, LLP argued for appellant APJL Consulting, LLC.

Dean T. Kirby, Jr. of Kirby & McGuinn argued for appellee Leonard J. Ackerman, Chapter 7 Trustee.

**Judges:** Before: JURY, KIRSCHER, and KURTZ, Bankruptcy Judges.

## Opinion

MEMORANDUM[*]

In BAP No. SC-13-1304, APJL Consulting, LLC (APJL) appeals from the bankruptcy court's order denying its compensation request for auctioneer services provided to Chapter 11[1] debtor, Treasures Inc., under a court-approved employment order (Compensation Order). For the reasons discussed below, we AFFIRM.

In BAP No. SC-13-1464, APJL appeals from the bankruptcy court's order finding APJL in contempt for willful violation of the automatic stay and award of damages (Damages [*2] Order). For the reasons discussed below, we AFFIRM the bankruptcy court's decision in all respects except for the award of actual damages in the amount of $68,598.49. We VACATE the award of actual damages and REMAND for further proceedings to determine the appropriate amount.

## I. FACTS

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see *Fed. R. App. P. 32.1*), it has no precedential value. See 9th Cir. BAP Rule 8024-1.

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, *11 U.S.C. §§ 101-1532*, and "Rule" references are to the Federal Rules of Bankruptcy Procedure.

EXHIBIT 7

## A. The Parties

APJL is a Virginia based limited liability company. APJL and its related companies AP Consulting, LLC, and J&L Management Consultants, Inc., provide struggling furniture retailers with augmentation services by helping them acquire inventory when they have insufficient credit to do so. APJL would use its own credit lines to order furniture for its client/customers, assist with liquidation and going out of business sales, and provide personnel and consultation with the operation of such sales. APJL provided these services for set percentages on the sale proceeds and extension of credit. Allen A. Parvizian (Parvizian) is APJL's president.

Treasures, Inc. was a home furniture retailer with stores in San Diego and Irvine, California. By early 2011, debtor had fallen behind on numerous obligations, was subject to lawsuits and judgments, and was at risk of closing down.

## B. The Prepetition Agreement [*3]  Between APJL and Treasures, Inc.

In July 2011, APJL and debtor entered into an agreement whereby APJL would assist debtor by providing augmentation services and consulting services, as well as conducting a "Closing of the Clearance Center" to raise funds, liquidate excess inventory, and improve debtor's financial condition. In the event this sale and "theme" did not achieve the objectives, APJL would conduct going out of business sales at debtor's San Diego store.

The agreement provided for APJL's augmentation services in several sections. Under ¶ 1(c), APJL agreed to, among other things, make available its contacts, credit lines and purchasing power to provide the going out of business sales with additional furniture and rugs (Additional Furniture) to be sold during the sale. APJL would order the Additional Furniture in debtor's name, but using its own credit lines. APJL charged a 3% fee (PMSI Fee) on all Additional Furniture based on invoice cost on any goods, material, or services that were placed on APJL's credit line.

Because debtor sold its own furniture inventory (Debtor's Furniture) in the sales along with the Additional Furniture, the agreement contemplated that the sale proceeds [*4] generated from Debtor's Furniture would be segregated from the sale proceeds generated from the Additional Furniture. As part of the segregation process, APJL used its own credit card machines for sales of the Additional Furniture so that proceeds generated from those sales went into an account designated by the parties as the augmentation account (Augmentation Account).

Paragraph 4 of the agreement provided for the establishment of the Augmentation Account:
> Consultant shall establish a bank account (Bank Account), which shall be controlled by Consultant. All proceeds from the Sale in relation to Additional Furniture shall be deposited into the Bank Account and distributed as provided under this Agreement. All other proceeds in relation to the Company Inventory shall be deposited into the Company's bank account.[2]

The parties further agreed that APJL would make weekly distributions to debtor from the Augmentation Account according to the priorities set forth in ¶ 7 of the agreement:

> Provided that Consultant establishes [*5] the Bank Account, proceeds of the Sale shall be distributed on a weekly basis in the following order: (i) first, to pay the Consultant Fee, (ii) second, if Additional Furniture is provided by Consultant to the Sale on a consignment basis, to pay for such Additional Furniture as it is sold and delivered; and if Additional Furniture is provided by Consultant other than on a consignment basis, to pay the invoice cost plus billed freight of such Additional Furniture, (iii) third, to pay for the PMSI Fee due to the Consultant, (iv) fourth, to pay back all monies advanced by the Consultant to the Sale, and (v) fifth, a draw from the Augment Account to the Company of 30% of all deposits during an Accounting Week; [and (vi)] sixth, the remainder to the Company.

---

[2] Debtor had its own separate bank account for the sale of its own furniture. This account was not involved in the accounting dispute between the parties which is described below.

2015 Bankr. LEXIS 662, *5

Essentially then, the Augmentation Account was to contain proceeds from the sale of the Additional Furniture from which would be paid APJL's 5% commission, its 3% PMSI fee, and certain expenses. After payment of the expenses, APJL would advance funds to debtor on a weekly basis from the remaining Additional Furniture proceeds — referred to as draws — which provided debtor with regular cash flow.

Although the draw was an advance to debtor [*6] on the profit for the Additional Furniture sales, each week the parties conducted an accounting to make sure sufficient cash remained in the account to cover the payment of APJL's commission and other expenses. The draw was set at 30% of deposits but mutually agreed upon adjustments occurred each week that altered the amount actually distributed to debtor.

The reconciliation process involved debtor's accounting supervisor, Ms. Butryn, sending a spreadsheet of debtor's sales and expense information to Parvizian. In turn, Parvizian would send a spreadsheet to Ms. Butryn that detailed the cumulative accounting information for all the income and expenses associated with the Augmentation Account. APJL's reconciliation sheet contained running totals from the beginning of the sale, through the end of the given week (Reconciliation Sheet). It was designed to account for all receipts and disbursements from the Augmentation Account as well as the amounts "due to" and "due from" the parties so the amount of the draw could be determined.

The expenses which reduced the amount of the weekly draw to debtor, included, among others: (1) advertising; (2) minor store expenses; (3) delivery fees; (4) expense [*7] reimbursements; and (5) credit card chargebacks. APJL's 5% commission was also included in the Reconciliation Sheet and was paid directly from the Augmentation Account on a weekly basis. The Reconciliation Sheet further settled between the parties collected delivery fees and sales taxes on invoices issued by debtor.

Finally, adjustments were made to account for sales of Debtor's Furniture that were accidently charged on APJL's credit card machines and likewise to account for sales of Additional Furniture that were charged on debtor's credit card machines. Since debtor did not have an American Express account, APJL's American Express account was sometimes used to receive payments for Debtor's Furniture. Such amounts were applied and credited to the calculation of debtor's draw, less the fees charged by American Express. Once the parties agreed upon the figure, APJL would wire the draw amount to debtor's bank account.

During the course of the relationship, the cash flow from the sales was not sufficient to pay expenses and provide debtor with the necessary cash for payroll and advertising. As a result, Parvizian would occasionally defer deducting certain expenses.[3]

APJL opened the Augmentation Account at its bank in Virginia using its tax identification number, with a subtitle on the account of the store name, "Treasures Furniture San Diego." The address on the account was APJL's address in Virginia. APJL took control over the account under the terms of the agreement.

Paragraph 6 of the agreement addressed the sales tax:

The Company shall solely be responsible for the payment of sales tax arising out of the Sale to applicable taxing authorities. If Consultant establishes the Bank Account, (a) Consultant shall forward to the Company the sales tax collected by Consultant, and the Company shall pay the sales tax to the applicable taxing authorities on a timely basis, and (b) from time to time, Consultant may, at the Company's request but at Consultant's sole and absolute discretion, provide the Company with an advance against moneys owed by Consultant to Company under the terms of this Agreement (the "Draw"); provided, however, that such Draw will be deemed first as an advance against sales tax collected [*9] by Consultant and due to Company and then the remaining as an advance against funds owed by Consultant to Company under the terms of this Agreement.

Finally, in ¶ 19, entitled <u>Security Interest</u>, debtor granted APJL a senior first priority security interest and lien in the Additional Furniture and their proceeds and all rights of [debtor] under the agreement, including, without limitation,

---

[3] Due to APJL's decision [*8] to defer charging certain expenses, the weekly Reconciliation Sheet could not have reflected the actual contractual amounts owed between the parties.

amounts due or to become due to [debtor] under the terms of the agreement, all funds in the "Bank Account," and all the proceeds (including any insurance proceeds and credit card receivables).

## C. Bankruptcy Events

On May 8, 2012, debtor filed a voluntary chapter 11 petition. In Schedule B, debtor listed an account receivable owing from APJL in an amount to be determined. In Schedule G, debtor listed the agreement with APJL as an executory contract. Debtor's Schedules did not list the Augmentation Account as its personal property nor was APJL listed as a secured creditor in Schedule D.

There is no indication in the record that a final accounting of the Augmentation Account for the prepetition period was performed before the petition was filed. Nor is it clear what the Augmentation Account balance was on [*10] the petition date. The parties simply continued to operate under the agreement as if there had been no bankruptcy filing, with APJL providing consultation and augmentation services to debtor and receiving payment for those services under the contract terms. Proceeds from the postpetition sales of Additional Furniture continued to be deposited into the Augmentation Account. The parties never sought approval for the arrangement from the bankruptcy court, although at various times in the record APJL and the court referred to the agreement as being "approved."[4]

In late June 2012, the Chief Restructuring Officer (CRO), James Emmitt, and debtor conducted a cost-benefit analysis of operations at the San Diego store and determined that it was in the best interests of the estate to [*11] close the store by the end of July 2012. Debtor reached an agreement with its landlord to surrender the premises and decided to conduct an auction of its equipment and furniture inventory during the period July 19 through July 25, 2012. Debtor requested APJL to act as auctioneer.

