ERIC P. ISRAEL, #132426
EPI@LNBYG.COM
LEVENE, NEALE, BENDER, YOO &
GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, CA 90034
Telephone: 310-229-1234
Fascimile:  310-229-1244

Attorneys for JEFFREY I. GOLDEN, Trustee

D. EDWARD HAYS, #162507
ehays@marshackhays.com
BRADFORD N. BARNHARDT, #328705
bbarnhardt@marshackhays.com
MARSHACK HAYS WOOD LLP
870 Roosevelt
Irvine, CA 92620
Telephone: (949) 333-7777
Facsimile: (949) 333-7778

Attorneys for Creditor,
HOUSER BROS. CO. dba RANCHO DEL
REY MOBILE HOME ESTATES

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| In re | Case No. 8:21-bk-11710-SC |
|---|---|
| JAMIE LYNN GALLIAN, | Chapter 7 |
| Debtor. | NOTICE OF UNPUBLISHED AUTHORITY IN SUPPORT OF JOINT REPLY IN SUPPORT OF 11 U.S.C. § 363(M) FINDING RE: GREGORY A. PEPLIN |
| | Date:   April 10, 2025<br>Time:  9:30 a.m.<br>Ctrm:  5C |

1

NOTICE OF UNPUBLISHED AUTHORITY

4880-1284-8131,v.1

TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY JUDGE,

THE DEBTOR AND HER COUNSEL OF RECORD, AND ALL INTERESTED PARTIES:

Jeffrey I. Golden, solely in his capacity as Chapter 7 Trustee ("Trustee") for the bankruptcy

estate ("Estate") of Jamie Lynn Gallian ("Debtor"), and Creditor, Houser Bros. Co., dba Rancho Del

Rey Mobile Home Estates ("Houser Bros."), attach copies of the following unpublished decisions

cited in Joint Reply ("Reply") in Support of the 11 U.S.C. § 363(m) Finding Re: Gregory A. Peplin

("Mr. Peplin").

## Unpublished Case

1.      *Wood v. Borland (In re Borland)*, 2009 Bankr. LEXIS 5648 (Bankr. E.D. Cal. July 23, 2009).

2.      *In re Zhang*, Case No. 6:22-bk-10523-SY, ECF No. 166 (Bankr. C.D. Cal. Feb. 13, 2024).

3.      *Cty. of Imperial Treasurer-Tax Collector v. RW Meridian, LLC (In re RW Meridian LLC)*, 2017 Bankr. LEXIS 4172 (B.A.P. 9th Cir. Dec. 6, 2017).

4.      *Licata v. Coan*, 2015 U.S. Dist. LEXIS 160333 (D. Conn. Sept. 22, 2015).

5.      *Nev. Bus. Credit, LLC v. Kavanaugh (In re Golden Empire Air Rescue, Inc.)*, 2007 Bankr.LEXIS 4880 (B.A.P. 9th Cir. Oct. 25, 2007).


DATED: April 8, 2025                    MARSHACK HAYS WOOD LLP

                                                  /s/ D. Edward Hays
                                         By: _____
                                              D. EDWARD HAYS
                                              BRADFORD N. BARNHARDT
                                              Attorneys for Creditor,
                                              HOUSER BROS. CO. dba RANCHO DEL
                                              REY MOBILE HOME ESTATES

NOTICE OF UNPUBLISHED AUTHORITY

4880-1284-8131,v.1

**EXHIBIT 1**

## *Wood v. Borland (In re Borland)*

United States Bankruptcy Court for the Eastern District of California

July 23, 2009, Decided; July 23, 2009, Filed

Case No. 07-13741, Adv. No. 08-1042

**Reporter**
2009 Bankr. LEXIS 5648 *; 2009 WL 9084773

In re ROBERT LLOYD BORLAND, Debtor.RAMONA WOOD, Plaintiff, vs. ROBERT LLOYD BORLAND, Defendant.

**Notice:** NOT FOR PUBLICATION

**Counsel:** **[*1]** For Robert Lloyd Borland (07-13741), Debtor: D. Max Gardner, Bakersfield, CA.

For Jeanette Lenore Borland (07-13741), Joint Debtor: D. Max Gardner, Bakersfield, CA.

For Trustee (07-13741): Randell Parker, Arvin, CA.

For Ramona Wood, fka Ramona Koster (08-01042), Plaintiff: Leo Mark Hinds, Bakersfield, CA; Robert S. Williams, LEAD ATTORNEY, Bakersfield, CA.

For Robert Lloyd Borland (08-01042), Defendant: D. Max Gardner, LEAD ATTORNEY, Bakersfield, CA.

**Judges:** WHITNEY RIMEL, United States Bankruptcy Judge.

**Opinion by:** WHITNEY RIMEL

# Opinion

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Trial in this adversary proceeding was held on February 11 and 12, 2009, and continued to March 18, 2009. Closing briefs were filed May 1, 2009, and the court then took the matter under submission.

This memorandum contains findings of fact and conclusions of law required by *Federal Rule of Bankruptcy Procedure 7052* and *Federal Rule of Civil Procedure 52*. This is a core proceeding as defined in *28 U.S.C. §157(b)(2)(I)*.

The adversary proceeding seeks a determination of nondischargeability of debt under *Bankruptcy Code sections 523(a)(2)*; *523(a)(4)*; and *523(a)(6)*. All the evidence at trial went to the claim for nondischargeability under *§ 523(a)(4)*.

Joint **[*2]** Statement of Undisputed Facts.

On March 12, 2009, plaintiff and defendant filed a Joint Statement of Undisputed Facts. Those facts are set forth below, and are adopted by the court as findings of fact in this adversary proceeding.

1. Plaintiff met defendant while working at Frito-Lay in Bakersfield, California. Defendant was one of the individuals who interviewed plaintiff for the position of Crewing Coordinator.

2. As a Crewing Coordinator, plaintiff worked under an equal level supervisor of defendant named Marcos, who was the Fritos unit supervisor.

3. On or about April of 2004, defendant acquired his real estate broker's license and started the real estate firm known as Christian Realty.

4. On or about December of that same year, Defendant quit his job at Frito Lay and became the president of the start-up company known as Kleenerz, Inc. ("Kleenerz"). As president of Kleenerz, defendant understood his duties to do everything in his power within reason to allow Kleenerz to succeed.

5. Kleenerz sought financing via an SBA type bank loan and found out that, due to being in existence for less than two years, it would be next to impossible to get such a loan.

6. On or about February 17, 2005, **[*3]** plaintiff engaged defendant as her real estate broker to sell her residence located at 11402 Garrick Ct., Bakersfield, California.

7. Such real estate brokerage relationship was successful in the sale of plaintiff's residence in approximately June 2005. The proceeds of sale were approximately $300,000.

8. Tim Denari, a shareholder and officer in Kleenerz, asked defendant if he knew of anyone that might be interested in loaning money to Kleenerz.

9. Defendant placed plaintiff on a list of five people that he thought could be potential investors interested in investing in Kleenerz. Such potential investors were defendant's cousin Danny Aldrich, a coworker Brent Fowler, defendant's aunt and uncle Dan and Elaine Aldrich, and Jeremy Jessup.

10. Mr. and Mrs. Aldrich, Mr. Fowler, and Mr. Jessup declined to invest in Kleenerz.

12. Defendant telephoned Ms. Wood about investing in Kleenerz. The next step was a meeting among defendant, Ms. Wood and Tim Denari. Defendant does not recall what financial information was provided to plaintiff. After such meeting, defendant understood that plaintiff had her money with Wells Fargo Bank.

13. Plaintiff loaned Kleenerz $300,000 on or about September 23, 2005. **[*4]** The loan was personally guaranteed by defendant and by Tim Denari. Interest payments were made as set forth in the payment history admitted into evidence.

14. The principal balance and accrued interest remains unpaid.

15. Defendant, and his wife, Mrs. Borland, subsequently signed a note for $300,000 in connection with pledging deeds of trust in an attempt to secure plaintiff's loan.


Additional Findings of Fact.

As set forth above, the parties agree that defendant Borland acted as a real estate broker in selling plaintiff's residence. The sale resulted in proceeds of about $300,000, which plaintiff Ramona Wood placed in a Wells Fargo Account.

In the meantime, Robert Borland had become a shareholder and officer in the start-up company called Kleenerz. Kleenerz needed capital. After Ramona Wood met with Robert Borland and the other officer and shareholder in Kleenerz, Tim Denari, she agreed to lend Kleenerz $300,000 and in fact did lend Kleenerz $300,000 on or about September 23, 2005. Kleenerz made some interest payments but ultimately the business failed. Both Kleenerz and Robert Borland filed bankruptcy. Borland and Denari had guaranteed the loan. Also, Borland and his wife had signed a **[*5]** second note for $300,000 to Wood and secured that note with deeds of trust. This was done after the initial loan.

EXHIBIT 1, PAGE 4

Wood and Borland had worked together at Frito-Lay. They knew each other as casual work acquaintances. However, when Wood decided to sell her house, she selected Borland as a real estate broker because she had known about him through Frito-Lay. Borland did not receive a commission on the loan made to Kleenerz.

Wood looked up to Borland and Denari. She thought they were responsible people. She was interested in the loan to Kleenerz because they told her they would give her 9% interest, which was better than the 3% she was getting at Wells Fargo. Initially, no collateral was offered or requested. Wood was interested in getting a better return on her $300,000 because she wanted to stay home with her child.

The testimony was inconclusive about whether Borland told Denari that Wood had $300,00 to invest before he obtained Wood's permission to make this disclosure.

When Wood, Denari, and Borland met, Denari explained to Wood how the Kleenerz business operated. Denari also gave her a personal guarantee, which was the only one he executed for any of the loans to Kleenerz. No documents [*6] about the financial condition of Kleenerz were given to Wood. However, Denari did discuss the risk of the investment with Wood. He explained to her that the cleaning business was subject to seasonal factors; that competitors were an issue; and that there were financing issues. He testified that he ran through the basic business risks with her. He also discussed with her the risk of entering into an unsecured loan and how unsecured lending works. No disclosures were made in writing to her.

Wood was interested in lending money to Kleenerz, not in being an investor in Kleenerz for an equity share. She was interested in obtaining regular interest payments.

Kleenerz had a business plan and initially did well. A number of people in the Bakersfield area invested in Kleenerz. Both Denari and Borland themselves invested substantial sums in Kleenerz. After Wood invested, Kleenerz continued to grow. Subsequently, a problem arose that caused Kleenerz to file its own bankruptcy case.

About three to six months after Wood lent Kleenerz $300,000, she became an employee of the company. Eventually she said to Borland that she didn't need the interest payment each month, and asked them to hold the interest [*7] payment.

Three years after the loan, Borland gave Wood deeds of trust on his rental properties. He did this because in his mind the rental property equity was her "failsafe." Borland caused a proof of claim to be filed for Wood in the Kleenerz chapter 11 case.

Borland believes that Wood lent the $300,000 to Kleenerz in part because she trusted him through their friendship and not specifically because he had been the real estate broker for the sale of her house.

Judgment on _11 U.S.C. sections 523(a)(2)_ and (a)(6).

As no evidence was introduced about whether the obligation is nondischargeable under _§ 523(a)(2)_ or _§ 523(a)(6)_, judgment on those claims will be issued for defendant.

Conclusions of Law.

_11 USC 523(a)(4)_

Under _11 USC 523(a)(4)_, a debt is not discharged if the debt is "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." In this case, there is no question of embezzlement. "Fraud" for purposes of _§ 523(a)(4)_requires intentional deceit, rather than implied or constructive fraud. 4 Collier on Bankruptcy ¶ 523.17 (15th Ed. 2009). "Defalcation refers to a failure to produce funds entrusted to a fiduciary and applies to conduct that

EXHIBIT 1, PAGE 5

does not necessarily  **[*8]**  reach the level of fraud, embezzlement, or misappropriation." Id. In the Ninth Circuit, an individual may be liable for defalcation without having the intent to defraud. *In re Lewis, 97 F.3d 1182, 1187 (9th Cir. 1996)*.

The Ninth Circuit has also set forth three requirements for a debt to be nondischargeable under *§ 523(a)(4)*.

> "A debt is nondischargeable under *11 U.S.C. § 523(a)(4)* where 1) an express trust existed, 2) the debt was caused by fraud or defalcation, and 3) the debtor acted as a fiduciary to the creditor at the time the debt was created."

*In re Niles, 106 F.3d 1456, 1459 (9th Cir. 1997)* (citation and internal quotations omitted).

Once the creditor establishes that a fiduciary duty exists, the debtor has the burden to explain the transaction. *Id. at 1461*.

A debtor is only a fiduciary for purposes of *§ 523(a)(4)* where state law imposes an express or statutory trust on the funds at issue. *Id. at 1463*, *In re Lewis, supra, at 1185*.

A real estate agent can be a fiduciary for purposes of *§ 523(a)(4)*. In *In re Niles, supra, at 1459*. Niles was a broker and property manager who collected rents and purchased and sold property at the direction of Otto, an investor. Niles borrowed money from  **[*9]**  the collected rents, and later filed a chapter 7 petition. Otto filed an adversary proceeding under *§ 523(a)(4)*, alleging defalcation. The court concluded that Niles was a fiduciary within the meaning of *523(a)(4)*. Niles collected rents for the Ottos in her capacity as a licensed real estate broker. She was required either to pay the funds directly to the Ottos or to hold them in a trust fund account in accordance with her instructions from the Ottos. Thus, she was the trustee of an express trust. *Id.* The court observed that the law imposes on a real estate agent the same obligation of undivided service and loyalty that it imposes on a trustee in favor of his beneficiary. *Id.* Thus, the fiduciary relationship arose from an express or technical trust that was imposed before and without reference to the wrong doing that caused the debt." *Id.* (citations and internal quotations omitted).