### 1. The Court-Approved Auction And Employment Of APJL

Although debtor did not think court approval of the auction was necessary because it thought the auction was ordinary course, debtor filed a motion to shorten time on its notice of intended action to auction property on July 18, 2012. The next day, debtor filed an ex parte application seeking bankruptcy court approval of the auction. In the application, debtor proposed using APJL as auctioneer under the terms set forth in an attached summary.

On July 20, 2012, the bankruptcy court granted debtor's motion to shorten time and scheduled a hearing on July 26, 2012. At the July 26, 2012 hearing, the bankruptcy court continued the matter to August 23, 2012, and required debtor to file a supplemental declaration explaining the circumstances as to how the emergency arose and provide information on the results of the auction.

On August 2, 2012, debtor filed a supplemental [*12] application seeking nunc pro tunc approval of the auction since the auction had concluded. Debtor explained that its portion of the net proceeds from the auction was approximately $70,000 which amounted to 40% of the gross proceeds generated from the sale.

At the August 23, 2012 hearing, the bankruptcy court orally granted debtor's request for approval of the auction. On the same day, debtor filed an application to employ APJL as the auctioneer nunc pro tunc. Parvizian filed a perfunctory "Declaration of Disinterest" in support, stating that "to the best of his knowledge," APJL did not have any connection with debtor "other than its liquidation and augmentation services" and did not represent any interest that was adverse to the estate.

---

[4] In its September 10, 2013 Memorandum Decision, the bankruptcy court stated that its "earlier approval of the Agreement" did not relieve APJL from its obligation to turn over the funds when the dispute arose. We found no court approval of the agreement in the record. Rather, the bankruptcy court approved APJL's employment in connection with the postpetition auction based on different terms than those in the agreement.

The United States Trustee (UST) objected to the employment application, contending that additional disclosures were required: specifically, APJL's connections with debtor, creditors or any other party in interest; the nature of APJL's relationship with debtor since July 2011; whether APJL was a creditor of debtor; whether APJL received payments from debtor since the filing of the bankruptcy; and the amount of payments debtor made to APJL one year preceding [*13] the bankruptcy. The UST also requested further information regarding APJL's affiliate, HFR Rugs, and arrangements regarding APJL's consignment of furniture for the auction.

Debtor responded by explaining APJL's augmentation services and disclosing that APJL had received $224,613.99 in commissions from the Augmentation Account since July 2011.

Parvizian filed a supplemental declaration on August 23, 2012, stating that as of the petition date, APJL was not a creditor of debtor, and that, "to the best of his knowledge" APJL had no interest adverse to debtor, its estate or creditors. Parvizian explained that APJL continued to provide debtor with augmentation and liquidation services since the petition date under the terms of the agreement and had received postpetition payments totaling $368,499.16 from all accounts. He also declared that prior to debtor's bankruptcy filing, APJL invoiced and received payment for all services it provided to debtor under the terms of the agreement (this statement would later come under scrutiny). Finally, Parvizian declared that the auction term sheet authorized APJL to supplement Debtor's Furniture with its own furniture, and with rugs provided by APJL's [*14] affiliate, HFR Rugs, and that APJL paid debtor a 10% royalty on the gross sales for the consigned furniture and a 12% royalty on the gross sales for the HFR-consigned rugs.

The bankruptcy court entered the orders approving the auction and APJL's employment as the auctioneer nunc pro tunc on August 28, 2012.

About two weeks later, pursuant to the bankruptcy court's local rule 2002-2(a)(6), debtor filed a notice of intended action and opportunity for hearing seeking allowance of $37,649.34 in compensation for APJL's auctioneer services.

## 2. The Late September Reconciliation Dispute

By late September, debtor had closed its retail stores and was out of business. APJL performed an internal audit and reconciliation to determine where the parties stood under their agreement. Critical to the audit was a determination of the amount of profit that was available to debtor during its final weeks of operation.[5] The record shows that APJL deviated from its previous protocol and did not exchange information with debtor regarding the late September reconciliations or conduct the settle up discussions.[6]

According to APJL, the audit revealed that it had excluded $75,759 in credit card fees (CC Fees) and a $28,000 manager's salary (Manager's Salary) from the weekly Reconciliation Sheet calculations. Thus, APJL included the unaccounted for portion of the Manager's Salary, along with the CC Fees, in the Reconciliation Sheet for September 21, 2012 (September 21 Reconciliation). This resulted in an adjusted draw for debtor of $11,942.50,

---

[5] From a final accounting perspective, if APJL had intentionally or inadvertently not included expenses in the previous reconciliations, [*15] theoretically the draws on the front end of the agreement could have been overfunded. Therefore, at the end of the agreement, debtor's draws would have to be reduced to account for those omitted expenses.

[6] Emmitt declared that APJL gave no notice to debtor nor did it receive debtor's consent before reducing the late September disbursements. There is nothing in the agreement that required such notice or consent, but that is how the parties had been operating up until this time.

2015 Bankr. LEXIS 662, *15

when debtor anticipated a draw closer to $110,000 which was based on a 40% gross sales figure.[7] Debtor asserted that APJL owed it an additional $99,000 for that week.

In the September 26, 2012 reconciliation (September 26 Reconciliation), debtor calculated it was entitled to $85,000 from gross proceeds, without any deduction for expenses. APJL had assessed charges against that amount resulting in a $36,601.04 net disbursement to debtor.

After receiving the September 21 Reconciliation, debtor requested a full reconciliation of the Augmentation Account and expressed concern over the sudden inclusion of the CC Fees and Manager's Salary. Debtor's counsel sent an email to APJL's corporate attorney, Jeffrey Wolf, on September 25, 2012, which states in relevant part:

> Treasures has ceased operations and is closing its retail stores. Treasures and APJL are currently in the process of completing the final accounting and reconciliation of the Treasures-APJL furniture transactions. APJL has recently provided transaction documentation to Treasures, which the Treasures CRO team is in the process of reviewing.
>
> As you may be aware, APJL manages a Treasure furniture-account bank account, [*17] which contains money that is property of the bankruptcy estate. It is in both parties' best interest to ensure the transparency, speed and accuracy of the final reconciliation process, as well as to protect property of the estate. Therefore, Treasures requests that all funds remain untouched in the bank account during the reconciliation process, and that APJL make no disbursements without Treasures' written consent until a final reconciliation is completed. Please confirm APJL's agreement to this arrangement, and thank you in advance for your cooperation.

On the same date, the CRO sent an email to Parvizian requesting Parvizian to seek written approval from him before making any disbursement from the account.

Having received no response from Mr. Wolf, debtor's counsel sent Mr. Wolf a follow-up letter on October 1, 2012 (October 1, 2012 Letter), which stated in relevant part:

> Treasures had determined that . . . APJL . . . has not provided the proper reconciliation documentation, and more significantly, appears to have made approximately $99,000 of unauthorized and inappropriate debits from the Treasures-liquidation bank account.
>
> Treasures demands that APJL provide no later than close of [*18] business tomorrow, October 2, 2012, (i) immediate delivery to Treasures of the requested QuickBooks reconciliation documentation flash drive, (ii) immediate freezing of the account with no disbursements made without written authorization from Treasures CRO, Mike Bergthold, which authorization will be granted for appropriate charges, and (iii) immediate payment to Treasures of $184,000, consisting of a $99,000 balance owed from the 9/20/12 weekly settlement and $85,000 owed from the 9/27/12 weekly settlements.
>
> Please be advised that . . . failure to meet these demands constitutes willful violation of the automatic stay and conversion of the property of the estate, which is punishable by sanctions.

### 3. Debtor's Ex Parte Application For Order To Show Cause

APJL did not comply with debtor's demands. Accordingly, on November 2, 2012, debtor filed an ex parte application for order to show cause (OSC) why APJL should not be held in contempt for violating the automatic stay and ordered to disgorge funds. Debtor argued that the Augmentation Account contained property of the estate because the account was used for the deposit of gross proceeds from some sales held at debtor's Irvine and San Diego [*19] retail locations and was also used for the deposit of gross proceeds from the San Diego auction. Debtor further asserted that APJL owed it at least $184,000 ($99,000 + $85,000) for the last two September reconciliations and that there were unexplained transactions related to prepetition services.

---

[7] Under the agreement, debtor was entitled to draws of 30% of the net profit. However, Parvizian later orally agreed to deviate [*16] from the agreement and allow debtor draws of 40% of the net profit. This oral agreement, however, did not change the final sums which would be due debtor under the terms of the agreement.

2015 Bankr. LEXIS 662, *16

APJL has no right to unilaterally withdraw funds from the account without complying with the reconciliation process and resolving any disputed charges with the Debtor. Moreover, withdrawing funds from and cashing checks against the Augmentation Account for amounts allegedly owed to APJL on a pre-petition basis is also a willful violation of the automatic stay.

Debtor also alleged that APJL had wrongfully withheld certain funds for delivery fees in the amount of $10,822 and sales taxes in the amount of $56,098 which were collected and deposited into the Augmentation Account. Debtor argued that APJL was required to release these funds to it under ¶ 6 of the agreement.

In connection with APJL's compensation for auctioneer services, debtor asserted that APJL, as a prepetiton creditor, was not disinterested when its employment as auctioneer was approved by the bankruptcy court and APJL also failed [*20] to disclose its relationship with a related entity furniture company called Cameron Michael. Debtor alleged that APJL diverted hundreds of thousands of dollars from the Augmentation Account to Cameron Michael.

Finally, debtor argued that $133,265 was in the Augmentation Account at the time it made the demand to freeze the account. Of that amount, $56,098 was collected for sales taxes and $10,822 was collected for delivery fees, which APJL refused to release to debtor, despite multiple demands to do so. Despite debtor's demand to freeze the account, APJL continued to cash checks and withdraw funds so that by the end of September 2012, the account balance was $88,840.20, and by the end of October 2012, the account balance was $48,395.19.

## 4. Debtor Objects To APJL's Compensation As Auctioneer

On October 15, 2012, debtor objected to its own notice of intended action regarding APJL's compensation for auctioneer services. Debtor essentially articulated the same problems it described in its ex parte application for an OSC and requested the bankruptcy court to order APJL to disgorge $37,649.34 in fees that APJL took as compensation for its auctioneer services.