In *In re Woosley, 117 B.R. 524 (9th Cir. BAP 1990)*, the court concluded that real estate agents licensed in California were fiduciaries under *§ 523(a)(4)* as a matter of law, with respect to carrying out licensed activities. In that case, an unsophisticated creditor loaned money to a real estate agent's partnership  **[*10]**  at the behest of the agent. The creditor and agent engaged in several transactions that involved the creditor lending the agent's partnership money in exchange for security interests, and exchanging security interests in certain pieces of real property for other security interests. Consequently, the court held that the agent was a fiduciary. The court held that the debtor was acting in his licensed capacity as construed under California law and, as such, he was a fiduciary under California law. *Id. at 530*.

Another relevant case is *In re Hooper, 112 B.R. 1009 (9th Cir. BAP 1990)*. In that case, an investor lent $100,000.00 to a real estate agent, which the agent invested in a real estate development project. In partial consideration for the loan, the agent agreed to counsel the investor regarding her marriage dissolution. The facts do not state whether the investor received a security interest in return for the investment. The bankruptcy court held that the facts were insufficient to create a fiduciary duty.

The Appellate Panel stated that it did not believe the lower court had committed clear error.

> "Even if the requisite trust relationship can arise solely by virtue of a broker-client  **[*11]**  relationship, although there is evidence that Hooper acted as a real estate broker in assisting Schieber in the sale or purchase of real property, there is no evidence that Hooper acted as Scheiber's real estate broker with respect to the transactions giving rise to the debt at issue. Rather, the evidence indicates that Hooper counseled Schieber with respect to certain investment decisions and induced Schieber to loan money to him or his company. Hooper's actions in borrowing money from Schieber do not fall within the scope of the acts of a real estate

EXHIBIT 1, PAGE 6

broker as defined by *Cal. Bus. & Prof. Code § 10131*. . . . The mere fact that Schieber may have employed Hooper to counsel her with respect to investment matters is not sufficient to create the requisite fiduciary capacity under the narrow standard discussed above."

*Id. at 1013-1014.*

Even where a real estate agent is a fiduciary, the agent's misconduct must be in the context of the agent's licensed capacity for the debt to be nondischargeable. Bankruptcy courts have been willing to treat real estate brokers as fiduciaries when they perform tasks within the scope of their agency. Courts have only found debts nondischargeable pursuant to **[*12]** *§ 523(a)(4)* when the loss is related to tasks that the agent performed that are typical of a real estate broker. Thus, subsequent transactions between a broker and client will not support a nondischargeability claim unless the broker was acting in his or her capacity as a broker during the transaction that gave rise to the debt.

Admissibility of Expert Witness Testimony.

In this case, both plaintiff and defendant called expert witnesses about the scope of a real estate broker's fiduciary duties. Neither party objected to the admission of such evidence. The court asked the parties to brief whether such testimony should be admissible in their closing briefs. Not surprisingly, both parties argue in their closing statements that such testimony is admissible. Whether such testimony is admissible depends on whether the testimony is about ultimate issues of fact or issues of law.

*Federal Rules of Evidence 702* and *704* authorize expert witnesses to testify about ultimate issues of fact. *Rule 702* provides that:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, **[*13]** skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case."

*Federal Rule of Evidence 704* states:
"Except as provided in subdivision (b) [addressing mental condition in a criminal matter], testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

Of course, expert testimony on issues of law is not admissible because an issue of law is to be determined by the court. See *In re Haberern v. Kaupp Vascular Surgeons, 812 F. Supp. 1376 (E.D. Pa. 1992)*. In that case, a former employee sued her employer, alleging breach of fiduciary duties under ERISA. One of the employee's claims was that the employer's requirement that employees sign a general release before receiving pension benefits was arbitrary and capricious. The employer sought to have a labor attorney testify that such a practice was reasonable. The court stated that **[*14]** the Federal Rules of Evidence allow testimony on ultimate issues of fact, but not law.

The testimony from Greg Hanvey, plaintiff's expert witness, and from Temmy Walker, defendant's expert witness, was consistent. Both testified that real estate brokers have a fiduciary duty to their clients. Walker testified that a real estate broker owes the same duty as does a trustee. This duty includes full disclosure to the client if the broker is going to use confidential information to his or her advantage. The duty to keep information confidential provides survives the agency. Walker also testified that other than the duty of nondisclosure, the fiduciary duty ends when the agency ends.

EXHIBIT 1, PAGE 7

Wood and Borland entered into a written agreement for sale of her house. The agreement states that the agent has a fiduciary duty to seller "of utmost care, integrity, honesty, and loyalty in dealing with the Seller." [1]

Additionally, the expert witnesses testified about the standards of practice of the National Association of Realtors. Standard of Practice 1-9 states:

"The obligation of REALTORS to preserve confidential information (as [*15] defined by state law) provided by their clients in the course of any agency relationship or non-agency relationship recognized by law continues after termination of agency relationships or any non-agency relationships recognized by law." [2]

According to Standard of Practice 1.9, realtors shall not during or following the termination of a professional relationship with a client, reveal confidential information of the client without permission. Realtors are also prohibited from using confidential information of clients for the advantage of the realtor or the advantage of third parties unless the client consents after full disclosure.

Generally, it was this obligation under Standard of Practice 1-9 to which the two expert witnesses testified. The Code of Ethics is admissible as evidence of the standard of care of members of the real estate industry. Miller & Starr, 3 Cal. Real Estate § 3:26 at p. 130 (3rd ed. 2000).

Borland agreed that as a realtor estate broker he had a fiduciary obligation to Wood. It was his understanding that except for the duty not to disclose confidential information, that fiduciary duty terminated when the agency relationship terminated. Borland was a member [*16] of the Bakersfield and the National Associations of Realtors. Thus, the Code of Ethics was applicable to him.

That real estate brokers in California have a fiduciary duty to their clients is an issue of law. Whether specific acts taken by the broker violate that duty is a matter of fact. The testimony of both expert witnesses focused on the existence of the duty and its extent. To the extent that testimony explicates an issue of law, the court will not consider it. To the extent it goes to facts, the court has considered it. Neither party objected to the admission of the testimony.


Conclusion.

At the time Borland solicited the loan from Wood for Kleenerz, their real estate agency relationship had terminated. However, his duty of nondisclosure continued. If he had told Denari about Wood's $300,000 prior to obtaining permission from her to do so, that would have violated his duty of nondisclosure.

The evidence on this point conflicts. At his deposition, Borland testified that he did tell Denari that Wood had $300,000. At trial, he testified the opposite.

However, Wood's damages, if any, did not result from any disclosure by Borland. Rather, they resulted from her making a loan to a business [*17] that ultimately failed and was unable to repay her.

To be nondischargeable under § 523(a)(4), it is not enough that the debtor be acting in a fiduciary capacity. Additionally, the debt must be for "fraud or defalcation." As set forth above, fraud in this context requires intentional deceit. There is no evidence that Borland intended to deceive Wood. In fact, all the evidence is that Borland was an officer and 50% shareholder in a start-up business that he very much wished to succeed. If things had gone otherwise, Wood would have been paid in full. Further, not only was there no intentional deceit, at the time the loan was made, Borland was not any longer in a fiduciary relationship with Wood.

---

[1] Disclosure regarding real estate agency relationships, admitted as Exhibit 9.

[2] Exhibit 11.

EXHIBIT 1, PAGE 8

Defalcation refers to a failure to produce funds entrusted to a fiduciary and applies to conduct that does not necessarily reach the level of fraud, embezzlement, or misappropriation. Because the fiduciary relationship between the parties had terminated by the time Wood made the loan, the only possible way the court could find defalcation is if it was in connection with the continuing fiduciary obligation not to disclose confidential information.

First, the court finds most credible Borland's testimony  [*18] at trial that he did not disclose Wood's $300,000 to Denari before they met. Second, even if Borland did disclose to Denari that Wood had $300,000 she might be willing to invest in Kleenerz, without receiving her permission to make that disclosure, the court does not find, on these facts, that such disclosure and the subsequent investment were a "defalcation" so as to make the obligation nondischargeable under *§ 523(a)(4)*.

From the testimony, the court is persuaded that Wood made the loan because she wanted to earn a higher interest rate so she could stay home with her child. She listened to Denari and Borland describe the business to her. There has been no suggestion that she was misled in any manner. Her damages resulted from Kleenerz's failing, not from any disclosure of confidential information without her permission. Even if Borland did disclose confidential information without her permission (and the court finds he did not), such disclosure did not lead directly to - was not the cause of - her making the loan.

For the foregoing reasons, judgment will be entered for defendant on the claim under *§ 523(a)(4)*, as well as the other claims for relief.

Counsel for defendant may submit  [*19] an appropriate form of judgment.

DATED: July 23, 2009

/s/ Whitney Rimel

WHITNEY RIMEL, Judge

United States Bankruptcy Court

---

**End of Document**

EXHIBIT 1, PAGE 9

**EXHIBIT 2**

1  CHAD V. HAES, #267221
   chaes@marshackhays.com
2  BRADFORD N. BARNHARDT, #328705
   bbarnhardt@marshackhays.com
3  MARSHACK HAYS WOOD LLP
   870 Roosevelt
4  Irvine, CA 92620
   Telephone: (949) 333-7777
5  Facsimile: (949) 333-7778

6  Attorneys for Chapter 7 Trustee,
   CHARLES W. DAFF

7

8

9              **UNITED STATES BANKRUPTCY COURT**

10         **CENTRAL DISTRICT OF CALIFORNIA – RIVERSIDE DIVISION**

11  In re:                              Case No. 6:22-bk-10523-SY

12  TOM ZHANG,                          Chapter 7

13          Debtor.                     **ORDER GRANTING TRUSTEE'S
                                        MOTION FOR ORDER AUTHORIZING**
14                                      **SALE OF REAL PROPERTY: (A)
                                        OUTSIDE THE ORDINARY COURSE OF**
15                                      **BUSINESS; (B) FREE AND CLEAR OF
                                        LIENS; (C) SUBJECT TO OVERBIDS;**
16                                      **AND (D) FOR DETERMINATION OF
                                        GOOD FAITH PURCHASER UNDER §**
17                                      **363(M)**

18                                      Hearing:
                                         Date:    February 1, 2024
19                                       Time:    9:30 a.m.
                                         Ctrm:    302
20                                       Address:  3420 Twelfth Street
                                                   Riverside, CA 92501
21

22          On February 1, 2023 at 9:30 a.m., the court conducted a hearing on the Trustee's Motion for

23  Order Authorizing Sale of Real Property: (A) Outside the Ordinary Course of Business; (B) Free and

24  Clear of Liens; (C) Subject to Overbids; and (D) For Determination of Good Faith Purchaser Under

25  § 363(m) ("Motion") filed on January 11, 2024 as Docket No. 156 by Charles W. Daff, solely in his

26  capacity as the duly appointed, qualified, and acting chapter 7 trustee ("Trustee") of the bankruptcy

27  estate of Tom Zhang ("Estate"), seeking an order authorizing the sale of real property located at and

28  commonly known as 13561 Wild Maple Court, Rancho Cucamonga, California 91739-9164

                                            1

**FILED & ENTERED**

**FEB 13 2024**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY Mason      DEPUTY CLERK**

**CHANGES MADE BY COURT**

1  ("Property"). Bradford N. Barnhardt, Esq., appeared on behalf of the Trustee, who was also present

2  in the courtroom. All other appearances were as noted on the record.

3       After consideration of the Motion, the declarations and exhibits in support of the Motion,

4  the lack of any timely filed written opposition, the amended conditional non-opposition

5  ("Conditional Non-Opposition") to the Motion filed by Wells Fargo Bank, N.A. ("Wells Fargo") on

6  January 30, 2024 as Docket No. 162, and the arguments and representations of counsel during the

7  hearing, the court found good cause to grant the Motion for the reasons stated on the record.

8  Accordingly, finding that proper and adequate notice of the Motion has been given,

9       IT IS ORDERED that:

10      1.    The Motion is granted.

11      2.    The Property, which is wholly property of the Estate, may be sold by the Trustee.

12      3.    Hany Mohamed Seyam ("Buyer") is determined to be the successful bidder for the

13  purchase of the Property.

14      4.    The Property sold is legally described as follows:

15      LOT 19 OF TRACT NO. 17651, AS DEPICTED ON THAT CERTAIN MAP

16      RECORDED MARCH 14, 2011, IN BOOK 334, PAGES 84 THROUGH 89,

17      INCLUSIVE, OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY

18      RECORDER OF THE AFORESAID COUNTY IN SUCH AFORESAID STATE.

19      APN: 0225-032-02-0-000

20      5.    Trustee is authorized to sell the Property under 11 U.S.C. § 363 and is further

21  authorized to pay, pursuant to demands submitted to escrow, all unpaid and outstanding *ad valorem*

22  property taxes, and the following liens pursuant to demand submitted to escrow:

23          a.    Consensual trust deed in favor of K. Hovnanian American Mortgage, LLC

24                and any subsequent assignments; and

25          b.    Consensual trust deed in favor of East West Bank and any subsequent

26                assignments.

27

28

2

EXHIBIT 2, PAGE 11

6.      Trustee is authorized to sign all documents necessary to consummate the sale and close escrow including, but not limited to, the purchase and sale agreement, grant deed, and escrow instructions.

7.      Trustee is authorized to pay all customary costs of sale out of escrow.

8.      Trustee is authorized to pay a broker's commission equal to 5% of the sale price, to be divided between seller's broker and buyer's broker according to customary practices.

9.      Trustee is authorized to reimburse Clarence Yoshikane of Berkshire Hathaway HomeServices California Properties ("Agent") for out-of-pocket costs paid by Agent up to $5,000 out of escrow.