APJL responded to the fee objection, [*21] asserting that debtor's contentions were false. APJL maintained that debtor did not own the Augmentation Account or APJL's Additional Furniture and was entitled to receive funds from the account only after the payment of all of APJL's expenses and overhead and the costs of goods and furniture. APJL also explained the reconciliation process for the September 21 Reconciliation and that it simply netted out the CC Fees and Manager's Salary that had been debited from the account since the beginning of the agreement. APJL stated that as to the September 26 Reconciliation, there were chargebacks, expense reimbursements, fees, advertising reimbursements and other reimbursements that were due to APJL that were netted out. APJL characterized the fees as "administrative" in nature as part of the parties' on going relations and because of the way the agreement was structured. APJL stated again that it was not a creditor of debtor.

On October 29, 2012, Parvizian filed a declaration in support of the opposition (October 29, 2012 Declaration), which stated in part:

> Debtor ceased operations in September 2012, and APJL reviewed its accounts for the September settlements in order to account for fees [*22] and expenses that had not been credited to APJL. As such, when APJL reviewed the amount to be settled for September 21, 2012 (incorrectly stated as 20th), it netted out the credit card fees that the Bank Account was debited from the beginning of the Agreement. The credit card fees totaled approximately $75,759 and were never included in the Debtor's weekly settlement documentation or paid by Debtor. In addition, APJL paid for the office manager who worked the Sale and deducted it from the proceeds ($28,000) as the Agreement provides that all expenses that APJL incurs are to be netted out of proceeds.

The bankruptcy court set the hearings on the OSC and debtor's objection to APJL's compensation for November 29, 2012.

## 5. The November 29, 2012 Hearing

2015 Bankr. LEXIS 662, *22

At the November hearing, the bankruptcy court decided that, based upon the language in the agreement and its understanding of the relationship between the parties, which the court characterized as a secured-creditor relationship, the monies in the Augmentation Account belonged to debtor.

The bankruptcy court also found that Parvizian willfully failed to disclose that APJL was a prepetition creditor in connection with APJL's employment application [*23] as auctioneer, and that had the court known APJL would use postpetition proceeds to offset a prepetition obligation, it would never have approved APJL's employment. The court denied APJL's application for compensation based on its failure to disclose prepetition creditor status or relationships.

In addressing debtor's application for the OSC, the bankruptcy court found there was no factual dispute that the Augmentation Account contained property of the estate, which was subject to APJL's security interest.[8] Therefore, the court did not think an evidentiary hearing was warranted on the property of estate issue. The bankruptcy court found APJL's offset of prepetition expenses (i.e., the CC Fees and Manager's Salary) was an improper violation of the automatic stay. Finally, the court ordered APJL to turn over the $75,759 and $28,000 amounts related to its offset and if APJL did not comply the court would hold APJL in contempt.[9]

APJL's counsel requested the opportunity to submit a supplemental declaration prior to entry of an order on the OSC to clarify the CC Fees and Manager's Salary issue. The bankruptcy court granted the request and ordered debtor's counsel to lodge orders on the auctioneer fee application and the OSC.

At the same hearing, the court considered debtor's motion to dismiss its chapter 11 case. Debtor's motion was mostly based on the fact that it had completed the orderly liquidation of its furniture inventory and ceased its retail operations at both the San Diego and Irvine retail stores. The bankruptcy court denied the motion and converted the case to one under chapter 7. On November 30, 2012, the case was converted and Leonard J. Ackerman was appointed the chapter 7 trustee (Trustee).


**6. Post-Hearing Pleadings**

Trustee's counsel did not lodge the orders on the auctioneer fee application and the OSC until February 15, 2013. Debtor's counsel, Christine Baur, later explained [*25] that there was some confusion as to whether she or Trustee's counsel was supposed to lodge the orders after the case was converted.

APJL filed an objection to Trustee's proposed form of order on the OSC along with Parvizian's declaration regarding the return of funds to the Augmentation Account. In his February 22, 2013 declaration (February 22, 2013 Declaration), Parvizian stated in relevant part:
> As opposed to any reimbursement as alleged in the OSC, the CC Fees and Manager Salary were debited regularly throughout the Agreement from the Augmentation Account. . . .
> The [Manager Salary] was paid directly from the Debtor's Augmentation Account. . . .
> The CC Fees were also automatically debited from the Debtor's Augmentation Account by Global Pay on behalf of the credit card companies and by American Express on a monthly basis. . . . Again, these amounts were paid directly from the Debtor's Augmentation Account.
> APJL never paid the CC Fees and was never reimbursed for such fees. . . .

Parvizian further declared that not all expenses were included in the weekly reconciliations and the draws did not account for all expenses paid through the Augmentation Account during the course of the relationship. [*26]

---

[8] As indicated below, APJL accepted the bankruptcy court's ruling that the funds in the Augmentation Account belonged to debtor and later adjusted Parvizian's description of the account as such.

[9] At the time the court ordered APJL to return the funds to the Augmentation [*24] Account, the court stated: "We need to restore the status quo so that the ownership of this account can be resolved." However, the bankruptcy court had already found that the funds in the account were property of the estate.

Parvizian concluded that due to the netting out of mutual debts, APJL should not be required to return any amounts to debtor.

Attached to Parvizian's declaration were copies of the Augmentation Account bank statements from March 2012 to September 2012 which showed the amounts for the CC Fees and Manager's Salary debited from the account. Also attached was the itemization for the debits to the account for the Manager's Salary for the time period March 8 through September 23, 2012, and the itemization for the debits to the account for the CC Fees for the time period May through September 2012. These itemizations show that most of the debits occurred postpetition.

Thereafter, the bankruptcy court issued a scheduling order requiring APJL to explain the perceived "inconsistent positions" adopted by APJL and setting the matter for further hearing on March 28, 2013. The inconsistency arose because it was difficult to discern whether APJL paid the disputed charges and then reimbursed itself as indicated in Parvizian's October 29, 2012 Declaration or whether the disputed charges had been automatically debited from the account as indicated in Parvizian's February 22, 2013 Declaration.

On March [*27] 4, 2013, Parvizian submitted a declaration in response to the bankruptcy court's scheduling order. Parvizian declared that his statements in the October 29, 2012 Declaration referred to an accounting of the funds for the September 2012 reconciliation of the Augmentation Account and not to any actual funds removed by APJL. At the time of that declaration, Parvizian testified that he believed the Augmentation Account belonged to APJL and, therefore, he referred to the payments as though they were made by APJL when they were made from the Augmentation Account. However, in the February 22, 2013 Declaration, Parvizian explained that he meant to show that the funds for the CC Fees and Manager's Salary were automatically deducted from the Augmentation Account each month. Recognizing that debtor owned the Augmentation Account, he no longer stated that APJL paid the expenses. Parvizian further declared that all debtor's expenses for the Additional Furniture, including the CC Fees and Manager's Salary, were paid regularly from the Augmentation Account and never reimbursed to APJL. Therefore, Parvizian again maintained that APJL owed debtor nothing under the agreement.

### 7. The March 28, 2013 Hearing [*28]

At the March 28, 2013 hearing, after considering the evidence presented by APJL, the bankruptcy court concluded that the deductions for the CC Fees and Manager's Salary were a "red herring" since those expenses had already been paid out of the Augmentation Account. The bankruptcy court concluded from the evidence that APJL had "double charged" the CC Fees and Manager's Salary since those monies had already been deducted from the Augmentation Account. The court further noted that the funds in the account belonged to debtor and that APJL failed to release the funds when debtor requested. The bankruptcy court also observed that although APJL's justification for holding back payment to debtor was the overfunding of debtor's draws prior to the September reconciliations, it found no evidence in the record to support that argument. In the end, the bankruptcy court ordered APJL to restore funds in the amount of $100,000 (roughly the amount of the CC Fees and Manager's Salary) to the Augmentation Account so that an accounting could be done and the funds properly allocated through an adversary proceeding.

### 8. The April 12, 2013 OSC

The bankruptcy court issued an OSC on April 2, 2013, which was amended [*29] on April 12, 2013, due to a typo. In the OSC, the court found that APJL was entrusted with control over property of the estate and APJL abused that trust by not accounting for the funds in the Augmentation Account and by giving incomplete and inconsistent explanations. The bankruptcy court ordered APJL to appear on May 2, 2013, to show cause why the court should not find APJL in contempt for its violation of the automatic stay and award damages to the estate.

The court also ordered APJL to (1) return the sum of $104,425.68 to the Augmentation Account for the CC Fees and the Manager's Salary, plus the unpaid sales taxes and delivery fees of $66,920.49 for a total of $171,346.17; (2) provide an accounting for its disposition of the funds in the Augmentation Account to the debtor; and (3) make

no further dispositions from the Augmentation Account pending resolution of the accounting adversary proceeding which must be brought by Trustee within thirty days of its order.

In response to the OSC, Parvizian filed a declaration on April 25, 2013, regarding the distribution of funds from the account. Parvizian declared that APJL was never paid more than the amounts set forth in the court-approved [*30] [10] agreement, which amounts were fixed contracted amounts of a 5% consulting fee on gross sales of the debtor (less sales tax and delivery fees), a 3% fee for all services connected with the provision of the Additional Furniture, and reimbursement of certain expenses paid on an ongoing basis during the entire course of the relationship. Parvizian also declared that once he discovered that the CC Fees and Manager's Salary were not shown in the weekly reconciliations, he realized that there was not enough money in the Augmentation Account to pay debtor's draws in the amounts debtor thought were due. As a result of the inadvertence, debtor had been receiving too much in weekly draw payments by the exact amount of $98,551.25 which would have otherwise been deducted from the draw payments on a weekly basis during the life of the agreement. This overpayment on the draws, according to Parvizian, explained the shortfall as of September 2012.