10.     The proposed overbid procedures are approved.

11.     The $1,410,000 sale price is fair and reasonable and represents a fair market value for the Property.

12.     The sale is made in good faith and for value.

13.     The Buyer is a good faith purchaser entitled to protection under 11 U.S.C. § 363(m).

14.     The Property is sold free and clear of all liens, claims, and interests of any creditor or interest-holder that consents to the sale under 11 U.S.C. § 363(f)(2).

15.     The Property is sold free and clear of all liens, claims, and interests of GSRF (as successor to and assignee of BMO Harris Bank N.A.), JPMorgan Chase Bank, N.A., Jiang Qi/Anthony Chu, Dilip Vithlani, Comdata Inc., SolarCity Corporation, and Tesla Inc. because those liens are subject to bona fide disputes under 11 U.S.C. § 363(f)(4).

///

///

///

EXHIBIT 2, PAGE 12

16.    The sale of the Property is "as-is" and "where-is" with all faults and without warranty, representation, or recourse whatsoever.

17.    The 14-day stay regarding the effectiveness of this order is waived.

18.    This court retains jurisdiction: (a) to interpret, enforce, and implement the terms and provisions of this sale; and (b) to resolve any disputes arising under or related to this order.

###

Date: February 13, 2024

Scott H. Yun
United States Bankruptcy Judge

4

EXHIBIT 2, PAGE 13

**EXHIBIT 3**

### *Cty. of Imperial Treasurer-Tax Collector v. RW Meridian, LLC (In re RW Meridian LLC)*

United States Bankruptcy Appellate Panel for the Ninth Circuit

November 30, 2017, Argued and Submitted, at Pasadena, California; December 6, 2017, Filed

BAP No. SC-16-1419-SAKu

**Reporter**

2017 Bankr. LEXIS 4172 *

In re: RW MERIDIAN LLC, Debtor.COUNTY OF IMPERIAL TREASURER-TAX COLLECTOR, Appellant, v. RW MERIDIAN, LLC; RONALD E. STADTMUELLER, Trustee, Appellees.

**Notice:** This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see *Fed. R. App. P. 32.1*), it has no precedential value. See 9th Cir. BAP Rule 8024-1.

**Subsequent History:** Appeal dismissed by *in Re RW Meridian, LLC v. RW Meridian, LLC, 2018 U.S. App. LEXIS 38961 (9th Cir., May 9, 2018)*

**Prior History:  [*1]** Appeal from the United States Bankruptcy Court for the Southern District of California. Bk. No. 3:16-bk-00629. Honorable Margaret M. Mann, Bankruptcy Judge, Presiding.

**Counsel:** Laurel Lee Hyde of Schwartz Hyde & Garfield argued for appellant.

Brian A. Kretsch argued for appellee Ronald E. Stadtmueller, Trustee.

**Judges:** Before: SPRAKER, ALSTON[*] and KURTZ, Bankruptcy Judges.

## Opinion

### INTRODUCTION

The Imperial County Treasurer-Tax Collector appeals from an order authorizing the chapter 7[1] trustee to sell real property encumbered by Imperial County's tax lien. As a result of the bankruptcy sale, the tax lien has been paid in full.

Because Imperial County lacks standing, we must DISMISS this appeal.

### FACTS

The facts and procedural history set forth below are undisputed. RW Meridian owned 58.53 acres of undeveloped land located in Imperial County, California. In order to satisfy roughly $167,000 in delinquent property taxes, Imperial County scheduled an auction of the property to commence on Saturday, February 6, 2016.

---

[*] Hon. Christopher M. Alston, United States Bankruptcy Judge for the Western District of Washington, sitting by designation.

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, *11 U.S.C. §§ 101-1532*.

2017 Bankr. LEXIS 4172, *1

Although the auction duly commenced on that date, it was not completed until Tuesday, February 9, 2016, when Imperial County accepted the winning bid of American Pacific Investments, LLC in the amount of $343,000. **[*2]** In the interim, on Monday, February 8, 2016, RW Meridian filed its chapter 7 petition.

Imperial County believed that, by virtue of the scheduled auction, RW Meridian's interest in the property was extinguished under California law at 5:00 p.m. on Friday, February 5, 2016. Even so, on Thursday, February 11, 2016, Imperial County filed a precautionary relief from stay motion to confirm that RW Meridian and its bankruptcy estate had no interest in the property at the time of its bankruptcy filing. The bankruptcy court disagreed with Imperial County, denied relief from the stay, and further held that the tax sale completed postpetition was void as a violation of the stay. *In re RW Meridian LLC, 553 B.R. 807, 814 (Bankr. S.D. Cal. 2016)*.

On appeal from the ruling declaring the tax sale void, we affirmed. *Cnty. of Imperial Treasurer-Tax Collector v. Stadtmueller (In re RW Meridian LLC), 564 B.R. 21, 25 (9th Cir. BAP 2017)*. Agreeing with the bankruptcy court, we held that, at the time of its petition filing, RW Meridian still had both legal and equitable interests in the property. Thus, we also concluded that the postpetition completion of the tax sale was void. Imperial County has appealed our affirmance to the Ninth Circuit Court of Appeals (Court of Appeals Dkt. No. 17-60020). That appeal is still pending.

In October 2016, while Imperial County's relief from stay appeal **[*3]** was still pending before this panel, Ronald E. Stadtmueller, as trustee of RW Meridian's chapter 7 bankruptcy estate, filed a motion to sell the property. In his motion, Stadtmueller proposed to sell the property to third parties James and Leann Lin for $500,000. Imperial County and American Pacific Investments both opposed Stadtmueller's proposed sale based on the tax sale that the bankruptcy court (and later this Panel) declared void.

At the hearing on the sale motion, the bankruptcy court overruled Imperial County's and American Pacific's objections. In essence, the bankruptcy court held that all of their key objections were premised on a tax sale that the court already had declared void.

More importantly for this appeal, the bankruptcy court pointed out that Imperial County's tax lien was going to be satisfied either way. The bankruptcy court's sale order specifically provided either for payment of Imperial County's tax lien through the sale escrow or for its lien to attach to the sale proceeds. Imperial County has admitted on appeal that it has received full payment of its tax lien from Stadtmueller.[2]

The bankruptcy court entered its order approving the sale of the property on November **[*4]** 29, 2016, and Imperial County timely appealed.[3]


**JURISDICTION**

The bankruptcy court had jurisdiction pursuant to *28 U.S.C. §§ 1334* and *157(b)(2)(N)*, and we have jurisdiction under *28 U.S.C. § 158*, subject to the standing discussion set forth below.


**ISSUE**

Does Imperial County have standing?


**STANDARDS OF REVIEW**

───────────────────────────

[2] Counsel for Imperial County confirmed this fact at oral argument.

[3] American Pacific Investments also appealed the sale order, but it later voluntarily dismissed its appeal.

EXHIBIT 3, PAGE 15

We review de novo whether Imperial County has standing. See *Giesbrecht v. Fitzgerald (In re Giesbrecht), 429 B.R. 682, 687 (9th Cir. BAP 2010)*.

## DISCUSSION

Stadtmueller has filed a motion to dismiss this appeal, asserting that the appeal is moot and Imperial County lacks standing. Imperial County has opposed the motion. We address the standing issue first.

### A. Standing Issue

In order to determine whether Imperial County has standing we must consider both constitutional and prudential standing doctrines. Constitutional standing is derived from the case and controversy requirement of Article III of the Constitution and requires a plaintiff to demonstrate "injury in fact, causation and redressability." *Republic of Marshall Islands v. United States, 865 F.3d 1187, 1199 (9th Cir. 2017)* (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1386, 188 L. Ed. 2d 392 (2014))*. On the other hand, prudential standing, is a set of "'judicially self-imposed limits on the exercise of federal jurisdiction.'" *Veal v. Am. Home Mortg. Servicing, Inc. (In re Veal), 450 B.R. 897, 906 (9th Cir. BAP 2011)* (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc., 554 U.S. 269, 289, 128 S. Ct. 2531, 171 L. Ed. 2d 424 (2008))*.

Imperial County bears the burden of establishing both constitutional standing and prudential standing. *In re Veal, 450 B.R. at 907 n.11*. At its core, the standing inquiry, in all its forms, "is an inherently factual inquiry into the nature **[*5]** of the rights asserted." Id.

### 1. Constitutional Standing

In order to satisfy the "injury in fact" element of constitutional standing, Imperial County must demonstrate "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Bishop Paiute Tribe v. Inyo Cnty., 863 F.3d 1144, 1153 (9th Cir. 2017)* (citing *Lujan v. Defs. of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992))*. To establish causation, Imperial County needs to show that its injury is "fairly traceable" to the challenged action - in this instance, the bankruptcy court's sale order. See *Lujan, 504 U.S. at 560*. And finally, to prove redressability, Imperial County has to persuade us that a favorable decision by this panel likely would redress its injury. *Id. at 560-61*.

Here, Imperial County has not identified any particularized or concrete injury arising from the bankruptcy court's sale order. To the contrary, Imperial County has admitted on appeal that its lienholder interest in the subject property has been fully satisfied from the proceeds of the court-approved sale. This admission also undermines any attempt by Imperial County to show causation. The sale order did not cause Imperial County any injury as a lienholder because the sale order directly resulted in Imperial County being paid in full. For the same **[*6]** reason, Imperial County cannot show redressability. It is axiomatic that you cannot redress an injury that does not exist. See C. Wright, A. Miller & E. Cooper, 13A F. Prac. & Proc. Juris., § 3531.4 (3d ed. 2017) ("a remedy addressed to actions that have not caused the injury will not alleviate the injury").

Imperial County posits that it has an independent, institutional interest as a taxing authority that has been injured by the sale order because that order conflicts with the prior tax sale of the same property. Furthermore, Imperial County claims that the sale order indirectly threatens other, future tax sales by way of the precedent it sets. The sale order does no such thing. Imperial County is conflating the impact of the sale order with the impact of the bankruptcy court's order denying relief from stay. The relief from stay denial order declared void the prior tax sale. As a result of that order, the tax sale never occurred. *Schwartz v. United States (In re Schwartz), 954 F.2d 569, 571*

EXHIBIT 3, PAGE 16

*(9th Cir. 1992)* (holding that actions taken in violation of the automatic stay are void). Thus, by the time Stadtmueller filed his sale motion, there was no tax sale to interfere with.[4]

Imperial County nonetheless insists that, as long as it has an appeal pending from the relief **[*7]** from stay denial order, there is a chance the tax sale might be reinstated. It argues that its interest in a potentially-reinstated tax sale, on a lien for which it has already been paid in full, was injured by the sale order. This alleged injury is not an injury in fact for standing purposes. As stated above, an injury in fact must be "actual or imminent, not conjectural or hypothetical." *Bishop Paiute Tribe, 863 F.3d at 1153*. Given that its interest in a potentially-reinstated tax sale only will arise if it prevails in its Ninth Circuit appeal from the relief from stay denial order, its injury is hypothetical.

Imperial County's argument also is based on a false legal premise. It assumes that the relief from stay denial order is ineffective while it is the subject of a pending appeal. This assumption is incorrect. While an appeal is pending, federal judgments and orders are fully effective and enforceable absent a stay pending appeal. *Bennett v. Gemmill (In re Combined Metals Reduction Co.), 557 F.2d 179, 190 (9th Cir. 1977)*.

In sum, Imperial County has not established that it meets the constitutional standing requirements of injury in fact, causation and redressability.

## 2. Prudential Standing - Standing to Appeal

Even if we somehow could conclude that Imperial County has constitutional standing, it also would **[*8]** need to show standing to pursue a bankruptcy appeal. This facet of prudential standing often is referred to as the "person aggrieved" standard: an appellant seeking appellate review of a bankruptcy court's judgment or order must be a "person aggrieved" by the order appealed. *Lehman Commercial Paper, Inc. v. Palmdale Hills Prop., LLC (In re Palmdale Hills Prop., LLC), 423 B.R. 655, 662 (9th Cir. BAP 2009)*, aff'd, *654 F.3d 868 (9th Cir. 2011)*.

Under this standard, only "those persons who are directly and adversely affected pecuniarily by an order of the bankruptcy court" have standing to appeal. *Id.* (quoting *Fondiller v. Robertson (In re Fondiller), 707 F.2d 441, 442 (9th Cir. 1983))*. At bottom, the person aggrieved standard presents a question of fact. *Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo), 408 B.R. 280, 299 (9th Cir. BAP 2009)* (citing *Paine v. Dickey (In re Paine), 250 B.R. 99, 104 (9th Cir. BAP 2000))*. Thus, Imperial County needs to show that the order on appeal diminished its property, increased its burdens or otherwise detrimentally affected its rights. See *In re Fondiller, 707 F.2d at 442-43*.

Imperial County cannot show that its pecuniary interests have been directly and adversely affected by the bankruptcy court's sale order. Instead, the sale order bestowed a monetary benefit on Imperial County. Imperial County has admitted that as a result of the sale order its tax lien has been paid in full. In fact, Imperial County has conceded that it has no direct pecuniary interest at stake in this appeal:

---

[4] We are aware that, in each of its appeals, and in every court, Imperial County has been unsuccessful in obtaining a stay pending appeal. The courts repeatedly have denied its stay motions because it has not shown a likelihood of success on the merits. In addition, we understand that Imperial County's arguments regarding its institutional interest in clarifying the efficacy of its tax sale procedures against the filing of a bankruptcy petition might be pertinent to mootness and standing issues raised in its Ninth Circuit appeal from the relief from stay denial order. We express no opinion on the merits of these arguments with respect to the Ninth Circuit appeal. We also understand that, in large part, the appeal from the sale order appears to have been aimed at protecting and preserving whatever rights it might have to prosecute its Ninth Circuit appeal. Indeed, Imperial County has suggested that the decision in this appeal simply be stayed pending resolution of the Ninth Circuit appeal on the relief from stay motion. This fails, however, to alter our conviction that Imperial County's institutional interest in clarifying the efficacy of its tax sale procedures is not implicated by the sale order at issue.