Parvizian also attached a copy of debtor's reconciliation for the week ended September 21, which showed $69,477.82 due, and not the $110,000 originally [*31] requested. Further, Parvizian pointed out that the amount debtor claimed due for the September 26 Reconciliation was $22,122.65, an amount that was $14,478.50 less than the $36,601.04 payment made by APJL to debtor for the period. Parvizian declared that one possible explanation for the difference was that debtor had asked him to increase its draws to 40% as the business was winding down. Parvizian agreed to increase the draws because he had estimated, incorrectly, that there would be sufficient funds in the Augmentation Account to cover such payments.

Finally, Parvizian pointed out that ¶ 6 of the agreement stated that draw payments will be deemed first as an advance against sales tax collected by APJL and due to debtor and then the remaining as an advance against funds owed by APJL to debtor under the terms of the agreement. Parvizian explained that since the final draw payment exhausted the funds in the Augmentation Account, debtor should have set aside monies sufficient to cover any applicable sales tax and delivery fees.[11] Parvizian attached back-up material and explanatory spreadsheets for the period of September 1, 2012 to April 2013.

On May 1, 2013, Trustee filed a reply to Parvizian's declaration. Trustee asserted that he was not satisfied with the explanations and documents proffered by APJL. Therefore, Trustee stated that he would file an adversary proceeding by the deadline set by the court.[12] Trustee also pointed out that APJL had failed to comply with the court's OSC, which required it to immediately turn over the sum of $171,346. Next, Trustee asserted that payments in the amount of $183,219 were made to Cameron Michael, one of APJL's largest vendors, in September and October 2012. According to Trustee, APJL never disclosed the relationship between Cameron Michael and APJL in its employment application for auctioneer. Finally, Trustee argued that the September and October 2012 payments in the amount of $115,678 to HFR Rugs did not contain appropriate back-up, and therefore these amounts should be returned to the Augmentation Account until an accounting was provided.

## 9. The May 2, 2013 Hearing On The OSC

On April 30, 2013, the bankruptcy court issued a tentative ruling for the May 2, 2013 hearing on the OSC. The court noted that it required APJL to restore the disputed funds to the estate until the dispute was resolved and Trustee

---

[10] As we noted earlier, despite the bankruptcy court's statements to the contrary, the agreement was never approved.

[11] The bankruptcy court later found that despite [*32] these provisions, the parties actually handled the sales taxes in a different manner. "APJL provided a weekly accounting of sales taxes collected and then Debtor provided an invoice to APJL for it to pay."

[12] Trustee filed the adversary proceeding on [*33] May 10, 2013, alleging claims for relief for turnover of and accounting for property of the estate under § 542; constructive trust; declaratory relief; avoidance and recovery of postpetition transfers and conversion.

was obligated to commence an adversary proceeding by May 20, 2013, if he disputed APJL's accounting. The court also observed that there was no evidence before it regarding the damages sustained by the estate in dealing with the turnover order. The bankruptcy court continued the matter to May 30, 2013 to determine: (1) whether the chapter 7 trustee will file an adversary proceeding to account for the funds at issue in the OSC by May 10, 2013; (2) whether APJL had returned $171,346.17 to the Augmentation Account as ordered by the court, and if not, why it has not complied with the court's order; (3) whether APJL had any excuse or justification for its inconsistent explanations for its actions taken in regard to the [*34] Augmentation Account; (4) whether APJL withdrew and failed to return the compensation for auctioneer services which the court declined to award; and (5) the amount of damages sustained by the estate for APJL's action in not turning over the funds to the estate since September 2012.

When the court issued its tentative ruling the order denying APJL's auctioneer compensation had not yet been entered.

On May 21, 2013, the bankruptcy court entered a Scheduling Order Re Order To Show Cause. The court ordered APJL to immediately turn over $171,346.17 to Trustee or his counsel to be held in counsel's client trust account pending further order of the court. The court continued the hearing on the OSC to June 13, 2013.

On May 24, 2013, the bankruptcy court entered an Order Implementing Order Dated 4/12/13. The bankruptcy court noted that it had ordered APJL to return $171,346 to the Augmentation Account on April 12, 2013. Trustee sought an order to allow those funds to be kept in a client trust account of his attorney. The court granted Trustee's request and ordered APJL to immediately turn over to Trustee or his counsel all funds in the Augmentation Account.

On May 28, 2013, APJL turned over to [*35] Trustee the amount of $27,958.58 which remained in the Augmentation Account.

## 10. The June 10, 2013 Entry Of The Compensation Order

On June 10, 2013, the bankruptcy court entered the order denying APJL compensation for its auctioneer services. The court also ordered Parvizian to file a declaration regarding the disbursement of funds from the auction by June 14, 2013, and ordered the funds disgorged and turned over to Trustee by June 17, 2013.

In his declaration, Parvizian declared that $37,649 in auctioneer fees were paid to APJL at the conclusion of the auction which took place at the end of August 2012 (the record shows the San Diego auction was complete by the end of July 2012.) Parvizian explained that APJL was never instructed that such fees could not be paid, and debtor did not request that such fees be held with debtor.[13] APJL stated that it would make its best efforts to return the fees by June 17, 2013.

APJL complied with the bankruptcy court's order and filed a timely appeal.

## 11. The June 13, 2013 Hearing On The OSC

On June 6, 2013, APJL filed a brief re OSC. There, APJL continued to assert that all the accounting issues needed to be resolved in the context of the adversary proceeding and that the orders relative to the $171,346 and associated attorney's fees should be stayed. APJL maintained that if it was compelled to pay nearly $250,000, it would become insolvent.

---

[13] This statement was contrary to the order employing APJL as auctioneer. The order provided that payment of APJL's compensation and reimbursement of expenses would be made only after it complied with local **bankruptcy rule 6005** and notice to creditors. However, the employment order appears to have been [*36] entered after APJL had received payment for its services.

2015 Bankr. LEXIS 662, *36

APJL also explained that it did not return the $171,346 to the Augmentation Account since the CC Fees and Manager's Salary were paid directly to the creditors and thus any turnover of such funds should be made by the parties who received the monies. APJL again asserted that debtor received exactly what it was owed under the agreement and APJL did not double charge debtor for any fees, costs or taxes. APJL reiterated that under the agreement, debtor was to apply all draw payments to sales taxes first. APJL further maintained that the inconsistencies were previously explained in Parvizian's declaration filed on March 3, 2013. APJL stated that it had an "honest" misunderstanding [*37] of the nature of the Augmentation Account. Finally, APJL discussed its relationship with Cameron Michael and stated that Cameron Michael was not a creditor of debtor.

Parvizian submitted another declaration dated June 6, 2013. Parvizian mostly reiterated the explanation for the reconciliation process. He declared that APJL would occasionally defer deducting certain expenses because debtor did not have the necessary cash flow to support making payroll and paying for advertising. He explained that APJL had deferred deducting the Manager's Salary from debtor's draws to assist debtor with cash flow. Parvizian testified that other items also resulted in the overfunding of debtor's draws, including APJL's failure to include the CC Fees in its weekly settlement calculations. Finally, Parvizian declared that in no way did APJL wrongfully take funds from debtor.

Trustee filed a brief in support of the OSC on May 30, 2013. Trustee reported that he had filed an adversary proceeding against APJL and that APJL had not returned the $171,346 to the Augmentation Account nor had it returned the compensation the court declined to award.

Trustee requested damages of $29,000 in attorney's fees to remedy [*38] the violation of the stay and $13,112.50 connected with his attempt to obtain an accounting from APJL, preparing for the June 2013 hearing, and responding to APJL's supplemental briefing. The CRO requested fees of $15,662.50 and Christine Baur, attorney for debtor, requested $33,400.36 for the estate's pre-conversion attorney fees. The bankruptcy court issued a tentative ruling prior to the hearing finding that (1) the Augmentation Account was property of the estate, (2) APJL was obligated to seek relief from stay before undertaking unilateral offset, (3) APJL willfully violated the automatic stay, and (4) APJL violated the court's turnover order. The court ordered APJL to return $171,346 and for each day that it failed to do so, it would be assessed an additional fine of $250 per day.

At the hearing, the bankruptcy court essentially adopted its tentative ruling, but allowed APJL to submit further briefing on the issue why it was impossible for APJL to comply with the court's turnover order. The court took the matter under submission.

### 12. Supplemental Briefing By APJL

On July 17, 2013, APJL submitted a supplemental brief. There, APJL again provided an accounting, this time specifically [*39] with respect to the October 1, 2012 Letter in which debtor requested APJL to freeze the account. APJL identified numerous third party checks that had been issued before October 1 in the amount of $25,582.66. APJL explained that had it "frozen" the account on October 2, 2012, all those checks would have been returned for insufficient funds to a total of nine different third-party vendors and service providers. APJL argued that the writing of bad checks could have subjected it to both civil and criminal liability in California, where the debtor is located, and in Virginia, where APJL is located. APJL asserted that it would not have been reasonable or prudent for APJL to have stopped payment or frozen the account as it pertained to such outstanding checks. APJL further noted that debtor had not challenged the validity of any of the expenses associated with the payments made by APJL after the October 1, 2012 Letter.

Finally, APJL argued that it was impossible for it to comply with the court's turnover order since the CC Fees had been collected by the credit card companies and the funds were not in its possession. Likewise, the Manager's Salary had also been withdrawn and those funds were [*40] not in its possession. Finally, APJL argued that a turnover motion could not be used as a shortcut for a breach of contract dispute under the holding in *Leonard v. Optimal Payments Ltd. (In re Nat'l Audit Def. Network), 332 B.R. 896, 914—916 (Bankr. D. Nev. 2005)*.

2015 Bankr. LEXIS 662, *40

### 13. The September 26, 2013 Entry Of The Damages Order

On September 10, 2013, the bankruptcy court issued its memorandum decision and civil contempt order against APJL for failing to turn over property of the estate and to pay damages. The court found APJL in violation of the automatic stay and awarded attorney's fees in the amount of $77,240 and actual damages in the sum of $68,598.49, for a total of $145,838.49.