EXHIBIT 3, PAGE 17

2017 Bankr. LEXIS 4172, *8

The County does not have to be at risk of monetary harm to have an interest in the appeal. **[*9]** The County has never argued that it is at risk of not being paid, but that it has a vital interest in establishing the validity of its official actions, not only in connection with this particular sale but as to all future sales.

Response In Opposition to Appellee's Motion to Dismiss Appeal, BAP Dkt. No. SC-16-1419, Doc. No 24, p. 19.[5]

As for Imperial County's argument regarding its "vital interest in establishing the validity of its official actions," we already addressed and rejected this argument as part of our consideration of constitutional standing. The sale order did nothing to any such interest. It was the relief from stay denial order that potentially impacted this interest. In any event, by its own admission, Imperial County's interest in its official actions was not a pecuniary interest directly and adversely affected by the sale order.

Accordingly, Imperial County lacks standing, and this appeal must be dismissed.

**B. Mootness Issue**

Because we have concluded that Imperial County lacks standing, we decline to address the mootness issue.

**CONCLUSION**

For the reasons set forth above, we DISMISS this appeal for lack of standing.

---

End of Document

---

[5] Counsel for Imperial County confirmed this position at oral argument.

EXHIBIT 3, PAGE 18

**EXHIBIT 4**

# *Licata v. Coan*

United States District Court for the District of Connecticut

September 22, 2015, Decided

No. 3:14-cv-1754 (MPS)

**Reporter**

2015 U.S. Dist. LEXIS 160333 *

James J. Licata, Appellant, v. Richard M. Coan, as Chapter 7 Trustee, Ronald I. Chorches, as Chapter 7 Trustee, Appellees.

**Subsequent History:** Affirmed by *Licata v. Coan (In re Licata), 2016 U.S. App. LEXIS 16307 (2d Cir. Conn., Sept. 2, 2016)*

**Prior History:** *In re First Conn. Consulting Group, Inc., 2014 Bankr. LEXIS 4317 (Bankr. D. Conn., Oct. 9, 2014)*

**Counsel:** **[*1]** For James J. Licata, Appellant: John F. Carberry, LEAD ATTORNEY, Cummings & Lockwood - Stmfd, Stamford, CT USA; Scott S. Markowitz, LEAD ATTORNEY, Tarter Krinsky & Drogin LLP, New York, NY USA.

For US Trustee, Notice: US Trustee, LEAD ATTORNEY, U.S. Trustee Office, New Haven, CT USA.

For Richard M. Coan, Chapter 7 Trustee, Appellee: Joanna Malgorzata Kornafel, Ronald I. Chorches, LEAD ATTORNEYS, Law Offices of Ronald I. Chorches, Wethersfield, CT USA; Timothy D. Miltenberger, LEAD ATTORNEY, Coan, Lewendon, Gulliver & Miltenberger, New Haven, CT USA.

For Reclaimed Holdings, Llc, Intervenor: Marc Stuart Goldberg, Marc Stuart Goldberg, LLC, Scarsdale, NY USA.

**Judges:** Michael P. Shea, United States District Judge.

**Opinion by:** Michael P. Shea

# Opinion

### Opinion and Order

James Licata, a chapter 7 debtor, challenges the bankruptcy court's decision to approve a settlement of disputed claims entered into between the chapter 7 trustees ("the Trustees") and third parties referred to as the "Mocco Parties." The bankruptcy court found that Licata lacked a pecuniary interest in the settlement and thus lacked standing, having failed to demonstrate a reasonable possibility that a surplus would remain in his estate after all creditors **[*2]** were paid. *In re First Connecticut Consulting Group, Inc., et al., Nos. 02-50852, 02-51167, 2014 Bankr. LEXIS 4317, 2014 WL 5092269 (Bankr. D. Conn. Oct. 9, 2014)* ("Bankruptcy Decision"). Because I agree that Licata failed to shoulder his burden of proving that there is any reasonable possibility of a surplus in his bankruptcy estate, and thus that there is any reasonable possibility that the bankruptcy court's decision to approve the settlement would adversely affect him, I find that he lacks standing to prosecute this appeal.

### I. Background

The history of this bankruptcy is long and complicated, stretching back more than thirteen years. Because this appeal challenges only the decision by the bankruptcy court to approve a settlement of disputed claims under *Rule 9019 of the Federal Rules of Bankruptcy Procedure*, only the facts relevant to that decision are set forth below.

The bankruptcy case is a procedural consolidation of the now-chapter 7 bankruptcies of James Licata and companies sharing the name "First Connecticut." The bankruptcies were consolidated in July of 2002. *See* Bankr. Doc. 86 (ordering joint administration for procedural purposes only).[1] Many lawsuits related to the assets involved in this bankruptcy have been filed in other jurisdictions, both state and federal. The litigation most relevant **[*3]** to the bankruptcy court's *Rule 9019* settlement approval is a fifteen-year-old dispute between Licata and his affiliates and an individual named Peter Mocco and his affiliates in New Jersey Superior Court ("the New Jersey Ownership Dispute"). The New Jersey Ownership Dispute is a consolidation of lawsuits arising out of the parties' disputed claims of ownership of a group of real estate holding companies and a Joint Venture Agreement ("JVA"). *Mocco, et al. v. Licata, et al.*, Consol. Case No. ESX-L-7709-13.

After Licata filed chapter 11 bankruptcy in 2002 (the bankruptcy was later converted to chapter 7), Mocco filed a motion to dismiss in the bankruptcy court, asserting that he, not Licata, owned many of the assets Licata had claimed in the bankruptcy estate. Bankr. Doc. 154. The motion to dismiss was transferred to the **[*4]** District of Vermont in December 2003. Bankr. Doc. 478. Judge Colleen Brown held an eight-day trial and ultimately granted Mocco's motion to dismiss with regard to the specific assets challenged. *In re First Connecticut Consulting Group, Inc., et al., Case No. 04-101, 2004 Bankr. LEXIS 2692, 2004 WL 1676211 (Bankr. Vt. July 27, 2004)*. Both Licata and Mocco testified at the trial. *2004 Bankr. LEXIS 2692, [WL] at *2*. In summarizing her findings, Judge Brown concluded,

> Licata had no ownership interest in the LLCs as of the date he filed the LLC bankruptcy petitions. Licata's title to the subject properties were always as Mocco's nominee only; the LLCs served merely as a conduit into which Mocco transferred his real property for later reconveyance to him or his designee.

*2004 Bankr. LEXIS 2692, [WL] at *16*. Judge Brown found Licata's testimony to be "both disturbing and disingenuous" with regard to a factual issue relevant to the question of ownership. *2004 Bankr. LEXIS 2692, [WL] at *4*. The bankruptcy court decision was affirmed by the United States District Court for the District of Vermont, *340 B.R. 210 (D. Vt. 2006)*, and the United States Court of Appeals for the Second Circuit, *254 Fed. Appx. 64 (2d Cir. 2007)*. The Vermont bankruptcy court decision did not, however, dismiss all of the bankruptcy cases started by Licata and his related entities. The remaining bankrupt estates continued their dispute with Mocco over ownership of certain assets, which the parties and the bankruptcy court refer to as the "Disputed Claims." The Disputed Claims form part of the New Jersey Ownership Dispute and **[*5]** underlie the bankruptcy court's decision at issue in this appeal.


*A. Attempts to Sell the Disputed Claims*

Between 2003 and 2006, Licata, then a chapter 11 debtor-in-possession, attempted to sell the Disputed Claims. These attempts culminated in the bankruptcy court's March 2006 approval of an $11.25 million sale to SWJ Holdings, LLC. Bankr. Doc. 917. As discussed below, that sale was not completed. In June of 2006, the bankruptcy court converted the consolidated bankruptcies from chapter 11 to chapter 7, Bankr. Doc. 1073, and as a result, responsibility for managing the bankruptcy estate shifted from Licata to the trustees of the Licata and First Connecticut estates. *In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 10 (1st Cir. 1993)* ("The chapter 7 trustee, not the chapter 7 debtor, is responsible for collecting all property of the estate and reducing it to money.").

---

[1] For simplicity, all citations to the bankruptcy court docket will refer to *In re First Connecticut Consulting Group, Inc.*, Bankruptcy Case No. 02-50852 (AHWS) (Bankr. D. Conn.), and will be styled as "Bankr. Doc. __." References to this Court's appellate docket, *In re Connecticut Consulting Group, Inc., et al.*, Case No. 14-cv-1754 (D. Conn.), will be styled as "Dist. Doc. __."

EXHIBIT 4, PAGE 20

SWJ Holdings failed to perform its obligations under the purchase agreement. Under the agreement, SWJ Holdings was required to pay $5.4 million at the closing, and the remaining portion of the price was due in December 2006 pursuant to a collateralized Note. *Bankruptcy Decision, 2014 Bankr. LEXIS 4317, [WL] at *2 n.13*. In December 2006, SWJ Holdings defaulted by failing to pay the money due under the Note. *Id.* The Trustees of the chapter 7 estates filed **[*6]** an adversary action against SWJ Holdings seeking to recover on the promissory note SWJ Holdings had provided as part of the purchase agreement. The bankruptcy court entered judgment in favor of the Trustees. *Coan et al. v. SWJ Holdings, LLC*, Bankr. Case No. 07-5010, Doc. 14. After SWJ Holdings failed to satisfy that judgment, the Trustees attempted to foreclose the assets previously conveyed to SWJ Holdings. Bankr. Doc. 1268. An auction of the foreclosed assets yielded no bidders, and as a result, the Trustees reacquired the assets. *Bankruptcy Decision, 2014 Bankr. LEXIS 4317, [WL] at *2 n.13*.

The Trustees were unable to find another purchaser of these assets until July 2013, when CB3 Acquisitions, LLC ("CB3"), paid $75,000 for an option to purchase the assets for an initial price of $7.7 million. Bankr. Doc. 2235, at ¶ 25. Within the option period another bidder, the Cardillo Group, expressed interest in purchasing the assets, so the Trustees held an auction. *Id. at ¶ 30*. CB3 emerged with the highest bid at $12.6 million. *Id. at ¶ 32*. The bankruptcy court approved this sale in an order in which the court stated its approval was subject to the condition that the Trustees not transfer any assets until CB3 paid the $12.6 million in full. *Id.* at **[*7]** ¶ E. The bankruptcy court also ordered that if CB3 did not ultimately purchase the assets, the Cardillo Group would then have an opportunity to purchase the assets at its bid price of $12.5 million. *Id.* at ¶ F. Neither CB3 nor the Cardillo Group ultimately purchased the assets and CB3 filed for bankruptcy soon after, *In re CB3 Acquisitions, LLC*, Bankr. Case No. 14-50524 (AHWS) (Bankr. Conn.). The Trustees once again sought a purchaser in the market.

Meanwhile, the Trustees were litigating the New Jersey Ownership Dispute. At some point, the New Jersey court found that although the Vermont bankruptcy court's decision in favor of Mocco would not be accorded res judicata or collateral estoppel effect in the New Jersey litigation, evidence from the Vermont trial was admissible and would be considered by the New Jersey court. *Bankruptcy Decision, 2014 Bankr. LEXIS 4317, [WL] at *2*. The Trustees, unable to find a buyer for the Disputed Claims and perhaps concerned about their chances at the upcoming New Jersey trial, decided to settle the Disputed Claims with Mocco for $1.5 million. In January 2014, the Trustees submitted a motion under *Fed. R. Bankr. P. 9019* asking the bankruptcy court to approve their settlement with Mocco and his affiliates. Bankr. Doc. 2321. After **[*8]** a round of amendments, the final proposal was presented to the bankruptcy court in August 2014. Bankr. Doc. 2464.

No creditor objected to the amended settlement proposal. Only Licata objected.[2] Bankr. Doc. 2470; *see also Bankruptcy Decision, 2014 Bankr. LEXIS 4317, [WL] at *1* ("Licata, a chapter 7 debtor with no standing . . . is the only party who objected to the Amended 9019 Motion."). In his objection, Licata argued that the $1.5 million settlement agreement did not reflect the actual value of the Disputed Claims, which, in his view, was considerably higher. In support of his objection, Licata submitted a one-page letter from an individual named Judy Morris. Dist. Doc. 10-3 (the "Morris letter"). The Morris letter was the only piece of evidence Licata submitted with his objection to the settlement. In the letter, Morris stated that her real estate company was familiar with "the real estate properties in Sayreville, Jersey City and Bergenwood, New Jersey," and that based on valuations done by developers with whom she had communicated, she estimated the value of the properties to be $1 billion dollars in total. Licata did not attach any affidavit purporting to authenticate the letter. The letter does not describe any of Morris's qualifications. **[*9]** Nor does the letter clearly identify which property it purports to value, but rather refers vaguely to the "Liberty Harbor development."

*B. Liabilities of Licata and First Connecticut Estates*

---

[2] Other parties filed objections to the original proposed settlement, Bankr. Doc. 2331, 2333, 2340, 2402, but these objections were not renewed upon filing of the amended settlement proposal. *See Bankruptcy Decision, 2014 Bankr. LEXIS 4317, [WL] at *1 n.5*.