In calculating the actual damages, the bankruptcy court used the time period from September 25, 2012 (the date debtor requested APJL to freeze the Augmentation Account) to October 1, 2012 (the date debtor informed APJL that it was in violation of the stay). According to the court, the balance in the Augmentation Account on October 1, 2012, was $116,702.74. Deposits after that date were made in the amount of $44,394.12. Therefore, the bankruptcy court found that the amount of $161,096.86 ($116,702.74 + $44,394.12) would have been preserved had APJL frozen the account.

Due to the fact APJL had paid debtor $36,601.04 on September [*41] 26, 2012, the bankruptcy court gave APJL credit for that amount. The court also gave APJL credit for the amount of $27,958.75[14] which it had turned over to Trustee on May 28, 2013. Therefore, the total credit given was $64,539.62,[15] to which the court added another credit of $27,958.75[16] leaving $68,598.49 unaccounted for ($161,096.86 - $64,539.62 - $27,958.75 = $68,598.49).

The order further provided that for each day that APJL refused to return $68,598.49 to Trustee, APJL would be assessed an additional fine of $100, plus additional attorney's fees incurred in rectifying its continuing contumacious conduct. The bankruptcy court entered the Damages Order on September 26, 2013. APJL timely appealed.

## II. JURISDICTION

The bankruptcy court had jurisdiction pursuant to _28 U.S.C. §§ 1334_ and _157(b)(2)(E)_ and _(O)_. We have jurisdiction under _28 U.S.C. § 158_.

## III. ISSUES

A. Whether the bankruptcy court erred by denying APJL compensation [*42] for its auctioneer services on the grounds that it was a prepetition creditor and therefore not "disinterested";

B. Whether the bankruptcy court erred in finding that the funds in the Augmentation Account were property of the estate;

C. Whether the bankruptcy court erred in finding that APJL had violated the automatic stay; and

D. Whether the bankruptcy court abused its discretion by awarding contempt damages for APJL's violation of the automatic stay without an evidentiary hearing.

## IV. STANDARDS OF REVIEW

---

[14] We could not find this exact amount in the record. Trustee's brief in support of the OSC filed May 30, 2013, indicates that APJL turned over $27,948.58 to Trustee.

[15] Using the bankruptcy court's numbers, the amount of the credit actually was $64,559.79.

[16] It appears that the court gave APJL double credit for the $27,958.49 amount.

2015 Bankr. LEXIS 662, *42

The abuse of discretion standard is applied to our review of the bankruptcy court's award of attorney's fees, the court's decision not to hold an evidentiary hearing, and its finding of civil contempt and imposition of sanctions. _Feder v. Lazar (In re Lazar), 83 F.3d 306, 308 (9th Cir. 1996)_ (attorney's fees); _Murphy v. Schneider Nat'l, Inc._, 362 F.3d 1133, 1139 (9th Cir. 2004) (evidentiary hearing); _F.T.C. v. Affordable Media, LLC, 179 F.3d 1228, 1239 (9th Cir. 1999)_ (civil contempt and imposition of sanctions).

The bankruptcy court abuses its discretion when it fails to identify and apply "the correct legal rule to the relief requested," _United States v. Hinkson, 585 F.3d 1247, 1263 (9th Cir. 2009)_ (en banc), or if its application of the correct legal standard was "'(1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" _Id. at 1262_.

We review for clear error the bankruptcy court's [*43] findings of fact in connection with the civil contempt order. _Affordable Media, LLC, 179 F.3d at 1239_.

Whether property is property of the estate is a question of law reviewed de novo. _Collect Access LLC v. Hernandez (In re Hernandez), 483 B.R. 713, 719 (9th Cir. BAP 2012)_. Similarly, the applicability of the automatic stay and exceptions thereto are questions of law that we consider de novo. _Lockyer v. Mirant Corp., 398 F.3d 1098, 1107 (9th Cir. 2005)_. De novo means review is independent, with no deference given to the trial court's conclusion. _Barclay v. Mackenzie (In re AFI Holding, Inc.), 525 F.3d 700, 702 (9th Cir. 2008)_.


# V. DISCUSSION


## A. The Compensation Order

The denial of APJL's compensation for its auctioneer services raises questions regarding APJL's disinterestedness, adverse interest to the estate, and adequacy of its disclosures. These issues are relevant to whether the bankruptcy court abused is discretion in denying APJL compensation for its auctioneer services.

Under _§ 327(a)_, a debtor in possession may employ a professional with court approval only if (1) they are disinterested persons and (2) they do not hold or represent an interest adverse to the estate. See _Tevis v. Wilke, Fleury, Hoffelt, Gould & Birney, LLP (In re Tevis), 347 B.R. 679, 687 (9th Cir. BAP 2006)_. The two tests overlap. _Id_.

A "disinterested person" is defined as one who "is not a creditor" and "does not have an interest materially adverse to the interest of the estate or of any class of creditors . . . by reason of any direct or indirect relationship to, connection with, or interest [*44] in, the debtor . . . or for any other reason." _§ 101(14)(A),(C)_. A creditor is defined as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." _§ 101(10)(A)_. A claim is defined as the "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." _§ 101(5)(A)_.

APJL's primary argument on appeal is that the bankruptcy court erroneously determined that it was a prepetition creditor of the bankruptcy estate and thus not disinterested. According to APJL, the error occurred because the bankruptcy court assumed that APJL had withdrawn and paid itself almost $100,000 in September 2012 to reimburse itself for the CC Fees and Manager's Salary. APJL asserts that the evidence shows those funds were debited directly from the Augmentation Account and thus APJL was not owed anything from debtor. APJL maintains it was not a prepetition creditor and therefore was a disinterested party.

We agree that APJL is not a prepetition creditor based upon the automatic debits for the CC Fees and Manager's Salary from the Augmentation Account prepetition. [*45] APJL had no "right to payment" from debtor for these expenses when they were automatically debited from the account. However, APJL has asserted throughout this record that it overfunded draws to debtor because it did not take into account the CC Fees and Manager's Salary. The record shows that some of the CC Fees and Manager's Salary were debited from the Augmentation Account

prepetition, but it is impossible to tell from this record whether APJL overfunded draws to debtor prepetition or whether the overfunding was limited to the postpetition period. If the draws were more than the expenses which were debited during the prepetition period, then it is possible APJL was owed money from debtor on the petition date. Most troubling is that APJL states that it was not a creditor even though it never conducted a final accounting as of the petition date that determined the rights and liabilities of the parties for the prepetition period.[17]

In any event, APJL overlooks that debtor granted APJL a security interest in the Additional Furniture and its proceeds under the terms of the agreement. Therefore, as of the petition date, APJL was a secured creditor and as the record shows, APJL continued to enforce its secured claims against debtor's funds in the Augmentation Account postpetition. APJL was thus not disinterested and failed to disclose its secured creditor status under the agreement in connection with its request for employment as auctioneer.

A professional may be disinterested if it does not have an "interest materially adverse to the interest of the estate . . . by reason of any direct or indirect relationship to, connection with, or interest in, the debtor . . . or for any other reason." *§ 101(14)(C)*. An "adverse interest" means "to possess or assert any economic interest that would tend to lessen the value of the bankrupt estate or that would **[*47]** create either an actual or potential dispute in which the estate is a rival claimant." *In re Tevis, 347 B.R. at 687*.

APJL had control of the Augmentation Account throughout the pre and postpetition relationship between the parties and offset pre and postpetition claims against debtor's postpetition draws. Moreover, during the postpetition period, APJL made payments from the account to entities that were insiders of APJL and those relationships were never disclosed in the context of its employment application. Further, since the parties continued to operate under the agreement postpetition, APJL was owed money on its commissions and reimbursement of other expenses on a recurring basis and therefore had postpetition creditor status. But this relationship was never disclosed.

The record shows that APJL clearly had an economic interest and connection to debtor under the terms of the agreement which were adverse to debtor as borne out by the present dispute. These facts were relevant and material to the bankruptcy court's scrutiny of the relationship between APJL and debtor for purposes of accessing whether APJL held an adverse interest or conflict of interest. Yet, APJL never disclosed these facts to the bankruptcy **[*48]** court.

*Rule 2014* provides that the employment application "shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest . . . ." The disclosure provisions of *Rule 2014* are strictly applied with the burden on the applicant to come forward and make full, candid, and complete disclosure. *Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park-Helena Corp.), 63 F.3d 877, 881 (9th Cir. 1995)*.

> Even a negligent or inadvertent failure to disclose fully relevant information may result in a denial of all requested fees. . . . The duty of professional is to disclose all connections with the debtor, debtor-in-possession, insiders, creditors, and parties in interest. . . . They cannot pick and choose which connections are irrelevant or trivial. . . . No matter how old the connection, no matter how trivial it appears, the professional seeking employment must disclose it. *Id. at 882*.

The record shows that APJL failed to meet the duty of full and complete disclosure. Whether its failure to disclose was willful or not is irrelevant to strict application of the disclosure rules.

---

[17] Under the execution of the terms of the agreement described in Parvizian's declarations, a weekly reconciliation was done and checks issued to balance the account on Mondays for the period ending several days prior. Therefore, on any given Tuesday, APJL was **[*46]** owed money by debtor for transactions since the last reconciliation. The likelihood that APJL was owed money on the petition date — and therefore a creditor — was significant, even without taking into account that APJL was not factoring in all expenses when it gave draw checks to debtor.

A lack of disinterestedness does not mandate a denial of all compensation if the professional [*49] relies on the employment order. _First Interstate Bank of Nev. v. CIC Inv. Corp. (In re CIC Inv. Corp.), 192 B.R. 549, 553—54 (9th Cir. BAP 1996)_. In In re CIC Inv. Corp., the Panel held that the bankruptcy court had discretion to award compensation for services performed in reliance on the order authorizing employment, before that order was reversed on appeal. Unlike here, the professional in that case had "fully disclosed" its relevant connections and "all potential conflicts" at the outset. Furthermore, we cannot see how APJL relied upon the employment order for its compensation when the order was entered after the auction was complete and entered nunc pro tunc. In any event, APJL does not tell us how it relied upon the order approving its employment, which was entered after the fact.