EXHIBIT 4, PAGE 21

2015 U.S. Dist. LEXIS 160333, *9

At the time of the bankruptcy court's order, the claim registers for Licata and First Connecticut's estates each listed over $200 million in claims. In the twelve years between the filing of the bankruptcy and the issuance of the order on appeal, only two sets of objections — neither of which was ultimately successful — were raised against these claims. First, Licata, acting as debtor-in-possession,[3] filed an objection on October 28, 2005, challenging a series of claims totaling over $117 million. Bankr. Doc. 853. The bankruptcy court denied this objection on November 14, 2005, because Licata's objection failed to meet the procedural requirements for contested matters. Bankr. Doc. 859. Licata never renewed this objection, nor did he submit any other objection. Second, after conversion, the Trustees objected **[*10]** to a $7.5 million claim made by Metropolitan Management, LLC. Bankr. Doc. 2136. According to the bankruptcy case docket, a hearing on this objection was scheduled, Bankr. Doc. 2137, but was canceled soon thereafter, *see* Non-Numbered Docket Entry, April 9, 2013. The bankruptcy court docket reflects that no action has since been taken with regard to that objection.[4]

In his objections to the original and amended proposed settlement filed with the bankruptcy court, the only assertion Licata made regarding the liabilities of the estate was the following: "Here, while there are millions of dollars of filed claims, many of these claims have been resolved and/or paid." Bankr. Doc. 2398, ¶ 19. Licata did not attach any evidence to his objection to bolster this argument that certain claims were invalid. Further, during the eight month span between the filing of the original settlement proposal and the final hearing on the amended proposal, Licata did not file a single objection to any of the claims. During one of the hearings on the settlement proposal, the Trustees informed the bankruptcy court that they viewed some of the claims to be invalid, and provided their estimate of the actual total estate[5] liabilities:

> As I stand here today the clerk's office reports that the **[*12]** claims against these bankruptcy estates exceeds [sic] $200 million. The trustees have done some analysis of the claims register.
> We think that the claims should drop down to a number that would be no more than $120 million. And there maybe other claims that can be resolved as well. But as we stand here today, and on the record before this Court, the amount of claims filed against the bankruptcy cases are in the $100 million range.

May 6 Hearing Transcript, Bankr. Doc. 2423, at 12. Licata's counsel's only response to the Trustees' remarks was, "I don't think there's $100 million in good claims against this estate." *Id. at 49.*

*C. Hearings on the Settlement Proposal*

The bankruptcy court held hearings regarding the original **[*13]** and amended settlement proposal on February 26, 2014, March 11, 2014, May 6, 2014, and November 23, 2014. Licata's counsel requested that the bankruptcy court

---

[3] Before the estate was converted to chapter 7, Licata was responsible as the chapter 11 debtor-in-possession for making objections to claims. *See, e.g., 11 U.S.C. § 1107(a)*; *In re C.H. Stuart, Inc., 28 B.R. 360, 361 (Bankr. W.D.N.Y. 1983)* ("*Section 704(4) of the Bankruptcy Code* enunciates a duty, applicable to debtor-in-possession by virtue of *11 U.S.C. §§ 1106(a)(1)* and *1107(a)* of the Code, to 'if a purpose would be served, examine *proofs of claims* and object to the allowance of any claim that is improper.'" (emphasis in original)).

[4] Although neither party has brought this to the Court's attention, the bankruptcy court docket reflects that during the pendency of this appeal, the Trustees have made further objections in the bankruptcy court. The bankruptcy court sustained an objection to a $10,453.26 claim on April 7, 2015. Bankr. Doc. 2582. The bankruptcy court denied the claim priority status, but allowed it as a general unsecured claim. The Trustees also objected to a series **[*11]** of claims totaling $205,378.91 on May 18, 2015. Bankr. Doc. 2600, 2602, 2604. The bankruptcy court held a hearing on those objections on June 23, 2015, but has not yet ruled on the objection. These claims' relatively small amount renders their potential invalidity immaterial to this ruling.

[5] The record is unclear as to which estate(s) the Trustees were referring when making this statement. A review of the claims registers in both cases, however, reflects that both Licata's (No. 02-51167) and First Connecticut's (No. 02-50852) claim register totals exceeded $200 million at the time the bankruptcy court rendered its decision on appeal. Thus, this uncertainty does not impact this Court's determination that the finding that Licata lacked standing was not clearly erroneous.

EXHIBIT 4, PAGE 22

hold an evidentiary hearing with regard to the settlement, but the bankruptcy court declined to do so. *See, e.g.*, November 23 Hearing Transcript, Bankr. Doc. 2510, at 50. On October 9, 2014, the bankruptcy court entered an order approving the settlement. In that order, the bankruptcy court ruled that Licata lacked standing to object to the settlement and that the settlement was fair and equitable. *Bankruptcy Decision, 2014 Bankr. LEXIS 4317, [WL] at *4*. With regard to standing, the bankruptcy court found as follows:

> [Licata's] attempt to establish a colorable basis for standing to object is unavailing. To do so, he would have had to proffer evidence that after the sale of the Assets and payment in full to holders of allowed unsecured claims, there would then be a surplus for him. His only proffer to support that scenario was a real estate broker's opinion letter, which was both vague and of insignificant probative value. Moreover, as Licata's counsel acknowledged, taking evidence on a *Rule 9019* motion is not required. . . .

> The record demonstrates that there are approximately $120 million[] **[*14]** of unsecured claims. There is nothing in the record to suggest that the sale of the Assets will generate enough money to satisfy those claims. Those findings warrant the conclusion that Licata has no pecuniary interest in these Cases and, therefore, no standing to object.

*Id.* Licata filed a timely notice of appeal and requested that the bankruptcy court stay its order pending this appeal. Bankr. Doc. 2492. The bankruptcy court denied that motion. Bankr. Doc. 2512. Licata then filed a motion for a stay in this Court pending the decision on its appeal. Dist. Doc. 7.

## II. Discussion

On appeal, Licata argues that the bankruptcy court erred in finding both that Licata lacked standing to object to the settlement and that the settlement was fair and equitable. Because I find that Licata lacks standing to appeal for the same reason he lacked standing in the bankruptcy court, I do not reach the second claim of error.

*A. Applicable Legal Standards*

### i. A Chapter 7 Debtor Generally Lacks Standing

"[T]he general rule is that, unlike creditors, Chapter 7 debtors lack standing to object to or appeal from orders of the bankruptcy court because the commencement of liquidation proceeding extinguishes any pecuniary **[*15]** interests that they formerly held in the property of the estate." *In re Rybka, 339 B.R. 464, 467 (Bankr. N.D. Ill. 2006)*. "Debtors generally lack standing because bankruptcy proceedings absolve the debtor of any liability to the creditors and the debtor has no interest in the distribution of the estate's property since the property has passed to the trustee." *In re Hope 7 Monroe Street Ltd. P'ship, 743 F.3d 867, 871, 408 U.S. App. D.C. 347 (D.C. Cir. 2014)*. "The rule is based on the assumption that the success of the debtor's objection cannot affect him because the debtor receives a distribution only after all creditors have been paid in full, and an estate will rarely have enough assets to do even that." *Pascazi v. Fiber Consultants, Inc., 445 B.R. 124, 127 (S.D.N.Y. 2011)* (citations and internal quotation marks omitted). To defeat this "assumption," a debtor must provide sufficient evidence to the bankruptcy court to prove a "reasonable possibility" of a surplus exists in order to demonstrate his or her standing. *In re 60 E. 80th Street Equities, Inc., 218 F.3d 109, 116 (2d Cir. 2000)*. When there is "no evidence that a surplus is a reasonable possibility," the bankruptcy court must find the debtor lacks standing. *See id.*

### ii. Standard of Review

On appeal, a district court reviews the bankruptcy court's legal determinations *de novo* and factual findings for clear error. *In re Robert Plan Corp., 777 F.3d 594, 596 (2d Cir. 2015)* (citing *In re Colony Hill Assocs., 111 F.3d 269, 273*

EXHIBIT 4, PAGE 23

*(2d Cir. 1997))*.[6] A bankruptcy court's finding that a reasonable possibility of a surplus does not **[*16]** exist is a finding of fact reviewed for clear error. *60 E. 80th Street Equities, 218 F.3d at 116* ("Both the Bankruptcy Court and the District Court in this case found that there was 'no evidence that a surplus is a reasonable possibility in these proceedings,' . . . . These findings of fact are not clearly erroneous."); *Pascazi, 445 B.R. at 127* ("Pascazi only has standing to object to the Claim as a debtor if he can demonstrate a reasonable possibility of a surplus once all claims are paid. This is a question of fact." (citations and internal quotation marks omitted)). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *New York Progress and Prot. PAC v. Walsh, 733 F.3d 483, 486 (2d Cir. 2013)* (citation and internal quotations marks omitted).

### iii. Burden of Proof

It was Licata's burden **[*17]** to prove to the bankruptcy court that a reasonable possibility of a surplus existed in the estate, i.e., that the estate assets were greater than the total amount of liabilities. *See Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1092 (2d Cir. 1995)* ("The burden to establish standing remains with the party claiming that standing exists."); *Drake v. United States, No. 13-cv-1136, 2014 U.S. Dist. LEXIS 167924, 2014 WL 6883104, at *2 (N.D.N.Y. Dec. 4, 2014)* (noting that in order to "participate in litigation surrounding the assets of the estate," a chapter 7 debtor must have standing, and that the debtor "bears the burden of showing a reasonable possibility that a surplus will exist at the conclusion of the bankruptcy proceedings" (internal quotation marks and citations omitted)); *Rybka, 339 B.R. at 468* ("[T]he debtor must *show* that a surplus is a reasonable possibility, not just that there is a theoretical chance of a surplus." (emphasis added)). In reviewing the bankruptcy court's finding, I consider the evidence (or lack of evidence) Licata presented to the bankruptcy court in seeking to meet that burden.

Licata also must prove his standing to appeal the bankruptcy court's decision. Demonstrating appellate standing in this context requires meeting the same standard already discussed — Licata must demonstrate a reasonable possibility of a surplus. *60 E. 80th Street Equities, 218 F.3d at 116* **[*18]** . As a result, if the bankruptcy court's finding that Licata failed to demonstrate a reasonable possibility of a surplus was not clearly erroneous, Licata also lacks standing to prosecute this appeal.

### B. Estate Assets: Value of the Disputed Claims

In his objection to the *Rule 9019* settlement, Licata argued that the settlement price grossly underestimated the value of the Disputed Claims. He asserted that the assets held "meritorious title to, at a minimum, the hundreds of millions of dollars worth of New Jersey real properties," and as a result, "[t]he trustees propose, in effect, to sell these properties to the Mocco parties for 1.6 million dollars, a mere pittance." Bankr. Doc. 2346, at ¶ 1. To bolster his argument, Licata submitted the one-page Morris letter. In its order approving the settlement, the bankruptcy court found the Morris letter to be "both vague and of insignificant probative value." *Bankruptcy Decision, 2014 Bankr. LEXIS 4317, [WL] at *4.* Under the circumstances, the bankruptcy court's determination not to accord probative value to the Morris letter was not clearly erroneous.

First, the letter is inadmissible — it is unauthenticated, consists of hearsay (sometimes double hearsay, *see, e.g.*, Dist. Doc. 10-3 ("The developers have evaluated **[*19]** the original 20 acres, which actually may include more land based on preliminary site work, at between $300 and $475 million dollars.")), and expresses an opinion unsupported by any indication of methodology, the qualifications of the author, or any other indicia of reliability. Licata provided no evidence supporting a finding that the letter is what Licata claimed it was, thus failing to meet the

---

[6] While the December 2014 amendments to the Federal Rules of Bankruptcy Procedure removed the previous Rule 8013 language setting out expressly the appellate standards of review, the amendments did not alter substantively those standards. *See* 10 Alan N. Resnick & Henry J. Summers, Collier on Bankruptcy ¶ 8014.02 (16th ed.); *Robert Plan Corp., 777 F.3d at 596-97* (maintaining the previously stated standards of review after the 2014 amendments).

EXHIBIT 4, PAGE 24

authentication requirements of the Federal Rules of Evidence. *See* Fed. R. Evid. 901(a). Most of the statements in the letter are a recitation of statements made by unnamed developers. Licata offered those statements in the letter to prove the truth of the matter asserted by the developers, i.e., their valuation estimates. They are therefore inadmissible hearsay. *See* Fed. R. Evid. 801, 802. Finally, the opinion on valuation does not meet the requirements of Fed. R. Evid. 702: the letter does not set forth the author's qualifications, and provides no information allowing the reader to ascertain whether the opinion expressed is the product of reliable principles and methods. In short, the letter did not constitute admissible evidence of the value of the Disputed Claims, and Licata failed to present any other admissible evidence in support of his valuation **[*20]** of the Disputed Claims.

In addition, during the settlement hearings, Judge Shiff raised several other concerns about the letter: "[The letter] didn't break out the separate 19 acres [i.e., the real estate actually pertinent to the Disputed Claims], and it didn't discuss the need for redevelopment agency approval. . . . It didn't discuss that [the real estate is] landlocked and needed to be extensively reconstructed because there were hazardous waste — it didn't discuss any of that." September 23 Hearing Transcript, at 57-58. Furthermore, the letter did not actually value property of the bankruptcy estates. That property consisted of the Disputed Claims, i.e., disputed interests in holding companies and a joint venture that owned the underlying real estate. A proper valuation of that property would incorporate not only valuation of the pertinent real estate, but also an assessment of the chances of success on the Disputed Claims.

The only actual evidence in the record of the value of the Disputed Claims supported the bankruptcy court's determination of value. That evidence, of course, was the saga of the Trustees' (and before them, Licata's) unsuccessful efforts to sell the Disputed Claims **[*21]** — a saga that unfolded in, and was thus well known to, the bankruptcy court. The Trustees placed the assets on the market multiple times throughout an eight-year period, and the highest bid price they could achieve was $12.6 million. *See* Appellee's Br. 22-24 (describing the Trustees' attempts to auction the Disputed Claims). Worse, none of the potential purchasers had the funds to support their offers — both SWJ Holdings and CB3 Acquisitions went bankrupt shortly after making their offers.[7] No wonder, then, that the bankruptcy court was skeptical that the SWJ and CB3 offers provided a reliable indication of the assets' true value: "[y]ou could get somebody walking across [the street] to bid on something." September 23 Transcript, at 39; *see also* id. at 38 ("[W]hat it's worth is what somebody's willing to pay for it. Nobody wants to pay for it."). Also weighing against Licata's assertion that the assets are worth hundreds of millions of dollars are his own actions. When acting as a chapter 11 debtor-in-possession, Licata agreed to sell the Disputed Claims for at most $11.25 million.[8]

Without any reliable evidence that the assets were worth anywhere near the value Licata asserted, the bankruptcy court concluded that the assets could not make up for the claims against the bankrupt estate. *Bankruptcy Decision, 2014 Bankr. LEXIS 4317, [WL] at *4* ("There is nothing in the record to suggest that the sale of the Assets will generate enough money to satisfy those claims."). Licata has failed to show that that finding was clearly erroneous.