In the end, the bankruptcy court has broad discretion in designing appropriate remedies to deal with violations of _Rule 2014_. _In re Park-Helena, 63 F.3d at 882_; see also _In re Film Ventures Int'l, Inc., 75 B.R. 250, 253 (9th Cir. BAP 1987)_; _§ 328(c)_. Considering the record as a whole, we conclude the bankruptcy court did not abuse its discretion when denying APJL's compensation request; the court applied the proper legal standards and its application of those standards to the facts is supported by the record. We thus affirm the Compensation Order.


## B. The Damages Order

The Damages Order involves the interplay between _§§ 541_, _542_, _362_, and _105(a)_.


### [*50] 1. Property of the Estate

"Property of the estate" is defined in _§ 541(a)_ as all of a debtor's legal or equitable interests in property, wherever located, as of the commencement of the case. "Any interest in property that the estate acquires after the commencement of the case" is property of the chapter 11 estate. _§ 541(a)(7)_. While _§ 541_ sets forth what interests of the debtor must be transferred to the bankruptcy estate, it does not address "'the threshold questions of the existence and scope of the debtor's interest in a given asset.'" _Dumas v. Mantle (In re Mantle), 153 F.3d 1082, 1084 (9th Cir. 1998)_. Rather, the bankruptcy court must look to state property law to determine whether, and to what extent, the debtor has any legal or equitable interests in property as of the commencement of the case. Id. The party seeking to include property in the estate bears the burden of showing that the item is property of the estate. _Seaver v. Klein—Swanson (In re Klein—Swanson), 488 B.R. 628, 633 (8th Cir. BAP 2013)_. Whether the proceeds in the Augmentation Account were property of the estate would necessarily preface the determination of whether a stay violation occurred.

Trustee argues on appeal that APJL conceded that the funds were property of the estate and thus the doctrines of judicial admission or judicial estoppel should [*51] apply. Judicial admission does not apply since APJL did not admit facts, but only adopted the legal conclusion by the bankruptcy court that the funds were property of the estate. Judicial estoppel "is an equitable doctrine invoked by a court at its discretion" and "is invoked to prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process." _Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir. 1990)_. Since the bankruptcy court's decision that the funds in the Augmentation Account were property of the estate is reviewed de novo, we fail to see how APJL's alleged inconsistent position on appeal would have an adverse impact on the judicial process.

APJL points to impermissible burden shifting as grounds for reversal. We do not discern any improper burden shifting and, as further discussed below, the agreement controlled the rights of the parties to the funds in the Augmentation Account. Once the bankruptcy court interpreted the agreement as a matter of law, the court still gave APJL an opportunity to refute the court's interpretation through other evidence, which it did not do.

2015 Bankr. LEXIS 662, *51

The prepetition agreement between the parties controls the rights of the [*52] parties to the funds in the Augmentation Account that were generated from the postpetition sales of the Additional Furniture.[18] The interpretation of the agreement is governed by Virginia law. Under Virginia law, we review the bankruptcy court's interpretation of a contract de novo and "'have an equal opportunity to consider the words of the contract within the four corners of the instrument itself.'" *Uniwest Constr., Inc. v. Amtech Elevator Servs., 280 Va. 428, 699 S.E.2d 223, 229 (Va. 2010)*. We construe the contract as a whole, giving terms their ordinary meaning unless some other meaning is apparent from the context. Id. The various provisions are harmonized, giving effect to each when reasonably possible, and are construed considering the circumstances under which they were executed and the condition of the parties. Id.

"Contract language is ambiguous when it may be understood in more than one way or when it refers to two or more things at the same time. However, a contract is not ambiguous merely [*53] because the parties disagree as to the meaning of the terms used." *Eure v. Norfolk Shipbuilding & Drydock Corp., 263 Va. 624, 561 S.E.2d 663, 668 (Va. 2002)*. When a contract is ambiguous, the court will look to parol evidence to determine the intent of the parties. *Id. at 667—68*.

Relying on the language used by APJL and debtor in the agreement, the bankruptcy court found that the agreement was essentially a financing arrangement whereby APJL loaned money through its credit lines to debtor for the purpose of acquiring the Additional Furniture which was bought in debtor's name. The court did not find any provision that said anything about the account being "owned" by APJL, only that APJL had "control". Accordingly, the court concluded that the proceeds deposited into the Augmentation Account belonged to debtor, subject to APJL's security interest. Thus, it follows that the proceeds were property of the estate.

We agree with the bankruptcy court's assessment that the language in the agreement shows a financing arrangement and a creditor-debtor relationship. The agreement plainly states that debtor granted APJL a security interest in all the proceeds from the Additional Furniture and other rights it had under the agreement and that APJL would buy the Additional Furniture in debtor's name. [*54] Furthermore, although APJL's possession and control of the account are indicia of ownership, its possession and control was necessary to perfect its security interest under Virginia law. See *Va. Code § 8.9A—312(b)(1)* (a security interest in a deposit account can only be perfected by control as defined in *Va. Code § 8.9A—314*); *Va. Code § 8.9A—314* (perfection by control occurs when the secured party actually obtains actual control of the deposit account).

The agreement is not ambiguous about APJL's security interest in the proceeds from the Additional Furniture. As the bankruptcy court noted, it would be illogical for APJL to have a security interest in its own property. Likewise, it would be illogical for APJL to be paying its own expenses (such as the commissions) out of its own property.

On appeal, APJL focuses on the priority of the distributions under the agreement, pointing out that debtor was allowed to share in the sale proceeds only after the payment of expenses (among them the CC Fees and Manager's Salary as well as costs of goods sold and other expenses). Whether or not the distribution scheme was adhered to is a separate question from what constitutes property of debtor's estate.

APJL also argues on appeal that the Augmentation Account [*55] operated more like an escrow account and thus the funds were not property of the estate under the holding of *Dzikowski v. NASD Regulation, Inc. (In re Scanlon), 239 F.3d 1195, 1198 n.6 (11 Cir. 2011)* and *Carlson v. Farmers Home Admin. (In re Newcomb), 744 F.2d 621, 626-27 (8th Cir. 1984)*. Because APJL raises the escrow argument for the first time on appeal, we do not need to consider it. *O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.), 887 F.2d 955, 957 (9th Cir.1989)*. However, even if we did, APJL's escrow analogy is contrary to the language of the agreement. Accordingly, we affirm the bankruptcy court's decision that the funds in the Augmentation Account were property of debtor's estate.

---

[18] Since the proceeds due debtor from the court-approved auction were paid by APJL prior to this dispute, it does not appear that debtor is owed any money from the auction. Therefore, we attribute the funds in the account to the postpetition sales and not proceeds from the auction.

## 2. Stay Violation

To assemble the bankruptcy estate, *§ 542* requires that, during bankruptcy proceedings, an entity "in possession, custody, or control" of certain property in the estate "shall deliver" that property to the trustee (subject to certain conditions not relevant here). *§ 542(a)*. While bankruptcy proceedings are pending, the automatic stay provisions of *§ 362* work with *§§ 541* and *542* to shelter the debtor's estate from action by creditors, enabling the debtor to get the relief and fresh start that are among the goals of the bankruptcy regime. Thus, under *§ 362*, filing a bankruptcy petition automatically effects a stay of "any act to obtain possession of property of the estate . . . or to exercise control over property of the estate." *§ 362(a)(3)*. Those who violate **[*56]** *§ 362* are liable for related damages and costs.

Since the funds in the Augmentation Account constituted estate property under *§ 541(a)(7)*, APJL was required to return the funds to debtor as soon as debtor notified it to return the property. Otherwise, it would be holding the funds in violation of the stay. See *United States v. Whiting Pools, Inc., 462 U.S. 198, 206-07, 103 S. Ct. 2309, 76 L. Ed. 2d 515 (1983)*. The record shows that debtor notified APJL to pay the amount of $184,000 (which represented the $99,000 and $85,000 shortfalls for the late September reconciliations) in the October 1, 2012 Letter and asserted that a stay violation would result if APJL failed to do so. The bankruptcy court found the October 1, 2012 Letter required APJL to "turn over the funds in the Augmentation Account under *§ 542* upon debtor's demand."

On appeal, APJL argues that the fundamental flaw in the bankruptcy court's finding is that the October 1, 2012 Letter never made a turnover request. Rather, according to APJL, the letter demanded that APJL "freeze" the account but that disbursements could be made with the CRO's written authorization. APJL further notes that in debtor's ex parte application for the OSC, debtor requested that APJL "disgorge" $184,000 as opposed to turnover.

We are not persuaded that these nuances change the **[*57]** outcome when considering the context of the letter as a whole. Debtor made a number of demands in the October 1, 2012 Letter, including requests for reconciliation documentation, freezing the account, and the immediate payment of $184,000. The letter also advised that failure to comply with these demands "constitutes willful violation of the stay and conversion of property of the estate which is punishable by sanctions." Importantly, by requesting the freezing of the account, limiting disbursements to those with written approval, and the return of $184,000, debtor sought to maintain the status quo, which is the purpose behind the automatic stay. See *Hillis Motors, Inc. v. Haw. Auto. Dealers' Ass'n, 997 F.2d 581, 585 (9th Cir. 1993)* (the automatic stay is designed to effect an immediate freeze of the status quo). "The stay requires the creditor to maintain the status quo ante and to remediate acts taken in ignorance of the stay." *Franchise Tax Bd. v. Roberts (In re Roberts), 175 B.R. 339, 345 (9th Cir. BAP 1994)*.