Licata argues In re Brutsche, 500 B.R. 62 (Bankr. N.M. 2013), is analogous to this case and weighs in his favor. In *Brutsche*, the bankruptcy court found a reasonable probability of surplus and therefore ruled that the chapter 7 debtor had standing to object to the settlement. The bankruptcy court noted that standing was a separate issue from the reasonableness of the Rule 9019 settlement, and a chapter 7 debtor could show a reasonable possibility of a surplus while **[*23]** at the same time failing to demonstrate that the settlement itself is unreasonable. Id. at 72. But the bankruptcy court in *Brutsche* relied on the debtor's "extensive evidence on both liability and damages" regarding the disputed claims. *Id.* In contrast, Licata has provided no reliable evidence of the value of the Disputed Claims.

---

[7] As noted above, the Cardillo Group tendered a competing bid against CB3 Acquisition's original option purchase. When CB3 decided **[*22]** not to purchase the assets after outbidding the Cardillo Group, the Trustees offered the Cardillo Group the option to purchase the assets at the Cardillo Group's bid price, $12.5 million. The Cardillo Group chose not to act on that offer.

[8] Appellees assert (though, without any citation to the record) that this sale included assets not covered by the Disputed Claims. Appellee's Br. 7-8.

EXHIBIT 4, PAGE 25

*C. Estate Liabilities: Claims Against the Estate*

In determining that Licata lacked standing, the bankruptcy court also considered the total value of the claims filed against the estate. In its decision, the bankruptcy court found that the estate was liable for "approximately $120 million[] of unsecured claims." *Bankruptcy Decision, 2014 Bankr. LEXIS 4317, [WL] at *4*. Licata has failed to show that this approximation of estate liabilities was clearly erroneous.

At the time of the bankruptcy court's decision, there were over $200 million worth of claims listed in each of Licata's and First Connecticut's claims registers. In the now thirteen-year history of the bankruptcy case, Licata has never raised a proper objection to any claims made against the estate. As discussed above, Licata filed an objection to a group of claims totaling approximately $117 million while acting as debtor-in-possession. Bankr. Doc. 853. This objection, **[*24]** however, was never sustained. Licata states that these objections did not move forward because "[a]s is customary in a chapter 11 case, these claims objections were never finally resolved because of the conversion to chapter 7." Appellant's Reply Br. 3. But the bankruptcy court docket suggests otherwise. On November 14, 2005, the bankruptcy court denied the objection for failure to comply with contested matter procedure. Bankr. Doc. 859. Licata has not indicated that his objection was ever renewed, nor can the Court find a renewed objection on the bankruptcy court docket. Furthermore, even if these objections had prevailed, approximately $80 million in claims would have remained.

The only other objection that had been raised at the time the bankruptcy court considered the amended settlement proposal was a $7.5 million claim objection filed by the Trustees. Bankr. Doc. 2136. Even discounting the claim objected to by the Trustees, at the time the bankruptcy court rendered its decision there were nearly $200 million in claims against the estate to which no objection was made. During the hearing, the Trustees conceded that the total amount in the register was higher than the actual amount in **[*25]** valid claims, characterizing the actual amount in the range of $120 million. May 6 Hearing, at 12. Licata's only response was his counsel's statement, "I don't think there's $100 million in good claims against this estate." *Id. at 49*. Despite the fact that Licata had the burden to *prove* his standing to object to the settlement, Licata presented no evidence challenging the validity of any claim against the estate.

In a reply brief filed in support of his motion to stay the bankruptcy court's decision pending this appeal, Licata points this Court to a series of claims in the register that he asserts are duplicative, frivolous, or otherwise invalid. Dist. Doc. 12, at 3-4 (challenging Claim Nos. 13, 23, 31, 32, 33, 34, 60, 62, and 76). This Court rejects Licata's effort to challenge the claims in this fashion. First, Licata never raised these arguments in the bankruptcy court. Licata cannot challenge the bankruptcy court's decision that he lacked standing on the basis of arguments or evidence he submits for the first time on appeal. Licata would apparently have this Court sift through each claim in the register to determine whether it was properly filed, after he failed to ask the bankruptcy court **[*26]** to do so during the twelve years he had the full opportunity to object to claims. Licata had the burden to demonstrate to the bankruptcy court that he had standing to object to the proposed settlement. It is not up to this Court, on appeal, to inspect claims that he never previously challenged.

Second, Licata did not include these new "objections" in his appeal briefs, instead burying them in a reply brief filed in connection with a motion to stay. A reply brief to a motion to stay is not the place for an appellant to raise substantive arguments for the first time. Third, besides vaguely referencing a 2003 district court decision that allegedly makes Claims 23, 31, 32, 33 and 34 invalid, Licata presents no evidence of the claims' invalidity. While he asserts that many of the claims are duplicative, he presents no evidence that they were filed improperly. If a claim is filed pursuant to the procedures set forth in the Federal Rules of Bankruptcy Procedure, the claim enjoys presumptive facial validity. *Fed. R. Bankr. P. 3001(f)* ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."). "To overcome this prima facie evidence, **[*27]** the objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim." *In re Reilly, 245 B.R. 768, 773 (2d. Cir. BAP 2000)*. Thus, Licata must

EXHIBIT 4, PAGE 26

provide actual evidence that the claims were filed improperly or that they are substantively invalid to mount a successful challenge.

Fourth, the bankruptcy court considered the Trustee's position that many of the claims in the register were duplicative, and the bankruptcy court relied on that information in arriving at its own discounted approximation of estate liabilities. It is noteworthy that the bankruptcy court's estimation of $120 million in liabilities was not far from the total amount in liabilities that would remain if all claims challenged by Licata were removed from the register. If one were to remove each claim Licata challenges from the $200 million total in the claims register at the time of the bankruptcy court's decision, the estate would still have $80 million remaining in liabilities.

In his reply brief, Licata argues that he cannot be faulted for failing to make claim objections during his eight years as chapter 7 debtor because it was never determined that he had standing to do so. Licata argues it would have [*28] been wasteful for him to object to claims without such a ruling — one that he apparently never sought: "[u]ntil there [was] a determination that surplus funds [would] be available to Licata there is simply no reason, nor should the Court require Licata to incur legal fees prosecuting objections to claims as a precondition to having standing to object to the settlement." Appellant's Reply Br. 3. This amounts to an argument that this Court should not hold Licata to his burden of demonstrating a reasonable possibility of a surplus because the bankruptcy court never determined that there was such a possibility. This is circular at best and borders on an admission that the bankruptcy court's decision was correct.

The bankruptcy court's finding that the estate liabilities in this case are approximately $120 million was not clearly erroneous. The record suggests that the Disputed Claims are worth at most $12.6 million, and probably closer to the $1.5 million the estates actually netted in the only completed sale. Thus, the bankruptcy court's finding that there was no reasonable possibility of surplus was not clearly erroneous.

### D. The Bankruptcy Court's Decision Not to Hold an Evidentiary Hearing

As [*29] a final matter, the bankruptcy court did not err in refusing to hold an evidentiary hearing before making its finding that Licata lacked standing.[9] When a debtor's arguments regarding valuation of assets and liabilities are "inadequate on their face," the bankruptcy court is not required to hold an evidentiary hearing in considering a *Rule 9019* settlement. *In re Turner Spares, Ltd., Inc., 210 B.R. 235, 237 (S.D.N.Y. 1997)*. In addition, if the bankruptcy court's "particularized knowledge of the facts of the bankruptcy proceeding" and material already existing in the record are sufficiently helpful, the bankruptcy court need not take additional testimony via an evidentiary hearing. *Alford v. Dribusch, No. 14-cv-558, 2014 U.S. Dist. LEXIS 175329, 2014 WL 7243321, at *3 (N.D.N.Y. Dec. 19, 2014)*; *see also In re SageCrest II, LLC, No. 10-cv-979, 2011 U.S. Dist. LEXIS 3517, 2011 WL 134893, at *10 (D. Conn. Jan. 14, 2011)* (ruling Judge Shiff's decision not to hold an evidentiary hearing in approving a settlement was not an abuse of discretion given the sufficiency of the evidence in the record, "especially when combined with his general knowledge of the facts of the bankruptcy proceeding"). Here, the bankruptcy court's close familiarity with a case over which it had presided for over a decade — including the abortive efforts to sell the Disputed Claims and the limited number of proper objections to the claims made [*30] against the estates — enabled it to make a proper standing determination without holding an evidentiary hearing. Licata never gave the bankruptcy court any reason to doubt its understanding of the assets and liabilities of the estate. The bankruptcy court's decision not to take additional evidence was therefore not error.

### III. Conclusion

---

[9] Although Licata challenges the decision not to hold an evidentiary hearing in connection with his attack on the approval of the settlement, I construe his appeal to make the same point with regard to the bankruptcy court's standing determination.

EXHIBIT 4, PAGE 27

2015 U.S. Dist. LEXIS 160333, *30

For the reasons stated above, the bankruptcy court's determination that Licata failed to prove a reasonable possibility of a surplus was not clearly erroneous. On appeal, Licata presents no reason to question that determination. As a result, I find that Licata lacks standing to appeal the bankruptcy court's approval of the *Rule 9019* settlement. The appeal is therefore DISMISSED. As a result of this ruling, the Motion for Stay and Expedited Appeal is DENIED as moot. The Clerk of Court is directed to close the case.

IT IS SO ORDERED.

/s/ Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut

September 22, 2015

---

**End of Document**

EXHIBIT 4, PAGE 28

**EXHIBIT 5**

## *Nev. Bus. Credit, LLC v. Kavanagh (In re Golden Empire Air Rescue, Inc.)*

United States Bankruptcy Appellate Panel for the Ninth Circuit

September 21, 2007, Argued and Submitted at Pasadena, California; October 25, 2007, Filed

BAP Nos. EC-07-1086-JuMkPa, EC-07-1087-JuMkPa

**Reporter**
2007 Bankr. LEXIS 4880 *

In re: GOLDEN EMPIRE AIR RESCUE, INC. Debtor, In re: GOLDEN EMPIRE AMBULANCE, INC. Debtor, PETER MOSESIAN; NEVADA BUSINESS CREDIT, LLC, Appellants, v. PATRICK KAVANAGH, Chapter 7 Trustee; ROGERS HELICOPTERS, INC., Appellees. PETER MOSESIAN; NEVADA BUSINESS CREDIT, LLC., Appellants, v. ROSSANA A. ZUBRZYCKI-BLANCO, Chapter 7 Trustee; ROGERS HELICOPTERS, INC., Appellees.

**Notice:** THIS DISPOSITION IS NOT APPROPRIATE FOR PUBLICATION. ALTHOUGH IT MAY BE CITED FOR WHATEVER PERSUASIVE VALUE IT MAY HAVE (SEE *FED. R. APP. P. 32.1*), IT HAS NO PRECEDENTIAL VALUE. SEE 9TH CIR. BAP RULE 8013-1.

**Prior History:  [*1]** Appeal from the United States Bankruptcy Court for the Eastern District of California. Bk. Nos. 05-18746, 05-19955. Honorable Whitney Rimel, Bankruptcy Judge, Presiding.

*In re Golden Empire Air Rescue, Inc., 2006 Bankr. LEXIS 2508 (Bankr. E.D. Cal., Sept. 25, 2006)*

**Judges:** Before: JURY, MARKELL and PAPPAS, Bankruptcy Judges.

# Opinion

**MEMORANDUM**

**I. INTRODUCTION**

The Chapter 7[2] trustees of the related debtors sought approval of a compromise between the bankruptcy estates and Rogers Helicopters, Inc. Peter Mosesian and Nevada Business Credit, LLC ("NBC") objected on the grounds that the compromise was a "disguised sale" subject to overbids and the record contained no evidence that Rogers gave reasonable value. The bankruptcy court approved the compromise over their objections.

Mosesian filed a motion for reconsideration under *Rule 9023*.[3] On reconsideration,  **[*2]** the bankruptcy court found that, even if the compromise was a sale, the requirements under *§ 363* were met and overbids were not required. Mosesian and NBC timely appealed.

_____

[2] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, *11 U.S.C. §§ 101-1330*, and to the *Federal Rules of Bankruptcy Procedure, Rules 1001-9036*, as enacted and promulgated prior to the effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, **Pub. L. 109-8, 119 Stat. 23**, because the cases from which this appeal arises were filed before its effective date (generally October 17, 2005).

[3] NBC filed a motion requesting the bankruptcy court to amend its Findings of Fact and Conclusions of Law under *Rule 7052*. The bankruptcy court granted the motion to clarify that Rogers could pursue the estates' causes of action only against Mosesian,

We find that some of the claims that the trustees sought to settle were decided by the bankruptcy court prior to the time the motion for compromise was heard. Thus, these claims were no longer in dispute. Further, the trustees failed to submit any evidence in support of their motion to approve the compromise with Rogers. The record contains only conclusory statements with respect to the factors set forth in *Martin v. Kane (In re A & C Props.), 784 F.2d 1377, 1380 (9th Cir. 1986)*. Finally, because the compromise disposes of property which belongs to the bankruptcy estates, the sale provisions of *§ 363* are implicated. We find that the possibility **[*3]** of overbids from Mosesian and NBC triggered the prospect of an auction and, therefore, procedures for overbids should have been established. We REVERSE and REMAND.