Regardless of whether debtor used the terminology "disgorge" or "turnover" later in the OSC, we conclude that the October 1, 2012 Letter was sufficient to put APJL on notice that its failure to freeze the account or its wrongful retention of funds would result in a violation of the automatic stay. Of course, APJL did not freeze the account **[*58]** nor did it seek written authorization from the CRO for any disbursements. It also never turned over any money to debtor. Had APJL re-established the status quo, its violation of the stay would have ended.[19]

APJL argues that by the time debtor demanded turnover of the $184,000, the expenses had already been disbursed to the credit card companies and the manager. The fact that APJL no longer had possession of the funds is irrelevant in a turnover analysis under *§ 542*. *Section 542(a)* states in relevant part, "[A]n entity . . . in possession, custody, or control, **during the case**, of [property of the estate, or exempt property], shall deliver to the trustee, and account for, such property **or the value of such property**, unless such property is of inconsequential value or

---

[19] One consequence of APJL not freezing the account was chargebacks by the credit card companies which occurred after October 1, 2012. These chargebacks themselves may have been violations of the automatic stay, especially if they were for prepetition debits which is unclear from the record. Whether pre or postpetition, a credit card company must get relief from stay to charge back a debtor's merchant account.

benefit to the estate." (Emphasis added). **[*59]**  The Ninth Circuit has recently rejected the argument APJL makes on appeal.

> First, 'during the case' means that the trustee may bring a motion for turnover against an entity who has possession of the property of the estate, or had possession of that property at some point during the bankruptcy case. Second, the phrase "or the value of such property" indicates that the entity need not be in possession of the property itself when the trustee files the motion for turnover. Because *§ 542(a)* permits a trustee to recover 'the value of [the] property,' instead of just the property itself, possession cannot be required in order to bring the motion for turnover.

*Shapiro v. Henson, 739 F.3d 1198, 1201 (9th Cir. 2014)*; see also *Newman v. Schwartzer (In re Newman), 487 B.R. 193 (9th Cir. BAP 2013)*.

In sum, "the failure to return property of the estate with knowledge of the bankruptcy is a violation of both the automatic stay and of the turnover requirements of the Bankruptcy Code." *Abrams v. Sw. Leasing and Rental Inc. (In re Abrams), 127 B.R. 239, 241—43 (9th Cir. BAP 1991)* (creditor's continuing retention of repossessed vehicle after receiving notice of bankruptcy violated automatic stay). By its express terms, *§ 542(a)* is self-executing and does not require the debtor to take any action or commence a proceeding or obtain a court order to compel the turnover. See *Mwangi v. Wells Fargo Bank, N.A. (In re Mwangi), 432 B.R. 812, 823 (9th Cir. BAP 2010)*. Accordingly, we conclude that the bankruptcy court properly **[*60]**  found that APJL violated the automatic stay by retaining property which was property of the estate.

The bankruptcy court also found APJL's offsets of prepetition expenses against debtor's postpetition draws violated the automatic stay. APJL does not address this finding with any specificity on appeal. To assert the right to setoff or pursue satisfaction of his or her claim, a creditor must seek relief from the automatic stay. *§ 362(d)(1)*. Further, "[t]he decision to award setoff rests squarely within the discretion of the Bankruptcy Court." *Hal Inc. v. United States (In re Hal, Inc.), 122 F.3d 851, 854 (9th Cir. 1997)*. Because no final accounting was completed in this record, we do not know if APJL did offset any prepetition expenses, but this has no effect on our decision to affirm.

### 3. The Contempt Order

Contempt damages under *§ 362(k)* are available to individuals, but because neither debtor as a corporation nor Trustee may seek contempt damages under *§ 362(k)*, contempt damages are available under *§ 105*. *Havelock v. Taxel (In re Pace), 67 F.3d 187, 192 (9th Cir.1995)*.

Under *§ 105*, "[t]he standard for finding a party in civil contempt is well settled: The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court." *Knupfer v. Lindblade (In re Dyer), 322 F.3d 1178, 1190—91 (9th Cir. 2003)*. The movant must prove that the creditor (1) knew the automatic stay was **[*61]**  applicable and (2) intended the actions which violated the injunction. *Id.*; *Zilog, Inc. v. Corning (In re Zilog, Inc.), 450 F.3d 996, 1007-08 (9th Cir. 2006)*. "Knowledge of the injunction, which is a prerequisite to its willful violation, cannot be imputed; it must be found." *In re Zilog, Inc., 450 F.3d at 1008*; see also *In re Dyer, 322 F.3d at 1191—92* (contempt sanctions upheld where creditor admitted having notice of the automatic bankruptcy stay, yet took no steps to remedy his violation of the stay).

APJL does not mention these standards in this appeal. Rather, it argues that it should not be held in contempt because debtor's demand to pay $184,000 was not the proper subject of a "turnover" demand based on the holding in *In re Nat'l Audit Def. Network, 332 B.R. at 911* (citing *MCI Telecommunications Corp. v. Gurga (In re Gurga), 176 B.R. 196, 199 (9th Cir. BAP 1994)* ("turnover proceedings involve return of **undisputed** funds. . . .")). There, the bankruptcy court noted that "settled and controlling law holds that the presence of an active dispute over the amount owed takes the action out of the turnover area; one cannot shortcut a breach of contract action with a turnover demand." *Id.*

2015 Bankr. LEXIS 662, *61

Here, APJL argues that the parties were in a dispute over an accounting issue. However, APJL again confuses the accounting issue with the property of estate issue. The proper distribution of debtor's property is at issue in the pending adversary proceeding which includes [*62] a request for an accounting. We agree that there are material disputes with respect to the accounting, but that does not excuse APJL from turning over property of the estate for purposes of maintaining the status quo.

We are also not convinced that it was "impossible" for APJL to comply with debtor's demand for return of the $184,000. First, APJL contends that the return of these funds cannot be the subject of a turnover order since they related to the CC Fees and Manager's Salary and other expenses which involve breach of contract. This argument we already addressed.

APJL next argues that since the demand for the return of $184,000 was not tied to the funds actually in the Augmentation Account, all the pleadings and hearings thereafter were focused on accounting issues. According to APJL, the bankruptcy court's attempt to combine the two issues led to the illogical result that improperly punishes APJL for claims that were never raised in the pleadings. Thus, according to APJL, the court improperly held that APJL had the ability to comply with a court order.

These arguments have nothing to do with the impossibility defense to a contempt order. To successfully assert this defense, APJL [*63] as the alleged contemnor must establish "categorically and in detail" its inability to comply with the court's order. _Affordable Media, LLC, 179 F.3d at 1239._ As noted by the bankruptcy court, APJL did not meet its burden. There is nothing in the record that shows APJL lacked resources to turn over the funds from other sources. More significantly, APJL could have frozen the account on October 1, 2012, or requested debtor to assert the automatic stay against the credit card companies. _See Moratzka v. Visa USA (In re Calstar, Inc.), 159 B.R. 247 (Bankr. D. Minn. 1993)_ (recovery of chargebacks from postpetition deposit is a violation of _§ 549_ and the automatic stay). Instead, APJL conducted its late September reconciliations without notifying debtor and then ignored debtor's demand to freeze the account and return the funds associated with the previously undisclosed charges. Even setting aside whether APJL had the ability to return the disputed $184,000, it clearly could have turned over the funds in the account on October 1, 2012. As the bankruptcy court observed, APJL alone was "responsible for the inability to comply." _In re Count Liberty, LLC, 370 B.R. 259, 275 (Bankr. C.D. Cal. 2007)._

### 4. Damages

APJL complains that the damages award was improperly calculated and inequitable.

The basis for the equitable argument is that the bankruptcy court is to blame for the accrued attorney's [*64] fees and the other damages. APJL maintains that the "focus" of the hearings shifted after November 29, 2012, to the accounting issues raised in the OSC application which resulted in three hearings, multiple tentative rulings and interim orders, multiple pleadings, and thousands of pages of accounting records that the parties all reviewed. At the end of all these hearings, the bankruptcy court calculated the damages based on the amount of money that was actually in the Augmentation Account, which was never the focus of the inquiry all along. As a result, the parties spent tens of thousands of dollars arguing over accounting issues, which the court specifically ordered to be dealt with in the adversary proceeding. APJL contends that "[t]he entire cost of the Bankruptcy court's flawed process has been imposed upon APJL [because] the determination of what funds were in the Augmentation Account could have been decided at the November 29, 2012 hearing."

At the November 29, 2012 hearing, the following discussion took place:

> MR. FAITH: Right. Well, your honor, I guess from my standpoint, what I want to be able to communicate to the client is, look, if you put the money back in there, at least the [*65] relief from stay issue isn't still hanging over our head in terms of the OSC.
>
> . . .
>
> MR. FAITH: I don't know if you're saying that or not.

75

THE COURT: Well, I am . . . . Damages for pursuing stay violations . . . don't continue to actually recover the money once the stay violation has ended, but they end when the stay violation ends. So basically the client's damages for stay violation are going to go until it puts the money back. So that's its choice. I'm not saying it's going to give them a free pass for its conduct today. I'm just telling you, you want more time, you want more process, you can have it. If you take that time, you're going to be faced with a potential consequence.

It was APJL's counsel that requested the opportunity for further briefing and it was Parvizian's February 22, 2013 declaration that was inconsistent with his previous declaration. That inconsistency raised further questions regarding the CC Fees and Manager's Salary which had been automatically deducted from the Augmentation Account. Further briefing ensued due to the new issues raised. Thus, the focus did shift from the initial inquiry as to whether APJL had reimbursed itself for the offset expenses. Nonetheless, [*66] the record shows that APJL never complied with any of debtor's demands set forth in the October 1, 2012 Letter. Had APJL frozen the account when debtor requested, it would have been unnecessary for the bankruptcy court to determine what the amount of the funds were in the Augmentation Account as of October 1, 2012. Moreover, APJL never complied with the bankruptcy court's ruling on November 29, 2012 when it ordered APJL to turn over the $75,759 and $28,000 amounts related to its offset, nor did APJL comply with the court's April 12, 2013 OSC which required APJL to return $171,346.17 to the Augmentation Account. Had APJL complied with either of the bankruptcy court's orders, the damages for its stay violation would have stopped accruing. In short, we are not persuaded by APJL's equitable argument, which also was raised for the first time on appeal. See *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills, 321 F.3d 878, 882 (9th Cir. 2003)* (arguments raised for the first time on appeal are waived).