## II. FACTS

Golden Empire Air Rescue, Inc. ("GEAR") filed its Chapter 7 petition on October 7, 2005, and Patrick M. Kavanah was appointed trustee. Golden Empire Ambulance, Inc. ("GEA") filed its Chapter 7 petition on October 13, 2005, and Rossana A. Zubrzycki-Blanco was appointed trustee.[4] The debtors are closely-held corporations owned and controlled by Mosesian or related entities. NBC is also owned by Mosesian or his family trust.

Mosesian and NBC filed claims in both bankruptcy cases.[5] Mosesian's claims are unsecured, while NBC's claims are secured.[6] Rogers filed an unsecured claim in both cases for almost $1 million.[7]

Mosesian and Rogers have a history of litigation that began in 2002. Their dispute arose out of a joint venture formed by Rogers and GEA in 1994 to operate an air ambulance service. GEA thereafter created GEAR to carry out its obligations under the joint venture agreement. Debtors and Rogers were to split the profits. In 1999, Rogers asked for an accounting. Debtors either failed to provide one or produced an accounting that did not satisfy Rogers.[8]

## The State Court Lawsuit

In 2002, Rogers sued the debtors, Mosesian and Penrose[9] in superior court, seeking an accounting and alleging fraud, breach of fiduciary duty and conversion by all defendants (the "Kern County Action").[10] The superior court

---

John Penrose ("Penrose") and any entity owned or controlled by them. In other words, Rogers could not pursue any other third party.

[4] Hereinafter, GEA and GEAR are collectively referred to as the "debtors" and Kavanah and Blanco are collectively referred to as the "trustees.".

[5] There is no indication in the record that the trustees filed objections to the claims. Therefore, the claims are "deemed allowed" pursuant to *§ 502(a)*.

[6] NBC attached a UCC-1 filing to its proof of claims that shows it holds a security interest in all of the debtors' **[*4]** assets, including general intangibles.

[7] The claims registers for both cases show other creditors besides Mosesian, NBC and Rogers. Those creditors include the Franchise Tax Board, IRS, John Wright and Richard Monje. In essence, though, these bankruptcy cases are a two party dispute.

[8] In 1999, GEA sold its ambulance permit. In 2001, GEAR sold its air permit. The trustees were investigating how the proceeds of these two sales were used or disbursed. The debtors have not conducted any business since 2001.

[9] Penrose was the debtors' president and has not appeared in these matters. Although he may remain a defendant in the Kern County Action, there are no further references to Penrose herein.

[10] Rogers also sued Williams & Brown, the accountant for debtors and their joint venture. After debtors filed their chapter 7 petitions, Rogers settled the action and was paid $500,000 by Camico Mutual Insurance Co., Williams & Brown's insurance

EXHIBIT 5, PAGE 30

[*5] found debtors liable to Rogers for more than $700,000 in connection with the accounting. The remaining causes of action[11] were set for trial on October 17, 2005, which did not commence due to debtors' Chapter 7 filings. GEAR also asserted a counterclaim that is still pending.

Because the alter ego claims against Mosesian were unresolved, [*6] Mosesian began to take steps to minimize his liability to Rogers.

### The Pre-Petition Settlements With the Debtors

Mosesian first entered into settlement agreements with the debtors prior to their Chapter 7 filings. Mosesian believed, or at least hoped, that the alter ego claims would be property of the prospective bankruptcy estates. Mosesian agreed to pay the debtors $145,000 in return for settlement of any and all of their claims against him. A condition to consummation, however, was the entry of a court order finding that the releases contained in the settlements would protect Mosesian.

### The Removal of the Kern County Action

After the bankruptcies were filed, Mosesian sought to enforce the settlements with the debtors by removing the Kern County Action to the bankruptcy court. However, the court remanded the action to state court and granted Rogers' motion for relief from stay to allow the Kern County Action to proceed.

### The Adversary Proceedings

Mosesian also commenced an adversary proceeding in each of the two bankruptcy cases, against Rogers, the trustees, and others seeking declaratory relief that the alter ego claims asserted in the Kern County Action against him were property of the [*7] two bankruptcy estates and were settled upon the payment of $145,000. Thus, the issue of whether the alter ego claims were property of the bankruptcy estates was squarely before the bankruptcy court. The defendants moved to dismiss.

At a hearing on July 26, 2006, the bankruptcy court examined the complaint in the Kern County Action and found that "the claims that Rogers asserts in its state court action are individual, particular, and specific to Rogers" and granted its motions to dismiss. The bankruptcy court further noted that even if its ruling was incorrect, the alter ego claims were not brought by the proper party which would be the bankruptcy trustees. Therefore, the court also granted the trustees' motions to dismiss.

### The Compromise

Prior to the bankruptcy court's hearing and decision on the motions to dismiss, the trustees and Rogers disputed whether the alter ego claims and "other claims[12]" were property of the bankruptcy estates. The trustees and Rogers were also wary of duplicating efforts if they each pursued their respective claims against Mosesian. Specifically, the trustees were concerned that they would be collecting money that would in large part go right back to Rogers, [*8] which had asserted a substantial claim in both estates.

---

carrier. Camico received a first-position lien on the Kern County Action. Camico then commenced an action against the debtors, Mosesian, and Penrose for indemnity and asserted alterego causes of action against Mosesian and Penrose.

[11] The remaining causes of action against Mosesian include fraud, breach of fiduciary duty, conversion and form alter ego allegations. Hereinafter, collectively referred to as the "alter ego claims."

[12] As discussed _infra_ the record does not provide much guidance as to what the "other claims" may be.

EXHIBIT 5, PAGE 31

2007 Bankr. LEXIS 4880, *8

Rather than litigate over ownership of the various claims, the trustees agreed that Rogers would pursue Mosesian on all claims, including those that arose because of the filings (defined in the settlement agreement as the "Trustees' Causes of Action"). In exchange, Rogers agreed to pay an immediate deposit of $30,000 to each estate and 5% of the gross recovery that exceeded $1.2 million from any judgment obtained in any court, to be equally divided between the two estates.[13]

The trustees moved for authority to enter into the compromise.[14] Mosesian and NBC objected to the compromise, contending it was a sale disguised as a compromise for the purpose of preventing overbids. NBC maintained that it had a security interest in the estates' causes of action and, therefore, was entitled to credit bid under *§ 363(k)*. Mosesian and NBC also objected on the ground that there was no evidence before the court that demonstrated the value offered by **[*9]** Rogers was reasonable.

After hearing oral argument, the bankruptcy court took the matter under submission and issued Findings of Fact and Conclusions of Law approving the compromise. On reconsideration, the court found that even if the compromise was a sale, the requirements under *§ 363* were met.

## III. JURISDICTION

The bankruptcy court had jurisdiction pursuant to *28 U.S.C. §§ 1334* and *157(b)(1)*. We have jurisdiction under *28 U.S.C. § 158*.

## IV. ISSUES

1. Whether the court erred in finding that the assignment of the Trustees' Causes of Action did not constitute a sale?

2. Whether the court erred in finding that even if the compromise was a sale, all the requirements of a sale were met and no overbidding was required?

3. Whether the court abused its discretion in approving the trustees' settlement with Rogers pursuant to *Rule 9019*?

## V. STANDARDS OF REVIEW

The panel reviews a bankruptcy court's order approving a trustee's application to compromise a controversy for abuse of discretion. *In re A & C Props., 784 F.2d at 1380.* **[*10]** The reviewing court must "determine whether the settlement entered into by the trustee was reasonable, given the particular circumstances of the case." *Id. at 1381.*

Sales under *§ 363* are reviewed for abuse of discretion. *Moldo v. Clark (In re Clark), 266 B.R. 163, 168 (9th Cir. BAP 2001).*

We review the denial of a motion for reconsideration for abuse of discretion. *In re Weiner, 161 F.3d 1216, 1217 (9th Cir. 1998).*

## VI. DISCUSSION

---

[13] The Settlement Agreement reflects the date of "May__, 2006," but was not signed by the parties.

[14] The motion was noticed for June 21, 2006, on shortened time. A hearing was held and the bankruptcy court authorized further briefing and continued the hearing until August 30, 2006.

EXHIBIT 5, PAGE 32

This appeal involves the overlap of *§ 363* and *Rules 6004* and *9019(a)*.

When examining a compromise pursuant to *Rule 9019*, it is necessary to distinguish between a true settlement and the sale of estate property. "[T]he disposition by way of 'compromise' of a claim that is an asset of the estate is the equivalent of a sale of the intangible property represented by the claim, which transaction simultaneously implicates the 'sale' provisions as implemented by the 'sale' provisions under *section 363* as implemented by the 'compromise' procedure of *Rule 9019(a)*." *Goodwin v. Mickey Thompson Entm't Group, Inc. (In re Mickey Thompson Entm't Group, Inc.), 292 B.R. 415, 421 (9th Cir. BAP 2003)*(citations omitted). However, not "every compromise of a bona fide controversy presented to a bankruptcy court **[*11]** under *Rule 9019* must pass muster as a sale under *§ 363*." *Id. at 422 n.7*.

The standards for approving a compromise are well settled. "In determining the fairness, reasonableness and adequacy of a proposed compromise, a bankruptcy court must consider: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expenses, inconvenience and delay necessarily attending it; [and] (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premise[s]." *Id. at 420*. (citation omitted). Additionally, "a bankruptcy court is obliged to consider, as part of the 'fair and equitable' analysis, whether any property of the estate that would be disposed of in connection with the settlement might draw a higher price through a competitive process and be the proper subject of a section 363 sale." *Id. at 422*.

### A. Analysis of the Compromise: True Settlement or Sale?

"By its very nature, a settlement resolves adversarial claims *prior* to their definitive determination by the court, whereas a 'sale' effects a '[t]ransfer of ['the title. . .'] [to] property **[*12]** for a consideration." See *Hicks, Muse & Co., Inc. v. Brandt (In re Healthco Int'l, Inc.), 136 F.3d 45, 49 (1st Cir. 1998)*(emphasis in original). The settlement of conflicting claims to property is not the equivalent of a sale when there has been no determination of whether the property was property of the estate. *In re Fidelity Am. Fin. Corp., 43 B.R. 74, 77 (Bankr. E.D. Pa. 1984)*. On the other hand, causes of action owned by the trustee are intangible items of property of the estate that may be sold. *Lahijani v. Claims Prosecutor, LLC (In re Lahijani), 325 B.R. 282, 287 (9th Cir. BAP 2005)*.

### 1. The Alter Ego Claims: No Dispute over Whether they Were Property of the Estates After Court Ruled On the Motions to Dismiss

Any dispute over whether the alter ego claims were property of the estates was resolved on July 26, 2006, prior to the hearing on the compromise. When ruling on Rogers' motions to dismiss, the bankruptcy court found that the claims Rogers asserts in its state court action are individual, particular, and specific to Rogers. When ruling on the trustees' motions to dismiss, the bankruptcy court found "as the court has concluded that the state court claims are not property of **[*13]** the bankruptcy estate, it must, therefore, lack jurisdiction." The bankruptcy court granted all motions to dismiss without leave to amend.

Generally, an order granting a motion to dismiss without leave to amend is a final order. *Lopez v. City of Needles, Cal., 95 F.3d 20, 22 (9th Cir. 1996)*(a dismissal without leave to amend is final); *Grover v. Riggsby (In re Riggsby), 745 F.2d 1153, 1154 (7th Cir. 1984)*(a bankruptcy court's grant of a motion to dismiss an adversary proceeding is a final order). Although the orders on the motions to dismiss were not part of the record on appeal, at minimum, the law of the case doctrine would apply. Under this doctrine, when the court decides upon a rule of law - for example, that the alter ego claims were not property of the estates - that decision should continue to govern the same issues in subsequent stages of the same case. "[A] court is ordinarily precluded from reexamining an issue previously decided by the same court . . . in the same case." *Wiersma v. Bank of the W. (In re Wiersma), 483 F.3d 933, 941 (9th Cir. 2007)*.

EXHIBIT 5, PAGE 33

On reconsideration, the bankruptcy court essentially acknowledged that there was no longer a dispute over the ownership of the  **[\*14]** alter ego claims in light of its prior ruling. Thus, at the time the hearing on the compromise took place, there was nothing for Rogers and the trustees to settle in connection with the alter ego claims. Cf. *Mickey Thompson, 292 B.R. at 421 n.5* (noting that while the settlement might have met the standards of A & C Properties when it was agreed upon and when the motion was filed, the trustee's post-agreement departure from the overbid procedures meant the compromise failed to meet the fair and equitable standards); *Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3rd Cir. 1996)* (finding that a trustee did not breach settlement agreement by informing the court of changed circumstances that would warrant withdrawal of trustee's support).

## 2. "Other Claims:" No Evidence They Were Property of the Estates

After acknowledging that it had already decided whether the alter ego claims were estate property, the bankruptcy court noted at the hearing on reconsideration that the trustees may hold other claims. The court further stated that because the estates and Rogers agreed that Rogers may pursue these claims, this resolves a dispute between Rogers and the estates about who owns the claims. The  **[\*15]** record does not support this conclusion.

The record does not provide much guidance as to what the "other claims" may be. If the "other claims" were those involved in the Kern County Action, any dispute over whether they were property of the estates was resolved in the context of the motions to dismiss. Moreover, at the hearing for the approval of the compromise, Rogers' attorney characterized the so-called dispute with the trustees over the "other claims" as a battle over how to define, or characterize, certain claims. For example, the attorney expressed concern that in the Kern County Action, Mosesian would take the position that the fraud, conversion or breach of fiduciary duty claim cannot be pursued by Rogers because it is "really a fraudulent transfer." He further argued that the trustees and Rogers don't want to "argue over how to define - not who owns, but who wants to define the cause of action that is being asserted in the Kern County trial. And that's what's being compromised[.]" (emphasis added). How to "define" a breach of fiduciary duty claim versus a fraudulent transfer claim is well settled and cannot properly be characterized as a bona fide controversy.