Finally, APJL contends that the bankruptcy court's award of actual damages required an evidentiary hearing because the funds at issue were "unaccounted for." In its memorandum decision, the bankruptcy court found:

> APJL's noncompliance with its automatic stay obligations and expenditure [*67] of the funds in the Augmentation Account for its own purposes has also caused actual damages to the estate in the amount of the deficiency between the funds on hand on October 1, 2012 and what was left when the funds were finally turned over. In its Supplemental Briefing on July 17, 2013 in response to the OSC, APJL admitted $133,265.98 was in the Augmentation Account when counsel initially requested it be frozen on September 25, 2012, and $116,702.74 was in the Augmentation Account on October 1, 2012 when Debtor's counsel informed APJL that it was in violation of the automatic stay. After October 1, 2012, an additional $44,394.12 was also deposited in the Augmentation Account. Had APJL frozen the account on October 1, 2012, $161,096.86 of Debtor's funds would have been preserved. After October 2012, APJL paid Debtor $64,539.62. By June 17, 2013, when APJL turned over the remaining funds in the Augmentation Account to the Chapter 7 Trustee, the balance had dwindled to $27,958.75. Of the original $161,096.86 that was available and could have been turned over to Debtor as of October 1, 2012, $68,598.49 is unaccounted for. These are the actual damages the Court awards to the estate.

The [*68] narrow question APJL raises on appeal is whether there is evidence to support the $68,598.49 award. APJL argues that since the accounting of the funds is at issue in the adversary, it should have had the opportunity to respond by way of an evidentiary hearing. APJL contends that the unaccounted for funds are disputed.

However, the bankruptcy court awarded the amount of $68,598.49 because APJL failed to preserve those funds by freezing the account. While APJL tries to link the actual damages to an accounting dispute, APJL once again misses the point that the status quo is the policy behind the automatic stay. The fact that certain funds may be "unaccounted" for does not make debtor's actual damages any less. Under these circumstances, the lack of an evidentiary hearing was not an abuse of discretion.

Nonetheless, we conclude that the bankruptcy court's calculations regarding the actual damages are not supported by the record and thus clearly erroneous. The bankruptcy court apparently gave APJL double credit for the $27,958.75 it turned over to Trustee on May 28, 2013. In addition, although the court fixed the account balance from which it credited the monies paid over to debtor as of [*69] October 1, 2012, $36,000 of that credit was paid before October 1 and perhaps this credit was improperly given. Thus, the bankruptcy court's calculation of the damages award was clearly erroneous.

2015 Bankr. LEXIS 662, *69

## VI. CONCLUSION

For the reasons stated, we AFFIRM the Compensation Order and AFFIRM the Damages Order in all respects except for the award of actual damages. We VACATE the award of actual damages and REMAND for further proceedings to determine the appropriate amount.

---

**End of Document**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 1901 Avenue of the Stars, Suite 450, Los Angeles, CA 90067-6006.

A true and correct copy of the foregoing document entitled (*specify*): **Chapter 7 Trustee's Notice of Motion and Motion for Order Compelling Debtor and any other Occupants to Vacate and Turn Over Manufactured Home and Authorizing Issuance of Writ of Assistance; Memorandum of Points and Authorities, Declaration of Jeffrey I. Golden and Request for Judicial Notice** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On January 31, 2025  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page.

**2.  SERVED BY UNITED STATES MAIL**:
On January 31, 2025 , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*)  January 31, 2025, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Debtor
Jamie Lynn Gallian
jamiegallian@gmail.com

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| January 31, 2025 | Gloria Ramos | /s/ Gloria Ramos |
| --- | --- | --- |
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
1785210.1  27064

**F 9013-3.1.PROOF.SERVICE**

<u>ADDITIONAL SERVICE INFORMATION</u> (if needed):

**1.  <u>SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")</u>**

Bradford Barnhardt on behalf of Interested Party Courtesy NEF
bbarnhardt@marshackhays.com, bbarnhardt@ecf.courtdrive.com,alinares@ecf.courtdrive.com

Bradford Barnhardt on behalf of Plaintiff Houser Bros. Co.
bbarnhardt@marshackhays.com, bbarnhardt@ecf.courtdrive.com,alinares@ecf.courtdrive.com

Christopher L Blank on behalf of Attorney Christopher L. Blank, Attorney at Law, PC
chris@chrisblanklaw.com

Aaron E. De Leest on behalf of Plaintiff Jeffrey I. Golden
adeleest@marshackhays.com, adeleest@marshackhays.com,alinares@ecf.courtdrive.com

Aaron E. De Leest on behalf of Trustee Jeffrey I Golden (TR)
adeleest@marshackhays.com, adeleest@marshackhays.com,alinares@ecf.courtdrive.com

Robert P Goe on behalf of Creditor The Huntington Beach Gables Homeowners Association
kmurphy@goeforlaw.com,
rgoe@goeforlaw.com;goeforecf@gmail.com;Goe.RobertP.R@notify.bestcase.com;ajohnston@goeforlaw.com

Robert P Goe on behalf of Interested Party The Huntington Beach Gables Homeowners Association
kmurphy@goeforlaw.com,
rgoe@goeforlaw.com;goeforecf@gmail.com;Goe.RobertP.R@notify.bestcase.com;ajohnston@goeforlaw.com

Robert P Goe on behalf of Plaintiff The Huntington Beach Gables Homeowners Association
kmurphy@goeforlaw.com,
rgoe@goeforlaw.com;goeforecf@gmail.com;Goe.RobertP.R@notify.bestcase.com;ajohnston@goeforlaw.com

Jeffrey I Golden (TR)
lwerner@go2.law, jig@trustesolutions.net;kadele@go2.law;C205@ecfcbis.com

D Edward Hays on behalf of Creditor Houser Bros. Co. dba Rancho Del Rey Mobile Home Estates
ehays@marshackhays.com,
ehays@ecf.courtdrive.com;alinares@ecf.courtdrive.com;cmendoza@marshackhays.com;cmendoza@ecf.courtdrive.com

D Edward Hays on behalf of Interested Party Courtesy NEF
ehays@marshackhays.com,
ehays@ecf.courtdrive.com;alinares@ecf.courtdrive.com;cmendoza@marshackhays.com;cmendoza@ecf.courtdrive.com

D Edward Hays on behalf of Plaintiff Houser Bros. Co.
ehays@marshackhays.com,
ehays@ecf.courtdrive.com;alinares@ecf.courtdrive.com;cmendoza@marshackhays.com;cmendoza@ecf.courtdrive.com

Brandon J. Iskander on behalf of Creditor The Huntington Beach Gables Homeowners Association
biskander@goeforlaw.com, kmurphy@goeforlaw.com

Brandon J. Iskander on behalf of Plaintiff The Huntington Beach Gables Homeowners Association
biskander@goeforlaw.com, kmurphy@goeforlaw.com

Eric P Israel on behalf of Trustee Jeffrey I Golden (TR)
eisrael@danninggill.com, danninggill@gmail.com;eisrael@ecf.inforuptcy.com

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
1785210.1  27064

**F 9013-3.1.PROOF.SERVICE**

Shantal Malmed on behalf of Interested Party Courtesy NEF
, cheryl.caldwell@gmlaw.com

Shantal Malmed on behalf of Plaintiff Jeffrey I. Golden
shantal.malmed@gmlaw.com, cheryl.caldwell@gmlaw.com

Shantal Malmed on behalf of Trustee Jeffrey I Golden (TR)
shantal.malmed@gmlaw.com, cheryl.caldwell@gmlaw.com

Laila Masud on behalf of Creditor Houser Bros. Co. dba Rancho Del Rey Mobile Home Estates
lmasud@marshackhays.com, lmasud@ecf.courtdrive.com;lbuchanan@marshackhays.com;alinares@ecf.courtdrive.com

Laila Masud on behalf of Interested Party Courtesy NEF
lmasud@marshackhays.com, lmasud@ecf.courtdrive.com;lbuchanan@marshackhays.com;alinares@ecf.courtdrive.com

Laila Masud on behalf of Plaintiff Houser Bros. Co.
lmasud@marshackhays.com, lmasud@ecf.courtdrive.com;lbuchanan@marshackhays.com;alinares@ecf.courtdrive.com

Mark A Mellor on behalf of Defendant Randall L Nickel
mail@mellorlawfirm.com, mellormr79158@notify.bestcase.com

Mark A Mellor on behalf of Interested Party Courtesy NEF
mail@mellorlawfirm.com, mellormr79158@notify.bestcase.com

Valerie Smith on behalf of Interested Party Courtesy NEF
claims@recoverycorp.com

United States Trustee (SA)
ustpregion16.sa.ecf@usdoj.gov


2. **SERVED BY U.S. MAIL**

| | | |
|---|---|---|
| **Jamie Lynn Gallian, Debtor**<br>16222 Monterey Ln Unit 376<br>Huntington Beach, CA 92649 | **The Honorable Scott C. Clarkson**<br>U.S. Bankruptcy Court<br>Ronald Reagan Federal Building<br>411 W. Fourth Street, Suite 5130<br>Santa Ana, CA 92701 | **Buyer**<br>Galaxy Homes<br>Attn: Richard Herr<br>12852 Bubbling Well Road<br>Santa Ana, CA  92705 |
| **Greg Bingham - Broker**<br>Coldwell Banker Residential<br>840 Newport Center Dr Ste 100<br>Newport Beach, CA 92660-6377 | **William Friedman - Broker**<br>Coldwell Banker Realty<br>840 Newport Center Dr Ste 100<br>Newport Beach, CA 92660-6377 | **Office of the United States Trustee**<br>411 West Fourth Street, Suite 7160<br>Santa Ana, CA  92701-4593 |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
1785210.1  27064

**F 9013-3.1.PROOF.SERVICE**