Accordingly, the  **[\*16]** record before us raises more questions than it answers in connection with the "other claims" because the trustees neither identify the "other claims" nor evaluate them pursuant to the factors set forth in A & C Properties. We remand to the bankruptcy court to determine what the "other claims" are and whether settlement of them is in the best interests of the estate.

## 3. The Assignment of the Trustees' Causes of Action Constitutes a Sale

The trustees assign the Trustees' Causes of Action in paragraph 3 of the settlement.[15] The Ninth Circuit does not prohibit such assignments. *Spradling & Metzger v. Baum Trust (In re P.R.T.C., Inc.), 177 F.3d 774 (9th Cir. 1999)*. It is undisputed that the Trustees' Causes of Action are property of the estates and the bankruptcy court acknowledged that the settlement agreement made clear that causes of action that arose upon the filing, such as preferential or fraudulent transfers, are general causes of action belonging to the two bankruptcy estates.

---

[15] Paragraph 3 provides: "Blanco and Kavanagh on behalf of the Chapter 7 estate [sic] of GEA and GEAR shall assign the Trustees' Causes of Action held by the two Chapter 7 estates against Peter Mosesian . . .,  **[\*17]** and other entities related to GEA and GEAR or related to or controlled by Peter Mosesian . . . . This assignment is to be treated in its broadest possible sense to include any and all causes of action held by either of the two bankruptcy estates against any entity that arise only upon the filing and as a result of the filing of the two Chapter 7 cases of GEA and GEAR."

The trustees also purport to assign general causes of action (in paragraph 4) of the agreement in the event any court determines that a Rogers' Cause of Action is not particular, but general. However, this assignment appears unnecessary in light of the bankruptcy court's ruling on the motions to dismiss.

EXHIBIT 5, PAGE 34

A review of the agreement also demonstrates that the assignment of the Trustees' Causes of Action is the equivalent of a sale. Not only are the Trustees' Causes of Action property of the estates, but the trustees relinquished all control over those causes of action to Rogers. *Healthco Int'l, Inc., 136 F.3d at 49* (holding that "a 'sale' effects a '[t]ransfer of ['the title. . .'] [to] property for a consideration.") (citation omitted). At the same time, Rogers took all the risks of ownership because the trustees made no **[*18]** representations regarding the existence or validity of any such causes of action, yet Rogers was willing to pay for them. Notably, Rogers is also not giving up any portion of its claim against the estates. Thus, this aspect of the compromise involves a sale subject to *§ 363(b)*. See *Lahijani, 325 B.R. at 287* (noting that causes of action owned by the trustee are intangible items of property of the estate that may be sold); see also *In re Telesphere Commc'ns, Inc., 179 B.R. 544 (Bankr. N.D. Ill. 1994)*(settlement of cause of action held by bankruptcy estate is plainly equivalent of "sale" of that claim under *§ 363(b)* subject to judicial approval where there is objection to settlement; there is no difference in effect on bankruptcy estate between sale of claim by way of assignment to third party and settlement of claim with adverse party).


## B. The Fair and Equitable Analysis

The bankruptcy court could only approve or deny the compromise as a whole. "The court must find that the compromise is fair and equitable." *A&C Props., 784 F.2d at 1381*. "[W]hile a court generally gives deference to a trustee's business judgment in deciding whether to settle a matter, the trustee 'has the burden of persuading **[*19]** the bankruptcy court that the compromise is fair and equitable and should be approved.'" Id. The trustees failed to carry their burden in these cases.


## 1. Issues Regarding the Compromise

The bankruptcy court's analysis of the factors set forth in A&C Properties only pertained to the dispute over whether the alter ego claims in the Kern County Action were property of the estates. The trustees apparently were content to rest upon the conclusory statements in their declarations and supplemental declarations, filed in support of the compromise, rather than submit any evidence.

The record contains no evidence regarding the Trustees' Causes of Action or a discussion of the *A&C Properties* factors in relation to those claims, which is required under *Mickey Thompson, 292 B.R. at 420-21*. The evidence in the record did not identify the Trustees' Causes of Action which were being assigned nor weigh the likelihood of recovery. There was no cost-benefit analysis of the merits of pursuing or assigning the Trustees' Causes of Action. In short, there was no evaluation at all, making it impossible to determine whether the price to be paid by Rogers for the opportunity to pursue the Trustees' Causes of Action **[*20]** was reasonable under the circumstances.

Moreover, the potential value of the 5% premium was not analyzed by the trustees. Rogers is not giving up any portion of its claims against these estates. More troubling is the lack of any evidence regarding GEAR's counterclaim against Rogers in the Kern County Action which is an asset of GEAR's estate and possibly an offset to Rogers' claims.

There was also no evidence regarding the probability of Rogers obtaining a judgment(s) in excess of $1.2 million or, more importantly, collecting such a judgment(s)in order to place a value on the 5% premium offered by Rogers.[16] Although Mosesian may have assets, the trustees presented no analysis of what those assets might be or the likely recovery.

---

[16] Since the accounting award to Rogers, even with accrued interest, was only worth about $1 million, an argument could be made that the 5% premium was worthless.

EXHIBIT 5, PAGE 35

The aspect of delay should also have been considered. No evidence was offered to show how long the estates would remain open before receiving the 5% premium.

Lastly, the interests of the creditors, although possibly hard to ascertain in these cases, was not discussed. The handful of creditors that exist  [*21] — save Rogers, NBC and Mosesian — have remained silent. Although Rogers has large claims in both estates, its support cannot predominate over the interests of the creditors as a whole.

The trustees failed to present any evidence to substantiate their argument that the compromise was in the best interests of the estates. Therefore, the bankruptcy court abused its discretion in approving the compromise.


**2. Issues Regarding the Sale**

The bankruptcy court found that if the compromise was a sale, the sale requirements under *§ 363(b)* were met, notice was adequate, and no overbidding was required.


**a. Notice**

Mosesian and NBC challenge the notice given by the trustees because it did not mention the assets being sold. Mosesian and NBC received adequate notice of the compromise and the merits of their objections were heard by the bankruptcy court. Assuming the trustees mislabeled the motion, there is no resulting harm because the requirements of notice and a hearing pursuant to *Rules 6004* and *9019* are the same.


**b. Bidding**

The main issue with respect to the sale of estate assets is whether the trustees obtained the best possible price in light of their fiduciary duty to maximize the value to the estates.  **[*22]** A sale that is well advertised and subject to overbids is usually the preferred method to achieve the best possible price. However, the guiding principle is that the "court's obligation in section 363(b) sales is to assure that optimal value is realized by the estate under the circumstances." *Lahijani, 325 B.R. at 288-89* (emphasis added).

The bankruptcy court concluded that even if compromise did involve the sale of estate property, no overbidding was required under the circumstances since Mosesian would not be bidding on the same thing as Rogers. However, the bankruptcy court did not recognize that assignment of the Trustees' Causes of Action involved a sale of estate property. Whether sold to creditors such as NBC or Rogers, or a defendant such as Mosesian, the rights sold would have been identical. Compare *Lahijani, 325 B.R. 282* (cause of action was being sold to present/potential defendant over creditors' objection). Thus, although the bankruptcy court considered the possibility of overbids and found that they were not required, its analysis did not recognize that the compromise involved the sale of estate property, which had a value that could be maximized by overbid. *Mickey Thompson, 292 B.R. at 422*  **[*23]** ("The possibility that someone else may be willing to pay a higher price triggers the prospect of an auction that could yield an even higher price.").

Although the bankruptcy court has discretion whether to impose formal sale procedures, it abused its discretion under the circumstances. Mosesian was interested in bidding on the avoidance actions. Setting up formal bidding procedures and allowing the bidding process to play out would have helped assure that the highest and best price was received for the benefit of the silent creditors.


**c. NBC's Rights, if any, to Credit Bid Under 363(k)**

EXHIBIT 5, PAGE 36

2007 Bankr. LEXIS 4880, *23

NBC argued that it had the right to credit bid. The bankruptcy court did not acknowledge NBC as an objecting party and did not discuss or determine what rights, if any, NBC had to credit bid. On remand, the bankruptcy should determine whether NBC has any right to credit bid and, if so, what impact that right has on the compromise. *In re Hung Tan Pham, 250 B.R. 93, 99 (9th Cir. BAP 2000)*(finding that an appellate court may remand when there is an absence of findings of fact and conclusions of law that prevents review on appeal)(citation omitted).

**VII. CONCLUSION**

In sum, the bankruptcy court abused its discretion **[*24]** by approving the compromise without any evidence to establish, at minimum, the factors set forth in *A & C Properties*. The court also did not properly analyze the settlement as a sale of estate assets. On this record, the trustees failed to meet their burden of showing that the compromise was "fair and equitable." On remand, the bankruptcy court should review the compromise in light of the relevant criteria enumerated above in order to determine whether the compromise is in the best interest of the estates or sale criteria should be imposed.

The order of the bankruptcy court approving the compromise is REVERSED. REVERSED AND REMANDED for further proceedings consistent with this memorandum decision.

---

**End of Document**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
870 Roosevelt, Irvine, CA 92620.

A true and correct copy of the foregoing document entitled: **NOTICE OF UNPUBLISHED AUTHORITY** IN SUPPORT OF
JOINT REPLY IN SUPPORT OF 11 U.S.C. § 363(M) FINDING RE: GREGORY A. PEPLIN will be served or was served
**(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **April 8,
2025**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following
persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On **April 8, 2025**, I served the following persons and/or entities at the last
known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed
envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here
constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**DEBTOR**
JAMIE LYNN GALLIAN
16222 MONTEREY LN UNIT 376
HUNTINGTON BEACH, CA 92649

☐  Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**: Pursuant to
F.R.Civ.P. 5 and/or controlling LBR, on **April 8, 2025**, I served the following persons and/or entities by personal delivery,
overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or
email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge
<u>will be completed</u> no later than 24 hours after the document is filed.

**VIA PERSONAL DELIVERY:**
**PRESIDING JUDGE'S COPY**
HONORABLE SCOTT C. CLARKSON
UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
411 WEST FOURTH STREET, SUITE 5130 /
COURTROOM 5C
SANTA ANA, CA 92701-4593

**VIA EMAIL:**
**DEBTOR**
JAMIE LYNN GALLIAN
jamiegallian@gmail.com

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| April 8, 2025 Layla Buchanan | | /s/ Layla Buchanan |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

1.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: CONTINUED:

- **ATTORNEY FOR CREDITOR AND PLAINTIFF HOUSER BROS. CO. and CREDITOR HOUSER BROS. CO. DBA RANCHO DEL REY MOBILE HOME ESTATES:** Bradford Barnhardt bbarnhardt@marshackhays.com, bbarnhardt@ecf.courtdrive.com, kfrederick@ecf.courtdrive.com
- **ATTORNEY FOR DEBTOR JAMIE LYNN GALLIAN:** Christopher L Blank    chris@chrisblanklaw.com
- **ATTORNEY FOR CREDITOR AND PLAINTIFF HOUSER BROS. CO. and CREDITOR HOUSER BROS. CO. DBA RANCHO DEL REY MOBILE HOME ESTATES:** Aaron E DE Leest adeleest@DanningGill.com, danninggill@gmail.com; adeleest@ecf.inforuptcy.com
- **ATTORNEY FOR CREDITOR AND PLAINTIFF THE HUNTINGTON BEACH GABLES HOMEOWNERS' ASSOCIATION:** Robert P Goe kmurphy@goeforlaw.com, rgoe@goeforlaw.com; goeforecf@gmail.com
- **CHAPTER 7 TRUSTEE JEFFREY I GOLDEN (TR):** Jeffrey I Golden (TR lwerner@wgllp.com, jig@trustesolutions.net; kadele@wgllp.com
- **ATTORNEY FOR CREDITOR AND PLAINTIFF HOUSER BROS. CO. and CREDITOR HOUSER BROS. CO. DBA RANCHO DEL REY MOBILE HOME ESTATES:** D Edward Hays ehays@marshackhays.com, ehays@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com; cmendoza@marshackhays.com; cmendoza@ecf.courtdrive.com
- **ATTORNEY FOR CREDITOR AND PLAINTIFF THE HUNTINGTON BEACH GABLES HOMEOWNERS' ASSOCIATION:** Brandon J Iskander biskander@goeforlaw.com, kmurphy@goeforlaw.com
- **ATTORNEY FOR TRUSTEE JEFFREY I GOLDEN (TR):** Eric P Israel eisrael@DanningGill.com, danninggill@gmail.com; eisrael@ecf.inforuptcy.com
- **INTERSTED PARTY COURTESY NEF: Shantal Malmed**    shantal.malmed@gmlaw.com, cheryl.caldwell@gmlaw.com
- **INTERESTED PARTY COURTESY NEF: Shantal Malmed**    , cheryl.caldwell@gmlaw.com
- **ATTORNEY FOR CREDITOR AND PLAINTIFF HOUSER BROS. CO. and CREDITOR HOUSER BROS. CO. DBA RANCHO DEL REY MOBILE HOME ESTATES:** Laila Masud lmasud@marshackhays.com, lmasud@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com
- **ATTORNEY FOR DEFENDANT RANDALL L NICKEL:** Mark A Mellor mail@mellorlawfirm.com, mellormr79158@notify.bestcase.com
- **INTERESTED PARTY COURTESY NEF:** Valerie Smith claims@recoverycorp.com
- **U.S. TRUSTEE:** United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov

4903-7392-5900, v. 1

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                **F 9013-3.1.PROOF.SERVICE**